Filed 3/20/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S099274 |
| v. | ) | |
| | ) | |
| DONALD LEWIS BROOKS, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. PA032918 |
| _____ | ) | |

A jury convicted Donald Lewis Brooks of the first degree murder of Lisa Kerr (Pen. Code, § 187, subd. (a)),[1] and found true two special-circumstance allegations — that the murder was committed while defendant was engaged in the commission of kidnapping (§ 190.2, subd. (a)(17)(B)), and that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)). The jury also convicted defendant of arson causing great bodily injury (§ 451, subd. (a)), and stalking (§ 646.9, subd. (a)). After a penalty phase, the jury returned a verdict of death. Defendant moved for modification of his sentence to life without the possibility of parole (§ 190.4, subd. (e)). The trial court denied the motion and

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

**SEE CONCURRING & DISSENTING OPINION**

sentenced him to death.[2]  Defendant's appeal is automatic.  (§ 1239, subd. (b).)

For the reasons that follow, we affirm the judgment.

## I.  FACTS

### A.  Guilt Phase Evidence

#### 1.  Prosecution evidence

Defendant met the homicide victim, Lisa Kerr, in October 1997 at a dance sponsored by Alcoholics Anonymous (AA), an organization to which they both belonged.  For about 10 months, defendant kept it a secret that he was having an affair with Kerr, who was married and the mother of a young son.  In August 1998, however, defendant revealed the affair during a lengthy conversation with another AA member, Mark Harvey.  Defendant told Harvey that he was in love with Kerr, that their relationship was perfect, and that his life was finally falling into place.  But defendant also indicated that he was upset and frustrated because Kerr had recently decided to reconcile with her husband for the sake of their son.  Defendant told Harvey that he did not want his relationship with Kerr to end, and that he wanted to stab Kerr's husband or "get him out of the picture."

Kerr soon began expressing to friends that she was afraid of defendant. One day in late September 1998, for example, she made a series of phone calls to Harvey's girlfriend, Lynda Farnand, who also knew defendant.  According to Farnand, Kerr was talking very fast and sounded scared.  After the last conversation that day, Farnand accompanied Kerr to the local police station.  Kerr called Farnand again several days later, this time telling her she was concerned

---

[2]     The court also sentenced defendant to the upper term of nine years for the arson conviction consecutive to eight months (one-third the midterm of 24 months) for the stalking conviction.

2

about three messages defendant had left on her home telephone answering machine. Farnand came to the house and listened to the messages. The first message was simply music. The second message began with music and ended with defendant calling Kerr a slut and a whore. In the final message, Farnand heard defendant say that "if he couldn't have her, nobody could have her."

Around the same time that Kerr was starting to confide in others that she feared defendant, defendant was talking to friends about the affair, saying he was frustrated with being "led on" by Kerr, and expressing open hostility toward Kerr's husband. One of the individuals with whom defendant spoke about the situation was Dwayne Kari, who also knew Kerr and was a good friend of Kerr's husband. Kari disapproved of the affair and repeatedly advised defendant to put an end to it. One morning in November 1998, Kari observed defendant driving his van toward Kerr's home. Kari gave chase and eventually caught up with defendant, accusing him of stalking Kerr and telling him it needed to stop. Kari also warned defendant that "it was going to get personal" after defendant admitted having previously told Kari that he planned to stab Kerr's husband. Defendant responded by saying Kerr was "screwing him around." To prove his point, defendant retrieved some items from his van. The first item was a tape-recorded message that Kerr had left on defendant's answering machine that said, "All I can say about last night was 'yummy.' " The other item was a piece of paper on which Kerr had written "Lisa Brooks." Defendant said he was going to show these items to Kerr's husband "if she doesn't leave him."

Defendant continued to follow Kerr. David Heiserman, who defendant had hired to assist him in his plumbing business, was in the van with defendant when they circled Kerr's home. Defendant explained to Heiserman that he wanted "to see what was going on," then parked the van one block away and was gone for 25 minutes. In December 1998, Kerr told her friend Cheryl Zornes that she feared

3

defendant because "every time she turned around" he was outside her home or workplace watching her. Kerr also told her friend that she was going to inform her husband about the affair before defendant did, and that she and her husband were going to split up after Christmas. At some point during that conversation, Kerr mentioned that, for her birthday, defendant had arranged to have an airplane with a banner fly over her house, telling her friend, "Look what he's willing to do for me." According to Kerr's friend, Kerr seemed scared and confused when she said that.

Despite her expressions of fear, Kerr accepted defendant's offer of financial assistance after separating from her husband and moving to her own apartment in January 1999. Defendant signed the rental agreement, naming "Donald Brooks and Lisa Brooks" as the tenants. According to Kerr's close friend, Kimberlee Hyer, Kerr said the only reason that defendant was in her life was "for the money." Hyer eventually helped Kerr pay her bills, telling Kerr that "she didn't ever have to ask [defendant] for money again." According to defendant's plumbing assistant Heiserman, Kerr was sarcastic and rude to defendant and made fun of him in front of others.

Meanwhile, defendant's obsession with Kerr intensified, and he stepped up his surveillance of her. He continued to follow Kerr to or from places he knew she would be, such as her workplace, her apartment, and certain bars. Defendant also showed Heiserman a package containing a mail-ordered listening device that he was going to use to bug Kerr's apartment. According to Heiserman, defendant was upset with Kerr because she wanted to go back to her husband and family and because he believed she was "running around on him" with fellow AA member Mark Harvey. In February or early March 1999, defendant told Heiserman that he was tormented by thoughts of Kerr, and said once or twice that he wanted to kill her by blowing up her car or being a sniper. According to Heiserman, defendant

4

also talked about blowing up Kerr's car or setting it on fire in order to get her "off his mind."

In the days and weeks preceding Kerr's death, defendant appeared even more consumed by his thoughts of Kerr. According to Heiserman, defendant's appearance was uncharacteristically disheveled and he was so "out of control" that Heiserman quit working for him. Defendant told Heiserman that he wanted Kerr to leave her family and start a family with him. He also said that, were she to refuse, he "wouldn't be able to live with it or be able to see her," and again mentioned blowing up her car. Meanwhile, Kerr's fear of defendant became more acute. According to Kerr's friend Hyer, 10 days before Kerr's death she insisted Hyer promise that she would take care of Kerr's son in the event anything happened to her.

On March 23, 1999, the day prior to Kerr's death, Kerr drove her car to Harvey's house around 7:00 p.m. to babysit one of his two young daughters so that he could attend an AA meeting. When Harvey returned to the residence around 10:00 p.m., he noticed the silhouette of someone and the glow of a cigarette at the edge of the fence and driveway, near some bushes. His back neighbor's dogs were barking, but he did not investigate. When Harvey entered the house, he saw Kerr asleep on the couch and his daughter asleep in her crib.

Kerr awoke around 11:00 p.m., and went outside to smoke. When she came back inside, she was shaking and nervous, and Harvey asked what was wrong. Kerr told him it would not be a good idea for her to accept his earlier offer for her to rent a room in his home because defendant had threatened to kill Harvey and his children in order to get to her. Kerr started to leave, but then said to Harvey, "We need to talk." Kerr and Harvey went back inside the house and sat in the living room on separate couches, one of which was located near an open heater vent, and they talked for the next two hours, until 1:15 a.m. Sometime during

5

their conversation, Kerr became very upset and told Harvey she was afraid of defendant because he was following her to work and AA meetings, and had threatened to kill her. Kerr also indicated that she was frustrated by her relationships with her husband and defendant, who she described as "overwhelmingly emotional." She told Harvey she "adored him" for being "the balance" between the two men. Kerr and Harvey talked about the possibility of becoming physically involved, but they agreed that they would not do so. At one point, however, Kerr sat on the floor while Harvey massaged her shoulders for a minute.

When Kerr and Harvey had finished talking and walked outside, Harvey tried to give Kerr a hug goodbye. She warned, "Be careful, 'Squirrel Boy' might be watching us." Kerr previously had referred to defendant as "Squirrel Boy." Before Kerr departed, Harvey asked her to call him when she arrived home. He never received a call.

At 4:11 a.m., about three hours after Kerr and Harvey parted ways, firefighters responded to a report of a fire adjacent to the southbound Hollywood Freeway in the San Fernando Valley, at the Roscoe Boulevard exit ramp. An intense fire had engulfed a vehicle located near the bottom of a 30- or 40-foot embankment, and most of the flames were coming from the car's interior, not from the engine. Firefighters succeeded in extinguishing the fire in two to three minutes. An arson investigator was summoned when a body was discovered on the floorboard behind the front seats.

Arson investigator Michael Camello arrived shortly after being called to the scene. His observations regarding the burn patterns and the amount, character, and location of damage to the car led him to conclude that the fire most probably had been intentionally set with a flammable liquid that was ignited with an open flame. For example, the car's windows and much of the floorboard carpeting had

6

burned away. This showed that the fire burned fast and low and had generated an intense amount of heat, which is characteristic of fires started with the use of a flammable liquid, rather than fires that began accidentally. Camello noticed a piece of rolled-up paper on the driver's seat, which he believed may have been lit and then thrown into the car from a safe distance to ignite the flammable liquid. He also found, stuffed inside the filler neck of the gas tank, pieces of cloth that had been lit and burned, which suggested to him a failed attempt to set the car on fire. He explained that such a method is rarely successful, and that someone attempting to set a car on fire in this manner might "not [be] thinking clearly."

Camello further concluded, based on the position of the victim's body and the nature of her injuries, that the flammable liquid used to start the fire had also been poured over her. Specifically, the victim was on the floorboard between the front and back seats, lying on her right side with her head facing toward the rear of the car and her legs wedged in behind the front passenger seat. The body was over the differential tunnel, which created an "open space" under her. In Camello's opinion, the flammable liquid that had been poured on top of the victim drained into this open space, burning away the carpeting, her hands, and the lower portion of her legs and feet. Camello found it noteworthy that the side of the victim's face, neck, and shoulder covering her purse on the floor had not burned away, which suggested to him that when the fire was lit she had been in the same position in which firefighters had found her. He also saw no evidence that the victim had been restrained.

Among the emergency personnel who responded to the scene of the car fire was California Highway Patrol Officer Raul Campos. His search of the area disclosed no evidence suggesting that the car had been involved in a traffic collision. For example, the car's "pop-up" headlights were closed, which would not occur if the car was involved in an accident. The position of Kerr's body and

7

the location of the vehicle itself also were inconsistent with having been involved in a collision. Specifically, the car was at a 90-degree angle from the off-ramp. Had the vehicle gone over the edge of the off-ramp as a result of an accident, it would have come to rest at a 45-degree angle and possibly gone through the chain link fence that bordered the bottom of the embankment. Campos believed that foul play was involved and that the car had been either pushed or driven at a low speed down the embankment.

Heiserman learned from a morning news report that Kerr had died in a car fire in the early morning hours, and he unsuccessfully tried to contact defendant. Around 11:30 a.m., defendant called Heiserman, ignoring Heiserman's question regarding his whereabouts and asking him, "[I]s she okay?" When Heiserman responded, "Is who okay?," defendant replied, "C'mon Smiley. Is she okay?" When Heiserman asked what was going on, defendant rephrased his question, this time asking, "Is she dead?" Heiserman said, "Yes." Defendant started to cry and said he had to go. He called Heiserman again around 7:00 p.m., sounding scared and upset. Defendant asked him to tell defendant's daughter that he loved her, and he offered Heiserman his van and all of his plumbing tools.

An autopsy performed the following day showed that Kerr died primarily as a result of smoke inhalation and thermal injuries. Other factors, for example, strangulation, also may have played some role in her death, but they could not be evaluated due to the extensive charring of her body. According to the medical examiner who conducted the autopsy, the presence of soot in Kerr's mouth, airway, larynx, trachea, and bronchi, which can occur only through active breathing, indicated that Kerr was alive at the beginning of the fire. He saw no evidence of intoxication or the use of restraints that would explain why Kerr made no attempt to escape the fire, and believed she was most likely unconscious when the fire started. From the extensive charring of Kerr's body and toxicology reports

8

showing low levels of carbon monoxide in the bloodstream, the medical examiner further concluded that Kerr had been killed by a "flash fire" that likely involved the use of an accelerant.

The investigation into Kerr's death involved further examination of the burned-out car, which had been transported from the scene of the fire to a towing yard. With the assistance of a dog trained to detect the odor of common liquid accelerants, an arson investigator concluded from his examination of the debris removed from the vehicle that an ignitable liquid had been distributed in the car and that the fire had been intentionally set. In contrast, a criminalist who used a gas chromatograph with mass selector detector and other methods to analyze the same debris examined by the arson investigator was unable to ascertain either the presence or absence of an ignitable liquid.

The investigation also included a review of defendant's cellular telephone records, which showed the times and general locations from which he made or received calls. In the early evening the day before Kerr's death, defendant called her pager four times, with no further calls after 7:18 p.m. In the early morning hours of the next day, defendant made or received several calls close in time to the fire. One call was transmitted near the fire scene at 4:23 a.m., just minutes after the firefighters' arrival. Two calls were then transmitted at 5:00 and 5:01 a.m., in close proximity to Kerr's residence.

In the course of the investigation, one of the detectives drove from Harvey's house to Kerr's residence and from Hervey's home and Kerr's residence to the scene of the fire so as to calculate how long it took to reach each of those locations. According to the officer, the trip from Harvey's home to Kerr's residence would have taken about 20 minutes in the early morning hours. The drive from Kerr's residence to the Roscoe Avenue off-ramp where the fire occurred would have taken between five and 10 minutes at that time of the day.

9

The drive from Harvey's house to the off-ramp would have taken 15 to 20 minutes.

As indicated by telephone records, defendant fled the day of Kerr's death, driving through Arizona and New Mexico until he reached Colorado about one week later. He drove a sedan that he had purchased "on the street" in California, leaving behind his work van and plumbing tools.

Defendant took the name "Don Blanton," and lived with others in a house in Colorado Springs until his arrest four months later, in July 1999. He continued his trade as a plumber, sometimes working with David Jayne, one of his housemates. At some point, defendant told Jayne he was looking for new identification because he had gotten in trouble in California. About three weeks before his arrest, defendant disclosed to Jayne that he was in trouble because he had strangled his girlfriend Lisa. Defendant explained that he suspected his girlfriend was cheating on him, and that he had been shadowing her. He said he followed her to the man's home and went into the crawl space underneath the house to listen to their conversation. Defendant told Jayne he heard his girlfriend belittling defendant's father, which angered him. He also told Jayne he heard his girlfriend and the other man having sex. Defendant said he then followed his girlfriend to her apartment, where he strangled her, "like a spur-of-the-moment type thing." Defendant illustrated the act for Jayne by holding his hands in a strangling motion and saying, "I'm going to go to jail for assault anyway, so I might as well kill her." According to Jayne, defendant was calm when recounting the events.

Defendant was arrested at the Colorado residence in late July 1999. The prosecutor presented evidence at trial that defendant told the arresting officer that at 1:30 a.m. on the day of the fire, he and Kerr had a brief argument at her apartment, and she was very angry when she left in her car. According to

10

defendant's account, he returned to the home he shared with his father. Later, when defendant was driving on the freeway in the early morning hours, he saw Kerr's car in flames and firefighters at the scene. Defendant explained that he believed Kerr was having a sexual relationship with Harvey and that he felt angry and betrayed by Kerr, particularly because he was paying for her apartment. He also indicated that he had formed his suspicions and was feeling angry at Kerr well before the night of her death.

While in custody after extradition to California, defendant again spoke with his former plumbing assistant Heiserman, this time describing the events leading to Kerr's death. Specifically, defendant explained that he had followed Kerr to Harvey's home, hid under the house, and heard them belittling him. Defendant then told Heiserman he "just couldn't take it," and that he confronted Kerr when she got to her car as she was leaving. He said he strangled Kerr and, when she "was out," put her in the backseat of her car.

### 2. *Defense evidence*

The defense did not dispute that defendant killed Kerr. Rather, the defense presented evidence to support the theory that defendant was guilty of heat of passion voluntary manslaughter, not murder. For example, the defense investigator testified that Heiserman told him defendant had admitted becoming incensed and fatally strangling Kerr after he overheard her calling him a "jerk." The defense also called several witnesses in an attempt to show that Kerr was not fearful of defendant but rather happily involved with, or taking advantage of, him. One such witness was Jody Wheeler, a bartender at the Van Nuys bar where defendant often joined his father for lunch. She testified that defendant introduced her to Kerr sometime in 1999 when he recommended Kerr for a job at the bar. Wheeler trained Kerr as a bartender for one day but did not hire her because the

11

bar had a policy against employees having their boyfriends at the bar. From that point in time, until her death, Kerr would call the bar sometimes 10 times a day asking for defendant.

## B. Penalty Phase Evidence

### 1. Prosecution's case in aggravation

The prosecution called Kerr's family members and a friend to testify regarding the impact of Kerr's death on themselves and other members of Kerr's family, including her young son and mother.

The prosecutor also presented the testimony of defendant's former wife, Mary C., who described for the jury acts of domestic violence that occurred during a tumultuous three-year marriage replete with bitter arguments and mutual combat. According to Mary, when she was pregnant with the first of their two children, defendant entered the bathroom where she was running water into the bathtub, grabbed her by the hair, and pushed her into the hot water. She admitted during cross-examination that the night before that incident, she had punched defendant in the eye. Mary also related that when she was eight months pregnant with their second child, defendant pointed a loaded 12-gauge shotgun at her stomach during an argument, asking her, "Do you want to die?" She responded by saying, "Pull the fucking trigger. I'm tired of talking about it." On another occasion some months later, according to Mary, she returned home to find defendant gone and a group of people she did not know in the house. Their daughter, who was now four months old, was sitting on one person's lap. The next day, when Mary angrily confronted defendant about leaving the child with strangers, defendant grabbed the arms of the wicker chair she was sitting in and jerked it toward a burning fireplace. She kicked him and took off running.

Mary told the jury that she separated from defendant because of the violence, and that she had obtained a restraining order after commencing divorce proceedings. Mary also related that defendant left the state for a short period of time to "straighten out his life." When he returned, however, he came over to the house, angry about the restraining order. According to Mary, defendant told her he should frame the order so that he could "always remember what you've put me through," to which Mary responded that defendant could "stick it up his ass." A fight ensued in which defendant picked up their daughter, grabbed the keys, and said he was leaving with the children. Mary said, "No you're not," and tried to call 911, but defendant ripped the phone out of the wall. Mary smacked defendant and ran to a neighbor's house, with defendant in pursuit. Defendant climbed over the neighbor's fence, placed Mary in a headlock, and dragged her back toward their house. During cross-examination, Mary described defendant as a person with a good heart, but said that when he helped someone, he believed that person was indebted to him. She testified further that she never saw defendant seriously hurt anyone.

### 2. *Defense case in mitigation*

The defense called five witnesses to testify regarding defendant's background, his good character, and his love for, and dedication to, his three children.

Defendant's older half sister and mother testified regarding defendant's upbringing in an environment of alcohol abuse and domestic violence. His sister first chronicled for the jury their mother's many marriages and divorces. She indicated that defendant was seven years old when his parents divorced, and that from an early age defendant had witnessed his mother and father arguing and fighting, which greatly upset him. Defendant's sister and his mother both testified

13

that defendant's father was an alcoholic, as was his stepfather, Edwin Rawl. They also indicated that two years after defendant's mother married Rawl, the incidents of intoxication-fueled domestic violence in the household not only resumed, but increased in severity. Defendant saw Rawl beat his mother often, and defendant sometimes intervened. On one occasion, the children watched as Rawl chased their mother around the house with a rifle, which he eventually discharged over the refrigerator. In another incident, defendant dragged his mother away from her bed when Rawl tried to set it on fire. Defendant's attempt to intervene in the violent incidents continued for as long as he lived at the house, until he graduated from high school and left home for the Army.

Defendant's sister and mother also recounted for the jury several incidents of extraordinary domestic violence. On one occasion, Rawl became enraged after receiving an exorbitant medical bill in connection with the premature birth of defendant's younger half brother. With defendant at home, Rawl poured gasoline around the house the day before defendant's mother and the infant were to be discharged from the hospital, although he ultimately did not set the house on fire. While in a drunken rage on another occasion, Rawl shot defendant's mother in the back with an M1 carbine. Defendant, who was 13 years old and home at the time of the shooting, was very upset. Although Rawl was arrested for the assault, defendant's mother eventually invited him back into the house and declined to press charges. The alcohol abuse and violence continued, however, until she and Rawl finally divorced years later.

All of the defense witnesses testified regarding defendant's great kindness toward others. For example, the owner of a plumbing business who frequently gave defendant work as a subcontractor told the jury that defendant often hired assistants who had been released from jail or prison in order to give them a chance. The former wife of a general contractor who also regularly hired

14

defendant as a plumbing subcontractor likewise indicated that defendant was a caring person who "would give anybody the shirt off his back." According to defendant's mother, defendant would let people live with him until they could get back on their feet.

Some of the witnesses testified furthermore regarding defendant's dedication to his children. The plumbing business owner related, for example, that defendant was adamant about declining work if it would have interfered with his every-other-weekend custody of his younger daughter.

All of the witnesses asked the jury to spare defendant's life.

## II. DISCUSSION

### A. Pretrial and Guilt Phase Issues

*1. Striking of defendant's testimony at the suppression hearing*

The defense filed a pretrial motion to suppress defendant's statements to interrogating officers on the ground that the statements were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436. Defendant testified at a hearing on the motion, but the trial court ordered defendant's testimony stricken in its entirety after he refused to answer one of the prosecutor's questions during cross-examination. The court ultimately granted the motion to suppress in part, ruling that some of the custodial statements were improperly obtained. Of those statements that the court found admissible, only one was presented to the jury in the prosecution's case-in-chief.

Defendant asserts that his conviction and death sentence must be reversed because the ruling striking his testimony prevented the court from properly evaluating his motion to suppress in violation of various state and federal constitutional rights, including his due process rights to a fair trial and to present a defense. Alternatively, defendant urges that the judgment be vacated and the

15

matter remanded to the trial judge to reconsider his suppression motion in light of defendant's testimony at the hearing. As we will explain, neither reversal nor vacation of the judgment is required. Even were this court to conclude that the trial court abused its discretion by striking defendant's testimony in its entirety, any error could not have prejudiced defendant because the custodial statement that was presented at trial was similar to, and less damaging than, defendant's other properly admitted statements implicating himself in the murder.

### a. Background

Defendant was arrested on July 21, 1999. He was taken to the Colorado Springs police station, where Colorado Springs Detective Derek Graham conducted an unrecorded interview of defendant. The next day, while still detained in Colorado Springs, defendant spoke with Los Angeles Police Department Detective Lindy Gligorijevic and her partner Detective Rick Gonzalez in a videotaped interview. Four days later, on July 26, defendant made additional statements to Gligorijevic and Gonzalez, first, while they transported him to the airport and second, during the flight back to Los Angeles.

Before trial, the defense moved to suppress all four of defendant's statements to the interrogating officers on the ground they were obtained in violation of *Miranda v. Arizona, supra,* 384 U.S. 436, arguing both that defendant had not waived his *Miranda* rights and that the officers failed to stop their questioning when defendant invoked his right to counsel. The court held a hearing over the course of two days.

### 1. Testimony of Detective Graham

Detective Graham of the Colorado Springs Police Department testified that he spoke with defendant for approximately three hours, during which time Graham mostly listened while defendant volunteered a substantial amount of information

16

about the crimes. Graham indicated that he spent the first 30 minutes sitting with defendant while he and defendant ate hamburgers out on a patio, listening to his concerns and talking with him about his *Miranda* rights. When defendant was then formally advised of his rights and presented with a written waiver form, he signed the form and agreed to speak with Graham. According to Graham, defendant never asked for an attorney at any time, either before or after signing the waiver form or at any point during the three-hour interview.

### 2. *Testimony of Detective Gligorijevic*

A transcript of the interrogation conducted by Detectives Gligorijevic and Gonzales the day after defendant's arrest showed that Gligorijevic began her formal interview by confirming with defendant that he had been advised of and waived his *Miranda* rights before speaking with Detective Graham the previous day. Detective Gligorijevic testified at the hearing that she interrogated defendant for about two hours, stopping the interview at the point she believed defendant clearly was asking for counsel.

Detective Gligorijevic testified further that defendant spoke to her and her partner four days later during the drive to the airport and the flight to Los Angeles. The conversation began in the car when defendant asked Gligorijevic if she and Detective Gonzalez were wearing wires or tape recording him. Gligorijevic assured him that they were not. Defendant then asked whether making a fuller statement could be used against him. Gligorijevic responded that whatever defendant said now would not be used against him because they were merely transporting him and he was "outside *Miranda*." According to Gligorijevic, defendant then spoke with the officers nonstop for hours, providing detailed information regarding his relationship with Kerr and the events leading up to and including her death, which Gligorijevic related to the court.

17

### 3. Defendant's testimony on direct examination

Defendant testified on his own behalf at the hearing. With regard to his dealings with the arresting officers, defendant testified that at the time of his arrest in Colorado Springs, he asked how he could speak with a lawyer but the officer "blew it off." According to defendant, he repeated that question about 30 minutes later, when Detective Graham and his partner took him into a coffee room at the police station. Defendant acknowledged at the hearing that he later signed a written waiver of his *Miranda* rights, but he explained that he did so because the officers had led him to believe they would help him.

Defendant also described his interview with the detectives from Los Angeles. According to defendant, during that interrogation, he repeatedly asked why there was no one helping him, and told the detectives several times that he was uncomfortable and wanted to leave the room. Defendant explained at the hearing that he had not wanted to be in the interrogation room, both because he believed he was being secretly videotaped and because no one was there speaking for him or helping him.

### 4. Cross-examination of defendant

The prosecutor began his cross-examination of defendant by asking him several questions about his flight back to Los Angeles with Detectives Gligorijevic and Gonzalez. When the prosecutor then asked defendant whether he told the detectives during the flight that he had killed Kerr, defense counsel objected. Specifically, he argued that the question went beyond the scope of direct examination and was irrelevant to the issue before the court, which was whether defendant had been told by the detectives while driving to the airport that anything he said could not be used against him. Counsel acknowledged that he had not objected when the prosecutor elicited from Detective Gligorijevic the substance of defendant's incriminating statements during the ride to the airport and the flight to

18

Los Angeles. Counsel pointed out, however, that he had not covered that subject with defendant during his testimony, and argued that the prosecutor's cross-examination had therefore exceeded the scope of direct examination.

The court observed that the subject matter of all of the statements at issue in the suppression motion seemed "fair game" for questioning, and overruled the defense objection.

### 5. *Refusal to answer and striking of testimony*

When the proceedings resumed after a short recess, defense counsel moved the court for reconsideration of its prior ruling. Counsel explained that he did not question defendant about his statements en route to the airport and during the flight to Los Angeles because the defense position was that those statements must be suppressed on the ground defendant was told that anything he said would not be used against him. Counsel also informed the court that although he had advised defendant not to answer any questions about the flight, defendant was "more than willing" to answer all questions concerning the time period covered on direct examination.

The court denied the motion for reconsideration and reaffirmed its prior ruling. The court emphasized that although defense counsel had questioned defendant regarding only two of the four statements that had been placed in issue by the suppression motion, Detective Gligorijevic had provided "significant testimony" regarding the other two statements, about which the prosecutor was entitled to cross-examine defendant. When the court subsequently ordered defendant to answer the prosecutor's question, defendant refused to do so. The court then granted the prosecutor's motion to strike all of defendant's direct examination testimony, observing that defendant was not permitted to "pick and choose" the questions he is willing to answer.

19

### 6. Rulings on the motion to suppress defendant's statements to interrogating officers

The court ruled that defendant's statements to Detective Graham during the 30-minute period prior to his signing the waiver form would be suppressed because he had not been properly advised of his *Miranda* rights, but that any statements he made thereafter were admissible.

At trial, the prosecutor elicited defendant's postwaiver statements during Graham's testimony.

The court also granted in part and denied in part the motion to suppress defendant's statements to Detectives Gligorijevic and Gonzalez. Relying primarily on the transcript of the July 22 interrogation in the police station, the court found that defendant had unequivocally and unambiguously invoked his right to counsel well before the detectives ceased their questioning, and ordered all statements after his request for a lawyer to be suppressed. Although the court declined to suppress the portion of defendant's July 22 statement that he made before invoking his right to counsel, the prosecution did not present that evidence during its guilt phase case.

Finally, the court ordered that defendant's statements to the detectives during the ride to the airport and the flight to Los Angeles be suppressed in their entirety. As the court put it, "basic justice" demanded that all of these admissions be excluded from the prosecution's case-in-chief.

### b. Discussion

Defendant argues that the court erred by striking his suppression hearing testimony in its entirety because the question he refused to answer was not relevant to the issue before the court. He further asserts that the order to strike prevented the court from accurately evaluating and determining whether *all* of his admissions were obtained in violation of *Miranda v. Arizona, supra*, 384 U.S. 436

20

and must be suppressed.  We conclude that defendant is not entitled to relief, as explained below.

A criminal defendant's due process right to defend against the state's accusations includes the right to testify in his or her own behalf.  (*Chambers v. Mississippi* (1973) 410 U.S. 284, 294; *People v. Robles* (1970) 2 Cal.3d 205, 215; *People v. Reynolds* (1984) 152 Cal.App.3d 42, 45-46.)  However, a defendant's right to take the witness stand to offer his or her account of the events in question coexists with the prosecutor's right to fairly test that testimony through cross-examination.  (*Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 733-734; *People v. Reynolds,* at p. 46; see generally *Chambers v. Mississippi,* at p. 295.) And it is well settled furthermore that "[a] defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, . . . limit the cross-examination to the precise facts concerning which he testifies."  (*People v. Cooper* (1991) 53 Cal.3d 771, 822; accord, *People v. Cornejo* (1979) 92 Cal.App.3d 637, 655.) Courts have long recognized that when a defendant refuses to answer some or all of a prosecutor's relevant questions during cross-examination, the trial court has discretion to strike the defendant's direct testimony, either in part or in its entirety. (*People v. Miller* (1990) 50 Cal.3d 954, 999; *People v. Reynolds,* at p. 47; *People v. McGowan* (1926) 80 Cal.App. 293, 298-299.)

In *People v. Reynolds, supra*, 152 Cal.App.3d 42, the Court of Appeal was mindful that the trial court's order striking all of the defendant's direct testimony in that case "prevented [the] defendant from exercising a fundamental right."  (*Id.* at p. 47.)  Accordingly, the appellate court recommended that a court exercising its discretion to strike testimony consider first whether the witness has refused to submit to cross-examination altogether, rather than refused to answer only one or more questions.  In the latter circumstance, the Court of Appeal suggested, the

21

witness's direct testimony need not be stricken in its entirety in every case, and the court should consider both the motive for the refusal to answer and the materiality of the answer. The Court of Appeal also suggested that the court consider solutions short of striking a defendant's entire testimony, such as striking only a portion of the testimony, or instructing the jurors that they may take into account the refusal to answer when assessing the defendant's credibility. (*Id*. at pp. 47-48.)

We find that the decision in *People v. Reynolds* provides a useful framework, not only for a trial court to follow in exercising its discretion in these circumstances, but also for a reviewing court to use when assessing an appellant's challenge to the trial court's ruling on a motion to strike his or her direct testimony. We follow the suggested approach here to consider defendant's claim that the court abused its discretion in striking his suppression hearing testimony in its entirety.

Defendant's motive for refusing to answer the prosecutor's question appears to have been a matter of tactics. Defense counsel strongly disagreed with the trial court's ruling rejecting his arguments that the prosecutor's line of questioning went beyond the scope of direct examination and was irrelevant to the issue before the court, which was whether the detectives had assured defendant that nothing he said could be used against him. Counsel informed the court, moreover, that he had advised defendant not to answer any questions about the flight to Los Angeles, acknowledging that the court would likely strike defendant's testimony were defendant to refuse to respond to the prosecutor's question. By accepting counsel's advice and refusing to answer, defendant apparently decided that there was more utility in keeping out of the record his response to the prosecutor's question than there was in having the court consider his hearing testimony up to that point. Defendant's tactical decision did not exempt him from cross-

22

examination.  (Cf. *People v. Reynolds, supra*, 152 Cal.App.3d at p. 46 [defendant's fear of attack by prison inmates for being a "snitch" were he to answer the prosecutor's question, although not baseless, did not constitute a legal exemption from cross-examination].)

Less clear is whether the prosecutor's question asking defendant whether he told the detectives that he had killed Kerr was material to the issues at the suppression hearing.  We agree with the People that defendant's credibility was central to the outcome of the hearing, which largely pitted defendant's word regarding the timing of his invocation of the right to counsel and the possibility of an improper inducement to waiving his rights against that of the testifying officers. Although whether or not defendant admitted to the detectives that he killed Kerr did not bear directly on either of those disputed issues, it may have been relevant to his credibility.  Were defendant to have said that he told the detectives he had killed Kerr, that response might have bolstered his credibility, generally speaking, in that such a statement would have been against his penal interest and could have been used to impeach him in the event he decided to testify on his own behalf at trial.  (See *People v. Seminoff* (2008) 159 Cal.App.4th 518, 527 [using similar reasoning to conclude that the codefendant's responses to questions she refused to answer on 5th Amend. grounds were crucial to an assessment of her credibility in the suppression hearing].)  By contrast, were defendant to deny having confessed to killing Kerr, his denial might have reflected poorly on his credibility generally, given Detective Gligorijevic's highly detailed testimony relating defendant's account of events leading up to and including the homicide.

Defendant's credibility was *not* critical to whether the statements defendant made to detectives on the drive to the airport and on the flight to Los Angeles should be suppressed, however.  As previously mentioned, defense counsel had successfully argued that those statements must be excluded because defendant had

23

been assured by the detectives that anything he said to them at that time could not be used against him. And as defendant points out, counsel's effort to suppress those statements relied, not on defendant's own testimony, but on the testimony of Detective Gligorijevic.

Even assuming for argument, however, that the court abused its discretion by declining to consider defendant's testimony when ruling on the motion to suppress and that, had it done so, the court would have suppressed *all* of the challenged statements, we conclude that any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Davis* (2009) 46 Cal.4th 539, 598.) The court fully suppressed two of the four sets of challenged statements, and suppressed sizeable portions of the other two. Of those portions of the statements that the court found admissible, only one of them was presented to the jury during the prosecution's case-in-chief, when Detective Graham recounted what defendant had said regarding his relationship with Kerr and his activities around the time of her death.

Specifically, Graham testified that defendant told him that at 1:30 a.m. on the day of the fire, he and Kerr had had a brief argument at her apartment and that she was angry when she left in her car. According to defendant, he was driving on the freeway in the early morning hours when he saw Kerr's car in flames and firefighters at the scene. Defendant explained to Graham that he believed Kerr was having a sexual relationship with Harvey and that he felt angry and betrayed by Kerr, particularly because he was paying for her apartment. He also indicated to the officer that he had formed his suspicions and was feeling angry at Kerr well before the night of her death.

But what Detective Graham told the jury about defendant's relationship with Kerr and his activities around the time of her death was both cumulative of, and less damaging than, other testimony and evidence admitted at trial that established

24

defendant's guilt. Like Graham, defendant's plumbing assistant Heiserman testified that defendant told him he was upset with Kerr because he suspected she was having a sexual relationship with Harvey, and that defendant had argued with Kerr on the night of her death. Both witnesses also indicated that defendant was angry with Kerr well before her death. But Heiserman also testified that defendant had expressed a desire to kill Kerr by blowing up her car or setting it on fire. And, Heiserman informed the jury that defendant admitted following Kerr to Harvey's house where he listened to their conversation, and then strangled her and put her in the back of her car. Defendant's Colorado Springs roommate David Jayne likewise testified that defendant admitted strangling his girlfriend after secretly listening to a conversation between her and a man with whom, he believed, she was sexually involved.

The People point out that the defense did not challenge the evidence that defendant killed Kerr, but had argued instead that he killed her in the heat of passion and therefore was guilty of voluntary manslaughter, not murder. Defendant asserts, however, that defense counsel's theory was substantially impacted by the court's rulings striking defendant's testimony and refusing to suppress his admissions to Graham. Had the court suppressed those statements as well, he posits, it is likely the defense would not have conceded that defendant killed Kerr.

We find defendant's assertion highly speculative, given that defendant made far more damaging admissions to other witnesses, as discussed above. For a similar reason, we reject defendant's further contention that defense counsel's concession was the only connection between defendant and Kerr's death. Defendant's statements to Detective Graham indeed placed defendant at the location where Kerr's burning vehicle had been found. But there was other, strong evidence connecting defendant to her death, such as defendant's call to Heiserman

25

on the morning of Kerr's death asking, "Is she dead?" and the mobile telephone records showing his immediate flight from Southern California. We conclude that the court's striking of defendant's testimony at the suppression hearing and refusal to suppress defendant's statements to Graham, even if error, was harmless beyond a reasonable doubt.

### 2. *Failure to appoint a second attorney*

Section 987, subdivision (d), provides trial courts with discretion to appoint at public expense a second attorney in a capital case "upon a written request of the first attorney appointed." Implicitly acknowledging that defense counsel did not make a request for the appointment of cocounsel, defendant contends that the court's failure, on its own motion, to appoint a second attorney to represent him violated his various rights under the state and federal Constitutions. We reject defendant's assertion that to protect those constitutional rights, the court had a duty to appoint cocounsel.

Our decisions have long emphasized that "[t]he appointment of a second counsel in a capital case is not an absolute right protected by either the state or the federal Constitution." (*People v. Clark* (1993) 5 Cal.4th 950, 997, fn. 22; accord, *People v. Cunningham* (2015) 61 Cal.4th 609, 667; *People v. Lancaster* (2007) 41 Cal.4th 50, 71.) From this it follows that the failure to appoint a second attorney does not, in itself, implicate any constitutional guarantees.

Defendant asserts nonetheless that the constitutional requirements of effective representation, heightened reliability, and an individualized determination of guilt and penalty require capital defendants to be represented by two attorneys. For support, he points to the recommendation in the 1989 American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (1989) (ABA Guidelines) that "two

26

qualified trial attorneys should be assigned to represent the defendant." (ABA Guidelines, guideline 2.1.) According to the commentary to this guideline, the responsibilities of trial counsel in a capital case are "sufficiently onerous" to require the appointment of two attorneys "in order to ensure that the capital defendant receives the best possible representation." (*Id*., comm. foll. guideline 2.1.)

As defendant acknowledges, this court has long recognized that the appointment of a second attorney to represent a capital defendant is a decision left to the trial court's discretion, based on a proper showing by the defendant that an additional attorney is necessary. (*Keenan v. Superior Court* (1982) 31 Cal.3d 424, 430 (*Keenan*); *People v. Jackson* (1980) 28 Cal.3d 264, 287.) We decline defendant's invitation to overrule these decisions and to hold instead that representation of a capital defendant by a single attorney, because it violates ABA Guidelines, amounts to constitutionally inadequate performance as a matter of law. Defendant is correct that the United States Supreme Court has recognized the ABA Guidelines as "useful 'guides' " for assessing the reasonableness of counsel's performance in connection with a defendant's claim of ineffective assistance of counsel. (*Bobby v. Van Hook* (2009) 558 U.S. 4, 7; see *Strickland v. Washington* (1984) 466 U.S. 668, 688.) But the high court has also indicated that the ABA Guidelines are not controlling. (*Bobby v. Van Hook,* at p. 8.) This court likewise has observed that the ABA Guidelines are "far from binding precedent." (*People v. Brown* (2014) 59 Cal.4th 86, 113.) Aside from his quotation of guideline 2.1 and its accompanying commentary, defendant fails to offer any persuasive basis on which to conclude that representation by a single attorney amounts to ineffective assistance in *every* capital case.

Nor does defendant provide any support for his contention that the constitutional requirement of heightened reliability in a capital case is undermined

27

when the judgment of only one attorney is involved.  We note that *Keenan* emphasized Sixth Amendment concerns when explaining how a trial court should exercise its discretion under section 987, subdivision (d).  For example, recognizing that "death is a different kind of punishment from any other, both in terms of severity and finality," *Keenan* directed trial courts to be "particularly sensitive to insure that every safeguard designed to guarantee defendant a full defense be observed." (*Keenan, supra*, 31 Cal.3d at p. 430.)  But *Keenan* also made clear that the decision to appoint a second attorney in a capital case is one left to the trial court's sound discretion, based on a showing that the additional attorney is necessary.  (*Ibid*.)

Defendant's claim that representation by a single attorney denied him equal protection under the law is likewise without merit.  Section 987, subdivision (d), authorizes the appointment of a second attorney at public expense in a capital case.  But not all capital defendants are similarly situated because not all capital cases present a "genuine need" for a second attorney to "lend important assistance in preparing for trial or presenting the case." (*Keenan, supra*, 31 Cal.3d at p. 434.)

We have expressly rejected in another case a capital defendant's claim that the trial court's failure to appoint, on its own motion, a second attorney to represent him infringed his federal constitutional rights under the Sixth and Eighth Amendments.  (*People v. Cunningham, supra*, 61 Cal.4th at p. 667.)  Defendant has presented no persuasive grounds for disturbing that prior conclusion.

### 3. *Admission of Kerr's statements regarding her fear of defendant*

Defendant was charged with the crimes of murder, stalking, and arson.  In connection with the stalking count, the trial court permitted the prosecution to elicit from several witnesses Kerr's out-of-court statements regarding her fear of defendant.  (See former § 646.9, subd. (e), as amended by Stats. 1998, ch. 825,

28

§ 4, p. 5162; *id*., ch. 826, § 1, p. 5166; CALJIC No. 9.16.1 (1999 rev.) (6th ed. 1996) [the crime of stalking under former § 646.9 requires a showing that the harassing conduct directed at a specific person actually caused that person "substantial emotional distress"]; cf. *People v. Ewing* (1999) 76 Cal.App.4th 199, 211-212 [evidence that the victim experienced sleepless nights and had joined a support group for battered women was insufficient to show that she suffered substantial emotional distress for purposes of establishing the stalking charge].)

Defendant contends the court erred in admitting Kerr's out-of-court statements, in part, because the statements were not admissible under any hearsay exception and should have been excluded as more prejudicial than probative under Evidence Code section 352. His primary argument, however, is that, even if Kerr's statements were relevant to prove the fear element of the stalking charge, the court's limiting instructions were inadequate to prevent the jury from using those statements for the improper purpose of finding that he killed Kerr intentionally and with premeditation, rather than in the heat of passion. Although we conclude that the statements in question were properly admitted, we need not decide whether the court's limiting instructions provided adequate safeguards against the improper use of that evidence because even if they did not, any error was harmless.

### a. Background

Prosecution witness Mark Harvey testified in large part about his interactions with Kerr on the evening preceding her death. Over repeated defense objections, and after extensive argument by the parties over the course of several court days, the trial court ruled it would permit Harvey to recount several statements Kerr made to him expressing her fear of defendant and relating that defendant had threatened to kill her. In ruling the evidence admissible, the court found Kerr's

29

expressions of fear fell within the state-of-mind exception to the hearsay rule. (Evid. Code, § 1250, subd. (a).) In this regard the court found Kerr's statements were both trustworthy and highly relevant to the issue of whether she was afraid of defendant, an element of the crime of stalking. The court further found that Kerr's statements regarding defendant's threats to kill her were also admissible, but as an admission of a party opponent, not under the state-of-mind exception. In response to defense counsel's objection under Evidence Code section 352, in which he argued that the evidence of defendant's threats was highly prejudicial because the jury would use this evidence to find intent to kill and premeditation, the court determined that the probative value of the evidence far outweighed its prejudice. Acknowledging that the prejudicial impact was considerable, however, the court indicated it would instruct the jury to consider the evidence only when deciding the charge of stalking, and for no other purpose. The court also granted defense counsel's request to give the limiting instruction during Harvey's testimony, rather than at the close of evidence.

In accordance with the court's ruling, Harvey described for the jury his conversations with Kerr on the night before her death. As mentioned in the factual recitation, Kerr had come to Harvey's home to babysit while Harvey attended an AA meeting. After Harvey returned, Kerr went outside to smoke a cigarette and when she came back inside, she was shaking. When asked what was wrong, Kerr stated that she did not believe it would be a good idea to accept Harvey's earlier offer to rent her a room in his home because defendant had threatened her. More specifically, she told Harvey that defendant had threatened to kill Harvey and his children, if he had to, in order to get to her. The court interrupted Harvey's testimony at this point to instruct the jury about the limited purpose of the testimony, directing the jury "not to consider it for . . . proof of an intent to commit a murder or any sort of proof of premeditation."

30

Subsequent to Harvey's testimony, the court similarly overruled defense counsel's hearsay and prejudice objections to testimony by three other prosecution witnesses who related Kerr's statements regarding her fear of defendant. Accordingly, Kerr's friend Lynda Farnand testified that Kerr mentioned in three separate conversations that she was afraid of defendant. As during the Harvey testimony, the court interrupted the questioning to instruct the jury that the evidence of Kerr's statements to Farnand was being admitted only to show Kerr's state of mind and whether she was afraid of defendant, for purposes of the stalking charge. When Farnand then testified that Kerr told her defendant once said no one could have Kerr if he could not have her, the court again admonished the jury that the evidence was being introduced for the limited purpose of determining whether or not the victim was afraid for purposes of the stalking count.

Later, over defense counsel's Evidence Code section 352 objection, the court permitted Kerr's friend Cheryl Zornes to testify briefly regarding a telephone conversation in which Kerr told her she was afraid of defendant because "every time she turned around [defendant] was there, following her." Another friend, Kim Hyer, likewise was permitted to testify regarding Kerr's statements suggesting she feared defendant. Specifically, Hyer told the jury that Kerr made her promise to take care of Kerr's young son were anything to happen to her. Immediately after this part of Hyer's testimony, the court reminded the jury that the limited purpose of this evidence was its relevance to the fear element of the stalking charge. The court also included a limiting instruction when instructing the jury prior to its deliberations.

31

*b. Discussion*

*1. Admissibility of Kerr's statements*

Defendant argues that Kerr's statements regarding her fear of defendant were not admissible, either as state-of-mind evidence under Evidence Code sections 1250 and 1252, or under Evidence Code section 352.[3] We agree with defendant that Kerr's statements fall into two categories for purposes of analyzing their admissibility, namely, Kerr's statements that she feared defendant, and Kerr's statements indicating that defendant had threatened her. Contrary to defendant's assertions, however, both categories of Kerr's statements were properly admitted below.

Defendant acknowledges that Kerr's statements that she feared defendant were relevant to the fear element of stalking and that they therefore fell within the scope of the state-of-mind exception under Evidence Code section 1250, subdivision (a)(1), which allows admission of a hearsay statement when the declarant's statement of his or her then existing state of mind "is itself an issue in the action." (See *People v. Hernandez* (2003) 30 Cal.4th 835, 872 ["A murder victim's fear of the alleged killer may be in issue when the victim's state of mind is directly relevant to an element of an offense"].) Defendant points out that before the trial court ruled on the admissibility of Harvey's testimony relating Kerr's statements, defense counsel indicated that he did not intend to challenge the point that Kerr feared defendant. According to defendant, this rendered Kerr's

---

[3] Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

32

statements inadmissible because they no longer were "an issue in the action," as required by Evidence Code section 1250, subdivision (a)(1).

Defendant's argument does not succeed. "[A] fact . . . generally becomes 'disputed' when it is raised by a plea of not guilty or a denial of an allegation [and] remains 'disputed' until it is resolved." (*People v. Rowland* (1992) 4 Cal.4th 238, 260; accord, *People v. Scott* (2011) 52 Cal.4th 452, 471.)

Defendant further argues that Kerr's statements that she feared defendant were inadmissible because defense counsel also offered to stipulate that Kerr told Harvey she was afraid of defendant. Contrary to defendant's assertion, however, the proposed stipulation was not a concession of the fear element of the stalking count and therefore did not remove that issue from dispute. In any event, and as defendant acknowledges, the prosecutor refused the stipulation. It is well settled that a prosecutor generally cannot be compelled to agree to a stipulation if it would diminish the persuasiveness and forcefulness of the prosecution's case. (*People v. Rogers* (2013) 57 Cal.4th 296, 329; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1007.) Defendant argues nonetheless that the trial court's refusal to force the prosecutor to accept the stipulation was error under Evidence Code section 352. He relies on *Old Chief v. United States* (1997) 519 U.S. 172 for support, but that decision reaffirms the general rule that "the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away." (*Id*. at p. 189.) The general rule must bend, the high court explained, "when the point at issue is a defendant's legal status [as a convicted felon], dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him." (*Id*. at p. 190.) Defense counsel's proposed stipulation concerned evidence from which the jury could draw the inferences necessary to reach its verdict on the stalking count; it did not concern defendant's status as a convicted felon. *Old Chief*'s exception to the general rule is not applicable here.

Nor does defendant persuade that the trial court's failure to compel the prosecutor to accept the proposed stipulation violated his right to due process. He argues that although Kerr's hearsay statements were not admitted to prove the murder charge, there was a significant risk the jury would conclude defendant premeditated the murder based on those statements. As explained *post*, at page 37, however, any inadequacy in the court's limiting instructions could not have prejudiced defendant.

Equally meritless is defendant's assertion that the admission of Kerr's statements violated the confrontation clause, as interpreted in *Crawford v. Washington* (2004) 541 U.S. 36. As defendant recognizes, the confrontation clause is implicated only when testimonial statements are involved. (*Id.* at p. 51.) Kerr's statements to her friend Harvey were clearly nontestimonial in nature and therefore fell outside the reach of confrontation clause protections. As *Crawford* itself explained, the confrontation clause addresses the specific concern of "[a]n accuser who makes a formal statement to government officers" because that person "bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Ibid.*; accord, *People v. Cage* (2007) 40 Cal.4th 965, 991; see *People v. Griffin* (2004) 33 Cal.4th 536, 579-580, fn. 19 [statement made to a friend at school does not constitute " 'testimonial hearsay' " under *Crawford*].)

We likewise reject defendant's argument that the trial court erred by admitting Kerr's statements that defendant had threatened to kill her. Defendant asserts that these statements could not be admitted under the state-of-mind exception in Evidence Code section 1250 because they showed *defendant's* state of mind, not Kerr's. Defendant's argument does not succeed, however, because the statements in question were not being admitted for their truth; that is, they were not presented to prove that defendant intended to kill her or thought about

34

killing her. Rather, Kerr's statements that defendant had threatened to kill her were relevant circumstantial evidence that she was afraid of defendant. (*People v. Green* (1980) 27 Cal.3d 1, 23, fn. 9; *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389-390.) Because the statements were being offered for a nonhearsay purpose, they fell outside the reach of Evidence Code section 1250 and other exceptions to the hearsay rule. The trial court found that evidence of defendant's threats to Kerr were admissible under the hearsay exception for admissions by a party opponent (Evid. Code, § 1220), rather than as statements not being offered for their truth. Although this analysis is different from ours, we have explained that " 'we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11.)

Defendant relies on *People v. Lew* (1968) 68 Cal.2d 774, to support his argument that Kerr's out-of-court statements relating defendant's threats to kill her were inadmissible because they amounted to double hearsay that concerned *defendant's* state of mind, not Kerr's. For several reasons, however, the reasoning in that case does not assist defendant. In *Lew*, although the court determined that the murder victim's out-of-court statements that the defendant had threatened to kill her were relevant to an issue raised by the defense, the evidence was deemed inadmissible, in part, because the statements referred to the defendant's past acts, rather than threats of future conduct. (*Id.* at pp. 779-780.) But the decisional basis for excluding the evidence for that reason, *People v. Hamilton* (1961) 55 Cal.2d 881, 893, appears to have been largely undermined by the later enactment of the Evidence Code. Under the Evidence Code, trial courts were granted broad discretion to determine in every case whether the need for the state-of-mind evidence outweighed the danger of misuse by the jury. (See *People v. Ortiz, supra*, 38 Cal.App.4th at pp. 387-389; 1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 211, pp. 1070-1071.) The other basis for exclusion in *Lew* was that the

victim's statements were made under circumstances indicating they were probably not trustworthy. (*Lew,* at pp. 779-780.) We observe, again, that *Lew* preceded enactment of the Evidence Code, and that the codified state-of-mind exception does not mention independent indicia of trustworthiness as part of the required foundation. Here, moreover, nothing in the record contradicts the trial court's determination that Kerr's statements to Harvey and her other friends were trustworthy. This is not a case like *Lew,* in which the victim may have claimed that the defendant had threatened her as a pretext for explaining to a college professor why she had missed a midterm examination. (*Id.* at p. 780.)

Finally, we find no merit in defendant's argument that Kerr's out-of-court statements should have been excluded as more prejudicial than probative under Evidence Code section 352. In *People v. Green, supra,* 27 Cal.3d 1, this court held that the trial court erred when it allowed the prosecution to present the murder victim's statements that the defendant said "he would kill her if she left him." (*Id.* at p. 23.) In *Green,* the victim's statements were relevant as circumstantial evidence that she was in fear of the defendant on the morning of the murder and would not have left with him willingly. We concluded, however, that the evidence was improperly admitted because the trial court failed to determine that the risk of undue prejudice from the evidence was outweighed by its probative value. (*Id.* at p. 26.) Although a "trial judge need not expressly weigh prejudice against probative value — or even expressly state that he has done so" (*People v. Mickey* (1991) 54 Cal.3d 612, 656), here, the trial court specifically considered the prejudicial impact of the evidence in question and reasonably determined that the prejudice was outweighed by the substantial probative value of the evidence with regard to the fear element of the stalking charge. The court properly exercised its discretion and its ruling fell well within the bounds of reason.

## 2. *Adequacy of the court's limiting instructions*

Defendant contends that even if Kerr's out-of-court statements were relevant to the fear element of the stalking charge, the court abused its discretion in admitting them, and their admission deprived him of his constitutional rights to due process, jury trial, and a reliable fact finding process, because the court's limiting instructions were not adequate to prevent the jury from using the evidence as proof of first degree premeditated murder. In defendant's view, it was impossible for the jury to have limited its consideration of Kerr's statements solely to the stalking charge, and he asserts that this evidence was used by the prosecution to convince the jury that he premeditated the murder.

We need not resolve whether the court's limiting instructions did not sufficiently protect against the jury's improper use of Kerr's statements that she feared defendant. Even if the instructions were inadequate, the error was harmless under any standard of review because the evidence of premeditation, including defendant's own statements, was extremely strong. For example, several months before Kerr's death, defendant told his plumbing assistant Heiserman that he wanted to get Kerr "off his mind" by blowing up her car or setting it on fire. Defendant also told Heiserman, closer in time to the killing, that were Kerr to refuse to leave her family for him, he "wouldn't be able to live with it or be able to see her," and again mentioned blowing up her car. Premeditation was further shown by strong circumstantial evidence, including the secluded location of Kerr's burning car and evidence showing that defendant poured accelerant over Kerr and the inside of her car, stuffed a burning rag into the gas tank and, when that did not ignite the accelerant, lit a rolled-up piece of paper on fire and threw it inside the car to set it ablaze.

37

## 4. *Admission of defendant's threats against Kerr's husband*

Defendant's fellow AA member Mark Harvey testified for the prosecution. At one point while he was on the witness stand, the court excused the jury and conducted a hearing to decide the admissibility of Harvey's expected testimony regarding a lengthy conversation he had with defendant about seven months before Kerr's death. Harvey testified at the hearing that, during their conversation, defendant disclosed that he was having an affair with Kerr, who was married and living with her husband at the time. According to Harvey, defendant made threats against Kerr's husband, saying he wanted to stab him or get rid of him.

Defense counsel objected to the anticipated testimony, but it was the court that articulated the basis of the objection, asking counsel if his position was that the evidence of the threat should be excluded as more prejudicial than probative under Evidence Code section 352 because the threat was directed at someone other than Kerr. Although counsel indicated that the court had correctly stated the basis of the defense objection, the court was not persuaded by the argument and overruled the objection. In the court's view, the probative value of the evidence — that months before Kerr's death, defendant had told Harvey he wanted to kill Kerr's husband — substantially outweighed its prejudicial impact. In accordance with the court's ruling, Harvey testified that defendant told him that he wanted to stab Kerr's husband or "get him out of the picture."

Defendant contends the court erred in admitting this evidence. The evidence was inflammatory, he asserts, because it involved death threats. And it lacked probative value because the threat was uttered some seven months before Kerr's death, which meant it had no relevance to whether defendant had killed Kerr in the heat of passion.

The People assert that defendant cannot raise such grounds for exclusion under Evidence Code section 352 because defense counsel did not present these

38

particular objections to the trial court during the hearing on the admissibility of the evidence. This court has explained that an objection must " 'fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' " (*People v. Geier* (2007) 41 Cal.4th 555, 609; see Evid. Code, § 353, subd. (a) [a judgment cannot be reversed on the basis of erroneously admitted evidence unless the defendant made a timely objection that "make[s] clear the specific ground of the objection or motion"].) The People's call for forfeiture is not well taken here, however, because the record indicates that the grounds for exclusion defendant now advances on appeal were before the court at the time of its ruling. In response to defense counsel's objection to the evidence, the prosecutor pointed out that the evidence of the alleged threats would show that seven months before Kerr's death, defendant was contemplating the notion of homicide and violence in connection with his relationship with her. As the prosecutor argued, such evidence was highly relevant to the issues of defendant's intent to kill and premeditation, particularly because the defense theory was that defendant killed during an explosion of rage. Although the court's articulation of the defense position emphasized that the alleged death threats were directed at someone other than Kerr, the court also would have considered the prosecutor's points, which fairly included a response to the basis for exclusion of the evidence that defendant presents for our review. Defendant's arguments are properly raised here.

Although we conclude that defendant has not forfeited his claim of error, we nonetheless reject his contention that the court abused its discretion in admitting Harvey's testimony that defendant told him he wanted to stab Kerr's husband and "get him out of the picture." The evidence was highly probative of defendant's

39

frustration with the affair and Kerr's attempt to reconcile with her husband. It also was relevant to show the progression of defendant's growing obsession with Kerr, which included contemplating violence or even homicide against someone who was coming between him and Kerr. Defendant argues that the evidence was too remote to be relevant to whether he made a spur-of-the-moment decision to kill while in the heat of passion. But this argument ignores the relevance of the evidence with regard to the other theory of homicide, that defendant premeditated and deliberated Kerr's killing. And, contrary to defendant's assertion, evidence of a death threat against a person other than Kerr was not unduly prejudicial in that it suggested to the jury that he would have killed other people if necessary to get to Kerr. The evidence was more probative than prejudicial in that it showed both that defendant wanted Kerr's husband "out of the picture" because he was obstructing defendant's relationship with Kerr, and the extent of defendant's obsession with Kerr.

Rulings under Evidence Code section 352 come within the trial court's broad discretion and will not be overturned on appeal absent a showing of an abuse of that discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 586.) On this record, we conclude that the court did not abuse its discretion in rejecting defendant's Evidence Code section 352 challenge to the admission of evidence of defendant's threats against Kerr's husband.

### 5. *Exclusion of defense evidence*

Defendant asserts that the court erred in sustaining the prosecutor's objections to defense evidence and questioning, and that the individual and cumulative impacts of the court's rulings deprived him of his state and federal constitutional rights to due process, fair trial, jury determination of the facts, and meaningful cross-examination. We conclude to the contrary that none of the

40

rulings in question amounted to prejudicial error, under either state law or the state or federal Constitutions.[4]

### a. Harvey's relationships with other women

During opening statements, defense counsel remarked that the jurors would hear testimony by prosecution witness Mark Harvey, who had spent time with Kerr at his home on the night of her death. According to counsel, several months before the killing, defendant observed Kerr becoming even closer to Harvey, which was "tremendously upsetting" to him. Counsel described Harvey as a "very nice looking guy" who "spends a lot of time at the Alcoholics Anonymous Club, dating women [who] are trying to recover from their problems with their alcohol and drugs."

Shortly after the parties' opening remarks, but outside the jury's presence, the prosecutor indicated to the court that he intended to move in limine to exclude evidence of Harvey's bad character to which defense counsel had alluded during

---

[4] The People assert that defendant has forfeited his constitutional claims on appeal, except for his claim of a due process violation, because he did not invoke constitutional guarantees at trial. The People are correct that defendant failed to explicitly raise some or all of the constitutional arguments he now advances. However, "[i]n each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.) " 'No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here.' [Citations.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 811, fn. 8.)

opening statement, specifically, evidence regarding Harvey's sexual relationships with other women. The court conducted a hearing on that motion immediately before Harvey was set to testify in front of the jury. Harvey stated at the hearing that he had been attending AA meetings for the past 20 years and that during that time he had formed romantic relationships with four women, but Kerr was not one of them. In ruling on the motion, the court indicated that evidence regarding a relationship between Kerr and Harvey was relevant to whether defendant killed Kerr in the heat of passion. In the court's view, however, evidence of Harvey's sexual conduct with women other than Kerr, was "totally irrelevant" to proving the existence of that relationship. Defense counsel argued that evidence regarding Harvey's proclivity for "hitting on" women at the AA Club would support the defense theory that defendant *believed* Harvey and Kerr were romantically involved, which would provide the basis of the provocation for the heat of passion defense. The court was not persuaded and reiterated that it would not allow evidence regarding other sexual or romantic relationships that Harvey may have had with the unnamed women. The court explained that, under Evidence Code section 352, the prejudicial impact of such evidence — that is, the undue consumption of time required for its presentation — far outweighed any probative value.

Defendant insists that the court erred in excluding evidence that Harvey had engaged in sexual relationships with women he met through his involvement in AA because such evidence was relevant to the reasonableness of defendant's belief that Harvey and Kerr were having a sexual relationship and was therefore fundamental to his heat of passion defense. As mentioned previously, the court found evidence that Harvey engaged in romantic relationships with women in AA to be "totally irrelevant." Although the court reasonably concluded that such evidence had no bearing on whether Harvey and Kerr were romantically involved,

42

the evidence appears to have had at least some relevance to defendant's *suspicions* in this regard. But even if the court mistakenly characterized the evidence as completely lacking in relevance, the court did not abuse its discretion in excluding it under Evidence Code section 352. The court weighed the arguably slight probative value of evidence regarding Harvey's romantic relationships with four women in AA against the likelihood that its admission would require an "undue consumption of time" (Evid. Code, § 352), and soundly determined that the balance justified exclusion. Contrary to defendant's assertion, the excluded evidence was far from "fundamental" to his heat of passion defense because several witnesses testified that defendant suspected Kerr was having a sexual relationship with Harvey. (Cf. *People v. Minifie* (1996) 13 Cal.4th 1055, 1070 [concluding that the court erred in excluding evidence of third party threats that went to the " 'heart of' " defendant's claim of self-defense and that would not have required an undue consumption of time].) We conclude that no abuse of discretion occurred.

### b. Kerr's reference to herself as Lisa Brooks

During cross-examination of Mark Harvey, defense counsel confirmed with the witness that during his conversation with Kerr at his home on the night of her death, she had referred to defendant as "Squirrel Boy." In response to further questioning, Harvey indicated that Kerr did not use that name in defendant's presence. When counsel then asked Harvey whether he knew that Kerr had been calling herself "Lisa Brooks" as opposed to Lisa Kerr, the prosecutor objected on relevance and hearsay grounds. The court sustained the objection without comment, at which point defense counsel indicated he had no further questions and concluded his cross-examination.

43

Defendant argues that the court's ruling was in error because the fact Kerr referred to herself using defendant's last name, rather than her married name, was not being admitted for its truth, but rather to show her state of mind and thereby to rebut the prosecutor's evidence that Kerr feared defendant.

Counsel made no offer of proof and advanced no argument to counter the prosecutor's relevance and hearsay objections to his cross-examination, and the trial court did not explain the basis of its ruling sustaining the objection. We conclude therefore that defendant has forfeited his claim of error. Even were we to assume that the court abused its discretion in preventing counsel from pursuing the challenged line of questioning, however, any error was harmless because Kerr's use of the name Brooks was independently established. The parties stipulated at trial that defendant signed a rental agreement with the names "Donald Brooks and Lisa Brooks" for an apartment in which Kerr lived. And defendant's acquaintance, Kari, testified that defendant showed him a piece of paper with "Lisa Brooks" written on it. The defense also called a number of witnesses who testified to the effect that Kerr did not fear defendant. For example, Sheila Peet told the jury that Kerr seemed happy and excited when she was around defendant. On this record, even if the court erred in precluding defense counsel from asking Harvey whether he was aware Kerr had been referring to herself as "Lisa Brooks," the ruling did not prejudice defendant.

### c. *Defendant's receipt of a package containing women's panties*

As previously mentioned, the defense called several witnesses in an attempt to show that Kerr was not fearful of defendant, but rather that she was happily involved with him. Over the prosecutor's objection, Yreno Lujano testified that defendant played for him several telephone messages that Kerr had left on defendant's answering machine telling defendant that she loved him and missed

44

him, and thanking him for helping her with her lawyer.  However, the court did not permit defense counsel to elicit from Lujano that he had seen defendant open a package he had received in the mail that contained a pair of women's panties.  In the court's view, this evidence could not support a reasonable inference regarding Kerr's state of mind because it lacked sufficient foundation that Kerr was the person who had sent the package to defendant.  In so ruling, the court rejected defense counsel's argument that Lujano's statement that he saw defendant open a package that had panties inside, standing alone, would support an inference that the panties had come from Kerr.  Defendant claims that the court erred in excluding this evidence.

The relevance, and thus the admissibility, of the evidence in question depends on the existence of the preliminary fact that Kerr was the person who mailed a pair of panties to defendant.  Defendant, as the proponent of the evidence, bore the burden of producing evidence in support of that preliminary fact.  (Evid. Code, § 403, subd. (a).)  When, like here, the evidence at issue concerns the "conduct of a particular person and the preliminary fact is whether that person . . . so conducted [herself]," the evidence is inadmissible "unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact."  (Evid. Code, §  403, subd. (a)(4).)  We have explained that the trial court's role with regard to preliminary fact questions under Evidence Code section 403, subdivision (a), " 'is merely to determine whether there is evidence sufficient to permit a jury to decide the question.' "  (*People v. Lucas* (1995) 12 Cal.4th 415, 467.)  The determination regarding the sufficiency of the foundational evidence is a matter left to the court's discretion.  (*Id*. at p. 466.)  Such determinations will not be disturbed on appeal unless an abuse of discretion is shown.  (*People v. Tafoya* (2007) 42 Cal.4th 147, 165; *People v. Cornwell* (2005) 37 Cal.4th 50, 83-84.)

45

The defense was entitled to rebut the prosecution's evidence that Kerr feared defendant, which supported the stalking charge, with evidence that Kerr did *not* fear him. Evidence that Kerr had sent defendant a pair of panties in the mail might tend to show she was not afraid of him. The preliminary fact necessary to permit Lujano's testimony that he saw defendant open a package that contained women's panties was that Kerr was the person who sent them. This fact may be established by circumstantial evidence. (See *People v. Coddington* (2000) 23 Cal.4th 529, 591; see also Evid. Code, §§ 1415-1421 [specifying some of the types of circumstantial evidence that may authenticate a document].)

Defendant argues that the court erred in excluding Lujano's testimony regarding defendant's receipt of the package because the undisputed fact that defendant and Kerr were involved in a sexual relationship, when coupled with evidence defendant had received a package of panties in the mail, was sufficient to allow the jury to infer that the package had come from Kerr. The People counter that the defense produced no evidence that would adequately support such an inference.

Here, the court ruled it would permit Lujano to testify that on several occasions during the period of defendant's relationship with Kerr, defendant played for him tape-recordings of answering machine messages left by Kerr telling defendant that she loved him. The court also allowed Lujano to testify that during this same period, defendant showed him love letters from Kerr. Defendant's receipt of the package presumably occurred close in time to the messages and love letters. From this evidence the jury arguably might have been able to decide that it was Kerr who had sent the package that Lujano saw defendant open.

We need not decide, however, whether the court erred in excluding Lujano's testimony regarding the package of panties because even if the evidence in question should have been allowed, there is no reasonable probability defendant

46

would have obtained a more favorable result had it been admitted. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4 [applying prejudice standard for state law error under *People v. Watson* (1956) 46 Cal.2d 818, 836, to assess effect of error in excluding evidence for lack of foundation].) As discussed above, the purpose of the proffered evidence was to show that Kerr did not fear defendant. The record shows, however, that the defense elicited strong evidence both during cross-examination and the defense case itself to make that point. For example, as noted earlier, prosecution witness Dwayne Kari testified that defendant played for him a tape-recorded message that Kerr had left on defendant's answering machine that said, "All I can say about last night was 'yummy.' " Kari also testified that defendant showed him a piece of paper on which Kerr had written "Lisa Brooks." Other evidence suggested that Kerr had willingly accepted defendant's offer of financial assistance, including his signing an apartment rental agreement for her that named "Donald Brooks and Lisa Brooks" as the tenants. And defense witness Jody Wheeler, a bartender at the bar where defendant often joined his father for lunch, testified that Kerr would often call the bar asking for defendant, sometimes 10 times a day. On this record, it is not reasonably probable that the addition of evidence from which it could be inferred that Kerr had mailed a pair of her panties to defendant would have led the jury to agree with the defense that Kerr did not fear defendant. Any error in the exclusion of this evidence does not warrant reversal of the judgment.

### d. Domestic violence against Kerr

Among the defense witnesses who testified that Kerr was not fearful of defendant was Sheila Peet, who owned a plumbing business where defendant purchased his plumbing supplies. According to Peet, defendant brought Kerr into the shop on two or three occasions in early 1999, and Kerr talked with Peet about

47

her relationship with defendant. When defense counsel asked the witness what Kerr had said in this regard, the court held a sidebar conference with the parties to discuss the anticipated out-of-court statements.

At the sidebar, defense counsel confirmed that the expected testimony was intended to show Kerr's state of mind, specifically, that she did not fear defendant. The prosecutor objected, however, to counsel's plan to elicit Kerr's statement to Peet to the effect that she had left her husband because he was violent and was trying to kill her. The court found that the proffered testimony regarding why Kerr left her husband was not relevant to the issue whether she feared defendant, and would not be admitted. The court also took defense counsel to task for attempting to "dirty up the victim."

Counsel pushed for admission of Kerr's statements regarding her husband nonetheless, arguing the proffered evidence would explain that, rather than fearing defendant, Kerr had a motivation to be with him. The court was not persuaded and reiterated that it would not allow that point to come in under the state-of-mind exception to the hearsay rule.

When Peet's testimony resumed, she told the jury that when Kerr came into the plumbing shop with defendant she appeared to be "very happy" and talked about defendant getting her a place to live and retaining an attorney for her. According to Peet, Kerr did not appear to be afraid of defendant.

Defendant contends the court erred in excluding evidence that Kerr said her husband was physically abusing her, which would have shown that she had a reason for being with defendant and did not fear him. According to defendant, the court's exclusion of the evidence on the ground that it "dirt[ied] up the victim" was erroneous because the proffered evidence portrayed Kerr's *husband*, not Kerr, in a negative light. This was not the basis of the court's ruling, however. Rather, the court excluded the evidence because it found Kerr's statements regarding her

48

husband to have no bearing on the issue whether she feared *defendant*. We conclude that the court acted well within its discretion in determining that Kerr's statements concerning her husband's violence toward her had no tendency to show her state of mind with respect to defendant.

Defendant observes that the trial court admitted into evidence numerous out-of-court statements by Kerr offered by the prosecution to show that Kerr feared defendant. From this he argues for the first time that evidence of Kerr's statements regarding physical abuse by her husband should have been admitted under authority of Evidence Code section 356.[5] We previously have referred to that provision as the "[r]ule of completeness" (*People v. Samuels* (2005) 36 Cal.4th 96, 130, italics omitted), and have described its purpose as " 'prevent[ing] the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 460; accord, *People v. Williams* (2006) 40 Cal.4th 287, 319.) Thus, " ' " '[i]n the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with*, the admission or declaration in evidence.' " ' " (*People v. Harris* (2005) 37 Cal.4th 310, 334-335.)

---

**5** Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . when a detached act, declaration, conversation, or writing is given in evidence, any other act declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

49

According to defendant, Kerr's statements regarding her husband's physical abuse were admissible under Evidence Code section 356 because it was misleading to allow the prosecution to present Kerr's statements that she feared defendant without also allowing statements suggesting she had a reason to be with him.

As a threshold matter, we conclude defendant forfeited his claim that the proffered evidence was admissible under Evidence Code section 356 because counsel did not raise that basis for admissibility below. (*People v. Pearson, supra,* 56 Cal.4th at p. 460.) In any event, Evidence Code section 356 has no application here. Defendant acknowledges that Kerr's statement to Peet regarding her husband's physical abuse of her did not occur in any of the conversations, presented by the prosecutor, in which Kerr said she feared defendant. By its terms, Evidence Code section 356 applies "[w]here *part* of an act, declaration, conversation, or writing is given in evidence by one party . . . ." (Evid. Code, § 356, italics added.) Nor does defendant persuade that the proffered statement was necessary to the jury's understanding of the prosecution's evidence regarding Kerr's fear of defendant. (See *People v. Farley* (2009) 46 Cal.4th 1053, 1103 [trial court was not required under Evid. Code, § 356 to grant the defendant's request to admit numerous additional letters from the defendant to the victim when several such letters that had been placed into evidence were " 'independently comprehensible' " on the relevant topics of intent to kill and premeditation].)

The defense was permitted to introduce evidence to the effect that Kerr did not fear defendant. This evidence was admitted, not as a matter of completeness under Evidence Code section 356, but rather because it tended to rebut the prosecution's evidence that Kerr feared defendant. The court determined that Kerr's statement regarding physical abuse by her husband was not relevant to

50

whether she feared defendant. We conclude that the court did not err in excluding the proffered evidence on that ground.

### e. Kerr's prior conviction for welfare fraud

At the end of the defense case, defense counsel sought admission of evidence that in March 1998, about one year before her death, Kerr had been convicted of welfare fraud. Counsel argued that the felony conviction was admissible to impeach Kerr's out-of-court statements regarding her fear of defendant, which had been admitted for their truth under the state-of-mind hearsay exception.

The court excluded the prior conviction evidence, finding it both irrelevant and more prejudicial than probative. As the court explained, the evidence was not relevant to the case because the court had admitted the fear evidence under the state-of-mind hearsay exception for only a limited purpose, that is, the stalking charge. Invoking Evidence Code section 352, the court also explained that the prejudicial impact of the proffered evidence far outweighed its probative value. In the court's view, the welfare fraud conviction lacked any probative value whatsoever because it was being offered against a dead victim who never testified at trial.

Defendant argues that the court prejudicially erred by refusing to allow the defense to use Kerr's welfare fraud conviction to impeach her out-of-court statements that she feared defendant and that he was stalking her, because preventing the defense from demonstrating Kerr was willing to lie cloaked her hearsay statements with a false air of truthfulness. Defendant's claim does not succeed: As explained below, even were defendant to show that the court abused its discretion in excluding the proffered evidence, the error did not prejudice him.

The court's stated reason for concluding that the prior conviction evidence lacked probative value suggests that the court was unaware of Evidence Code

51

section 1202, which allows impeachment of hearsay statements with evidence that would have been admissible had the declarant testified at trial.[6]  (See generally *People v. Blacksher* (2011) 52 Cal.4th 769, 806-808.)  Although this court has not addressed the issue whether a prior felony conviction may be used as impeachment evidence under Evidence Code section 1202, the Courts of Appeal have held that such evidence falls within the purview of that provision.  (*People v. Little* (2012) 206 Cal.App.4th 1364, 1373-1377; *People v. Jacobs* (2000) 78 Cal.App.4th 1444, 1449-1452.)  The appellate courts also have concluded that, like the use of prior felony convictions for purposes of impeachment generally (*People v. Castro* (1985) 38 Cal.3d 301, 312), the admission of a prior felony conviction pursuant to Evidence Code section 1202 to impeach the credibility of a declarant who does not testify at trial is subject to the trial court's discretion under Evidence Code section 352.  (*People v. Little,* at pp. 1377-1379; *People v. Jacobs,* at pp. 1452-1453; see *People v. Baldwin* (2010) 189 Cal.App.4th 991, 1005 [trial court has discretion under Evid. Code, § 352 to exclude as more prejudicial than probative evidence of a declarant's prior inconsistent statements proffered for purposes of impeachment under Evid. Code, § 1202].)

Because the court excluded, rather than allowed, the evidence of Kerr's felony welfare fraud conviction, we need not decide in this case whether prior felony convictions may be admitted pursuant to Evidence Code section 1202 to impeach the hearsay statements of a declarant who does not testify at trial.

---

**6**    In relevant part, Evidence Code section 1202 provides that "[e]vidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct."

52

Assuming without deciding that evidence of a prior felony conviction may be admitted under section 1202, we reject defendant's assertion that the court prejudicially erred under Evidence Code section 352 when it prohibited the defense from presenting the welfare fraud conviction to impeach Kerr's statements admitted under the state of mind exception to the hearsay rule.

In considering whether to admit evidence of a prior felony conviction of a witness subject to impeachment concerning his or her credibility, the prominent factors in determining the probative value of the prior conviction include "whether the conviction (1) reflects on honesty and (2) is near in time." (*People v. Clair* (1992) 2 Cal.4th 629, 654; *People v. Woodard* (1979) 23 Cal.3d 329, 335-337.) As defendant points out, Kerr's felony welfare fraud conviction involved a crime of moral turpitude reflecting on her honesty. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1128.) Moreover, because the prior conviction occurred in March 1998, during Kerr's relationship with defendant, it clearly was not remote in time. Finally, and as previously related, the court found that the prior conviction lacked probative value because it was being offered against a dead victim who never testified at trial. At the time of the court's ruling, however, *People v. Jacobs, supra*, 78 Cal.App.4th 1444 established that a prior conviction could be admitted pursuant to Evidence Code section 1202 to impeach the out-of-court statement of a declarant who did not testify at trial. (*Jacobs,* at pp. 1449-1452.)

We need not determine whether the court abused its discretion by excluding evidence of Kerr's prior felony conviction for lack of probative value, however. Even if the court's ruling was an abuse of discretion, reversal is not warranted because there is no reasonable probability that a more favorable result would have occurred had the prior conviction evidence been admitted. (*People v. Watson, supra*, 46 Cal.2d at p. 836.) The defense attempted to cast doubt on the veracity of

53

Kerr's statements regarding her fear of defendant and his stalking activities with testimonial evidence from which it could be inferred that Kerr was not afraid of defendant. For example, as recounted earlier, a fellow plumber and friend of defendant's, Yreno Lujano, testified that he heard a telephone answering machine message from Kerr telling defendant that she loved him and missed him. The owner of a plumbing supply store, Sheila Peet, told the jury that when defendant brought Kerr into the shop with him, Kerr seemed happy and did not appear to be afraid. In addition, the bartender at the bar where defendant often dined testified that Kerr sometimes called the bar numerous times a day asking for defendant. Given the defense evidence that was before the jury, the admission of documentary proof that Kerr had committed welfare fraud, for the limited purpose of impeaching her out-of-court statements, would not have led the jury to disbelieve the prosecution's evidence that Kerr feared defendant. Even if the court erred by preventing the defense from presenting evidence of Kerr's prior conviction for welfare fraud, that error could not have prejudiced defendant.

Defendant contends that the cumulative prejudicial impact of all of the evidentiary rulings that he challenges in this claim of error rendered his trial unfair. Whether viewing the asserted evidentiary errors individually or cumulatively, we conclude that the rulings in question did not deprive defendant of his right to a fair trial.

### 6. *Admission of photographs*

Defendant claims that the trial court's admission of inflammatory crime scene and autopsy photographs showing Kerr's charred remains and her soot-filled respiratory tract, and a photograph of Kerr while alive, violated Evidence Code section 352 and defendant's state and federal constitutional rights to due process

and a reliable death verdict. We conclude that the photographs were properly admitted, as explained below.

### a. Crime scene and autopsy photographs

During the prosecution's case-in-chief, the prosecutor referred several of its witnesses to exhibit No. 5, a large board containing six crime scene photographs of Kerr's face, head, and body that were labeled A through F. The last of the witnesses to be asked about the exhibit No. 5 photographs was Dr. Raffi Djabourian, who performed the autopsy on Kerr and testified regarding his findings. When Dr. Djabourian explained that the extensive charring of Kerr's body showed she had suffered a thermal injury from the fire, the prosecutor referred him to exhibit No. 5C, which depicted Kerr's badly charred body after it had been removed from the car. Dr. Djabourian confirmed that his finding was consistent with that photograph. Next referring to the entire board of photographs, the prosecutor asked Dr. Djabourian his opinion as to why a certain area of Kerr's hair and face appeared not to have burned. According to the witness, it may have been caused by the positioning of the body and the use of accelerant to cause the fire.

The prosecutor then questioned Dr. Djabourian regarding his findings following an internal examination of Kerr's body during the autopsy. According to Dr. Djabourian, one of the most significant findings was the presence of soot in the respiratory system, including inside the mouth and within the larynx, trachea, and bronchi. The court interrupted the witness's testimony to conduct a sidebar conference regarding defense counsel's objection to the admission of exhibit No. 27, which consisted of two autopsy photographs depicting these portions of Kerr's upper respiratory system. Counsel argued that this evidence, and the exhibit No. 5 photographs of Kerr's body at the crime scene, were "too gory for the jury" and

therefore inadmissible under Evidence Code section 352.  The court overruled the objection, presumably agreeing with the prosecutor that the photographs were highly relevant to significant issues in the case, including whether Kerr was alive at the time of the fire.

When Dr. Djabourian's testimony resumed and the prosecutor referred him to exhibit No. 27, the witness indicated that the black discoloration in the larynx and trachea was soot.  Dr. Djabourian told the jury that, based on the distribution of the soot in the respiratory tract, he had no doubt that Kerr was alive, at least at the beginning of the fire.

Defendant argues that the photographs in exhibits Nos. 5 and 27 were unnecessary to prove any fact in dispute, and that they were inflammatory.  As defendant points out, for example, the defense did not contest that there was soot in Kerr's respiratory tract, which rendered photographs depicting that condition unnecessary.

"The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion.  [Citation.]  'A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.'" (*People v. Roldan* (2005) 35 Cal.4th 646, 713; accord, *People v. Cage* (2015) 62 Cal.4th 256, 283.)

Even if the defense did not contest that Kerr had soot in her respiratory tract, or that her charred body was found on the floorboard in the car, and was willing to so stipulate, " '[t]he prosecution was not obligated to "accept antiseptic stipulations in lieu of photographic evidence." ' " (*People v. Johnson* (2015) 61 Cal.4th 734, 767.)  The autopsy and crime scene photographs were relevant to several issues, including whether the fire was started with accelerant and whether Kerr was alive at the time.  These issues in turn were relevant to the prosecution's

theories that defendant premeditated the murder and committed torture. (See *People v. Brents* (2012) 53 Cal.4th 599, 617 [photograph of the victim's burned body lying in the trunk of the car, combined with autopsy evidence indicating she was alive when set on fire, was probative of premeditation and torture].) "[T]he jury is entitled to see details of the [victim's body] to determine if the evidence supports the prosecution's theory of the case." (*People v. Gurule* (2002) 28 Cal.4th 557, 624.)

We have examined the objected-to photographs and find they are not unduly gruesome. Indeed, any "revulsion they induce is attributable to the acts done, not to the photographs." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1054.) The court did not abuse its discretion in admitting these photographs.

### b. Photograph of Kerr while alive

Before opening argument, and outside the jury's presence, the prosecutor informed the court that during opening argument he would be referring to a number of photographs mounted on display boards. Defense counsel indicated he had no objection to the prosecution's photographs, one of which depicted Kerr while alive. Nor did defense counsel object when the court allowed the jury to individually examine the photograph of Kerr after one of the jurors indicated during the prosecutor's opening statement that he had not seen it clearly.

The photograph of Kerr while alive was marked as People's exhibit No. 13 and first shown during the redirect examination of Detective Gligorijevic, who identified the exhibit as a picture of Kerr. The prosecutor elicited from the detective that she had obtained the photograph during the course of her investigation. When asked from where she had obtained the photograph, the detective indicated it had come from a friend of Kerr's, at which point defense counsel objected on the grounds of relevance, hearsay, and lack of personal

57

knowledge. The court immediately overruled the first two grounds for objection but eventually sustained the objection based on personal knowledge.

Later during trial, Kerr's friend Cheryl Zornes confirmed that she had given Kerr's picture to Detective Gonzales, and that the photograph comprising exhibit No. 13 depicted Kerr. The prosecutor also showed exhibit No. 13 to prosecution witnesses Mark Harvey, Lynda Farnand, and Dwayne Kari, who likewise identified Kerr as the person shown in the photograph. At the conclusion of the guilt phase, the court admitted into evidence all of the prosecution's marked exhibits. Counsel raised no new objections to the exhibits at that time, submitting the issue of their admissibility on the objections he had raised during trial.

Defendant contends the trial court abused its discretion in admitting the photograph of Kerr while alive because it created an undue risk of sympathy for the victim and prejudice against him. He argues that the court's ruling also deprived him of his state and federal constitutional right to due process and protection against cruel and unusual punishment.

We agree with the People that defendant has forfeited his claim of error on appeal because defense counsel did not object on these grounds when the prosecutor used the photograph during opening remarks and while questioning witnesses. Defendant insists that counsel's relevance objection to exhibit No. 13 at the time it was offered into evidence during Detective Gligorijevic's testimony was sufficient to preserve his claim on appeal. We reject his reading of the record. As summarized above, the record shows that defense counsel did raise a relevancy objection to Gligorijevic's testimony, but never challenged the photograph itself. Accordingly, he may not challenge its admission here. (See *People v. Boyette* (2002 ) 29 Cal.4th 381, 423-424.)

In any event, defendant does not persuade that the court abused its discretion in admitting the photograph of Kerr while alive. We have long advised trial courts

58

to exercise care when deciding whether to admit during the guilt phase of trial photographs of a capital murder victim while alive, because of the risk such evidence "will merely generate sympathy for the victim[]." (*People v. Harris, supra*, 37 Cal.4th at p. 331; accord, *People v. Osband* (1996) 13 Cal.4th 622, 677.) But the possibility that a photograph of the victim while alive will elicit sympathy from the jury does not require exclusion if it is otherwise relevant. (*Harris*, at p. 331; *People v. Osband,* at p. 677; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1230.) Here, the photograph was relevant because it permitted the witnesses to identify Kerr as the person "about whom they were testifying." (*DeSantis*, at p. 1230 [upholding on similar grounds the admission of a photograph of the capital murder victim and his wife while on vacation].) Moreover, our examination of the photograph suggests no basis on which to conclude that its admission was unduly prejudicial. Exhibit No. 13 was a two-feet by three-feet poster board, but the photocopy of the color photograph of Kerr that is mounted on the board measures eight and one-half by 11 and one-half inches, and the actual image measures four by 11 inches. The picture shows Kerr in a pair of shorts and a sleeveless shirt, smiling and standing in what appears to be a park or garden. Although the photograph arguably posed some risk it would elicit sympathy from the jury, nothing about the manner in which Kerr's likeness was displayed or the photograph's background suggests it was " 'particularly calculated' " to do so. (*People v. Smithey* (1999) 20 Cal.4th 936, 975.) There was no error in admission of the photograph. Nor did its admission violate defendant's federal and state constitutional rights. (Cf. *People v. DeSantis,* at p. 1231 [in light of the strong evidence of guilt, there was little possibility that any sympathy toward the victims that was generated by the photograph lessened the reliability of the guilt verdict in violation of the 8th Amend.].)

## 7. *Sufficiency of the evidence*

The prosecution presented five theories of defendant's guilt of first degree murder: (1) premeditated, deliberate murder, (2) murder during the commission of kidnapping, (3) murder during the commission of arson, (4) murder by means of torture, and (5) murder by means of lying in wait. Three of these theories, kidnap-murder, torture, and lying in wait, were the underpinnings of the three special circumstances alleged in the case.

The jury found defendant guilty of first degree murder but did not specify the theory or theories on which it rested its verdict. The jury also found the kidnapping-murder and torture-murder special-circumstance allegations to be true, but found the lying-in-wait special-circumstance allegation to be not true.

Defendant does not challenge the sufficiency of the evidence supporting the lying-in-wait theory of first degree murder. But he argues that the first degree murder conviction and death judgment must be reversed because the evidence was insufficient to prove any of the other four theories of first degree murder presented by the prosecution. He asserts furthermore that there was insufficient evidence supporting the kidnapping-murder and torture-murder special-circumstance findings, which likewise would require reversal of the death judgment.

The principles governing our assessment of defendant's various challenges to the sufficiency of the evidence are well settled. We " ' "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Clark* (2011) 52 Cal.4th 856, 942.) The same standard applies when examining the sufficiency of the evidence supporting a special circumstance finding. (*Id*. at p. 943.) "Substantial evidence

60

includes circumstantial evidence and any reasonable inferences drawn from that evidence." (*In re Michael D*. (2002) 100 Cal.App.4th 115, 126.)

Defendant's sufficiency challenge to the four theories of first degree murder liability and the special circumstance findings is premised on the same factual argument. According to defendant, the evidence showed that he confronted Kerr at her apartment in a fit of jealousy and rage and fatally strangled her, then placed the body in the back of her car and drove to the freeway off-ramp where he set the car on fire to hide the killing. As explained below, however, there was evidence in the record from which a reasonable trier of fact could have rejected that scenario and found instead that defendant had incapacitated Kerr, that he was aware she was still alive when he placed her in the back of the car, and that, after deciding her fate, ultimately drove to the off-ramp to set Kerr and her car on fire. Although the scenario defendant describes appears plausible, this court's role on review does not involve a reevaluation of the evidence. Rather, "we presume the existence of every fact in support of the verdict that could reasonably be inferred from the evidence." (*People v. Booker* (2011) 51 Cal.4th 141, 173.)

Under the applicable standard of review, we conclude that the record contains substantial evidence from which a reasonable trier of fact could find that defendant committed premeditated and deliberate murder, murder in the commission of kidnapping and arson, and murder by means of torture, and that substantial evidence likewise supports the true findings on the kidnapping-murder and torture-murder special-circumstance allegations.

### a. First degree murder based on a theory of premeditation and deliberation

A "willful, deliberate, and premeditated killing" is murder in the first degree. (§ 189.) " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*People v.*

*Koontz* (2002) 27 Cal.4th 1041, 1080.) "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of premeditation and deliberation excludes from murder of the first degree those homicides . . . which are the result of mere unconsidered or rash impulse hastily executed." (*People v. Thomas* (1945) 25 Cal.2d 880, 900-901.)

*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 identified three categories of evidence relevant to deciding whether to sustain a verdict of first degree murder based on premeditation and deliberation: (1) evidence of planning activity prior to the killing, (2) evidence of the defendant's prior relationship with the victim from which the jury could reasonably infer a motive to kill, and (3) evidence that the manner in which the defendant carried out the killing "was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (Italics omitted.)

The identified categories of evidence are those we " 'typically' find sufficient" to uphold first degree murder convictions. (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) But we have also observed that the *Anderson* factors are simply an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125; accord, *People v. Streeter* (2012) 54 Cal.4th 205, 242.)

The record in this case discloses ample evidence from which it could be inferred that defendant acted deliberately and according to a "preconceived

design" rather than from a rash impulse. Circumstantial evidence of planning included evidence regarding the location of Kerr's burning car, which defendant had driven to a secluded freeway off-ramp in the early morning hours when there was likely to be little traffic, and either had maneuvered or pushed the car down the embankment, hidden from view, to fake an accident and avoid detection. Planning also could be inferred from evidence regarding the various materials defendant used to set Kerr's car on fire. Specifically, defendant poured accelerant over Kerr and the inside of her car, stuffed a burning rag into the gas tank and, when that failed to ignite the accelerant, lit a rolled-up piece of paper on fire and threw it inside the car to set it ablaze.

With regard to motive, the record discloses evidence that in the months preceding the killing, defendant had become obsessed and angry with Kerr. An acquaintance of defendant testified that defendant told him Kerr was "screwing him around," and that defendant threatened to disclose evidence of the affair to Kerr's husband "if she doesn't leave him." Other witnesses testified that defendant was suspicious and highly possessive of Kerr, that he routinely monitored her whereabouts and activities, and that he had placed a listening device inside her home. Defendant's plumbing assistant Heiserman testified, for example, that he and defendant were on a job when defendant parked the van near Kerr's home and was gone for 25 minutes "to see what was going on." Heiserman testified, moreover, that in the weeks before Kerr's death, defendant appeared even more consumed by his thoughts of Kerr, telling Heiserman that he wanted Kerr to leave her husband and son and start a family with him. According to defendant's Colorado roommate, defendant told him that he suspected Kerr was cheating on him and that, on the night of the killing, he was in the crawl space underneath the man's house when he overheard them having sex. Defendant also told his roommate that he overheard them belittling his father, which made him

63

angry. And, according to Mark Harvey, while he and Kerr stood outside the front of his house saying goodnight, Kerr referred to defendant as "Squirrel Boy."

There was also evidence of a deliberate manner of killing. The crime scene and arson investigation evidence suggested that defendant poured accelerant around the car's interior and directly onto Kerr as she lay on her side, unconscious, on the backseat floorboard. The evidence also indicated that defendant first attempted to set the car afire by stuffing a lighted cloth into the gas tank. And, when that plan did not succeed, he chose a different strategy, lighting a rolled-up piece of paper on fire and tossing it into the front seat from a safe distance away, which caused an intense and quick-burning fire.

As described earlier, the record shows additional evidence from which a rational trier of fact could find a premeditated, deliberate murder. On one or two occasions several months before Kerr's death, defendant told his plumbing assistant Heiserman that he wanted to get Kerr "off his mind" by blowing up her car or setting it on fire. And, close in time to the killing, defendant told Heiserman that were Kerr to refuse to leave her family for him, he "wouldn't be able to live with it or be able to see her," and again mentioned blowing up her car.

Defendant acknowledges the testimony by the medical examiner that Kerr was alive but unconscious when the car was set on fire, and that she died of thermal injuries. But he argues there was no evidence suggesting that he knew Kerr was alive at that time, thereby precluding a finding that he set out to kill her in a deliberate and intentional manner by lighting her car on fire. Defendant asserts that the evidence showed he confronted Kerr at her apartment in a fit of jealous rage and fatally strangled her, then placed the body in her car and drove to the freeway off-ramp where he set the car on fire to hide the killing.

Notwithstanding defendant's argument, the record discloses substantial evidence from which a reasonable trier of fact could have rejected defendant's

64

reading of the record and found instead that defendant had incapacitated Kerr before driving her to the off-ramp, and that he knew she was alive, albeit unconscious, at the time he set her and her car on fire. The evidence showed that defendant had positioned Kerr's body so she was not visible, and he poured accelerant not only on the interior of Kerr's car but also on Kerr herself. From this evidence the jury could reasonably infer that defendant did so to cause her death, not simply to cover up his crimes. The evidence showed furthermore that when defendant called Heiserman some seven hours after firefighters responded to the scene of Kerr's burning car, he ignored Heiserman's question about his whereabouts and asked, "Is she okay?" When Heiserman responded, "Is who okay?," defendant said, "C'mon Smiley. Is she okay?" Heiserman asked what was going on, and defendant rephrased his question, this time asking, "Is she dead?" When Heiserman said, "Yes," defendant started to cry. A reasonable trier of fact could have inferred from these questions that defendant was asking whether Kerr had survived the fire. Heiserman further testified about the substance of his conversation with defendant after defendant had been returned to California following his arrest in Colorado. As noted earlier, during that conversation defendant explained that after hiding in the crawl space below Harvey's house and overhearing Harvey and Kerr bad-mouthing him, he confronted Kerr at her car, strangled her and, "when she was out," put her in the backseat of her car.

This evidence is more than sufficient to raise an inference that defendant knew Kerr was alive at the time he drove to the off-ramp and set her and her car on fire. We therefore conclude there is substantial evidence in the record from which a reasonable trier of fact could have found beyond a reasonable doubt that defendant committed a premeditated and deliberate murder.

65

*b. First degree felony murder based on a kidnapping-murder*
*theory and kidnapping-murder special-circumstance finding*

We likewise conclude the evidence was sufficient to support both the first degree murder verdict on a felony-murder theory based on kidnapping, and the kidnapping-murder special-circumstance finding.

"All murder . . . which is committed in the perpetration of . . . kidnapping . . . is murder of the first degree." (§ 189.) At the time of defendant's crimes, section 207, subdivision (a), as now, provided that "[e]very person who forcibly . . . steals or takes, . . . or arrests any person in this state, and carries the person into another . . . part of the same county, is guilty of kidnapping." (§ 207, subd. (a), as amended by Stats. 1990, ch. 55, § 1, p. 393.)

The mental state required for felony murder is "the specific intent to commit the underlying felony" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140), and " 'the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death.' " (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1016.) First degree felony murder does not require proof of a strict causal or temporal relationship between the felony and the killing. (*Ibid.*) Rather, a killing has been "committed in the perpetration of" the underlying felony within the meaning of section 189 "if the killing and the felony are parts of one continuous transaction." (*Ainsworth*, at p. 1016; accord, *People v. Booker, supra,* 51 Cal.4th at p. 175.)

The evidence showed that defendant formed an intent to kidnap Kerr prior to committing the acts that caused her death. Kerr was last seen alive at 1:15 a.m. when she left Mark Harvey's house to drive home to her apartment. Defendant had told his plumbing assistant Heiserman that he confronted and strangled Kerr when she got to her car and that when she "was out," he put her in the backseat. But Kerr's burning vehicle and charred body were not discovered until three hours

66

later, at the bottom of an embankment near a freeway off-ramp that was a 15 to 20-minute drive from Harvey's residence. From this evidence, a jury could reasonably have inferred that defendant formed the intent to kidnap Kerr after rendering her unconscious, and that he set her and her car on fire only after having formed that intent. We conclude there is substantial evidence from which a reasonable trier of fact could have found beyond a reasonable doubt that defendant formed the intent to commit kidnapping before killing Kerr, and that he committed both crimes as part of a continuous transaction.[7]

Defendant argues that his belief he had killed Kerr at her apartment precludes a finding that moving her from the apartment to the location where her charred body was discovered constituted a kidnapping. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 498 [kidnapping requires a living victim].) As previously discussed, however (see *ante*, at p. 65), the record discloses substantial evidence from which a reasonable trier of fact could have rejected that scenario and found instead that defendant incapacitated Kerr after confronting her at her car as she was leaving Harvey's house, and that he knew Kerr was still alive, albeit unconscious, when he placed her in the back of her car and eventually drove to the off-ramp embankment where he set her and her car on fire.

We likewise reject defendant's challenge to the sufficiency of the evidence supporting the kidnapping-murder special-circumstance finding. The prosecution alleged that Kerr's murder was committed while defendant was engaged in the commission of kidnapping. (§ 190.2, subd. (a)(17)(B).) To prove that special

---

[7] We reject defendant's further argument that the first degree murder verdict based on a theory of murder perpetrated in the commission of kidnapping was infected by prejudicial instructional error, as discussed more fully *post*, at page 75 et seq.

67

circumstance allegation at the time the present crimes occurred, the prosecutor had to show "that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder."[8] (*People v. Mendoza* (2000) 24 Cal.4th 130, 182; see also *People v. Raley* (1992) 2 Cal.4th 870, 902 [inquiring whether the defendant had a "purpose for the kidnapping apart from murder"].)

Defendant argues that, even were the jury to have rejected the defense theory and found instead that he drove to the embankment of the freeway off-ramp to murder Kerr, the only logical conclusion would be that the kidnapping was merely incidental to the murder. We conclude that substantial evidence supports the contrary conclusion.

Here, the record discloses substantial evidence from which a jury could reasonably infer that defendant had not yet decided Kerr's fate after incapacitating her and moving her into the back of her own car. First, the evidence established an hours-long gap between the time Kerr said goodbye to Harvey at around 1:15 a.m. to return to her apartment and the firefighters' discovery of her burning car and charred body. Heiserman testified that defendant told him he had confronted Kerr and strangled her into unconsciousness when she got to her car after leaving

---

[8]    Subsequent to the crimes in this case, voters approved the adoption of section 190.2, subdivision (a)(17)(M), which did away with the independent felonious purpose requirement for the kidnapping and the arson special circumstances. That subdivision provides that "[t]o prove the special circumstances of kidnapping in subparagraph (B), or arson in subparagraph (H), if there is specific intent to kill, it is only required that there be proof of the elements of those felonies. If so established, those two special circumstances are proven even if the felony of kidnapping or arson is committed primarily or solely for the purpose of facilitating the murder." (*Ibid*.; see *People v. Brents, supra,* 53 Cal.4th at pp. 608-609, fn. 4.)

Harvey's house.  But it was not until three hours later that firefighters arrived at the scene of Kerr's intensely burning car.

In addition to evidence of the three-hour time gap, there was substantial evidence regarding the complicated relationship between defendant and Kerr from which a reasonable jury could infer that defendant was conflicted regarding what to do with Kerr after he had strangled her.  By all accounts, their year-long affair was tumultuous and consuming.  Defendant conveyed to others that he was in love with Kerr and wanted to marry her, and described their relationship as "perfect."  The evidence showed that defendant was upset and frustrated by Kerr's decision to try to reconcile with her husband.  But even shortly before the murder, defendant continued to profess his love for Kerr and his desire for her to leave her husband and start a family with him.  Moreover, although he suspected that Kerr was "screwing him around," defendant nonetheless rented an apartment for her after she left her husband, signing the rental agreement as "Donald Brooks and Lisa Brooks."

The record further showed that defendant had grown increasingly obsessed with Kerr and "tormented by thoughts" of her.  It is during this period that defendant made remarks to the effect that he wanted to burn or blow up Kerr's car.  Although the prosecutor used such statements to support his theory of premeditated murder, a reasonable jury could also have inferred from this evidence that defendant's mental and emotional state was highly unstable close in time to the crimes.  Evidence of defendant's complicated relationship with Kerr, when coupled with evidence of his fragile mental and emotional state, raised a reasonable inference that defendant was conflicted, confused, and possibly in a state of panic after rendering Kerr unconscious, and that he decided her fate only after having placed her on the floorboard of her car and driven off.  Indeed, the arson investigator testified during cross-examination that defendant's initial

69

attempt to light the car on fire — by stuffing a burning cloth into the gas tank's filler neck — is a method that is rarely successful, and suggested that defendant may not have been "thinking clearly."

Viewing the evidence in the light most favorable to the jury's true finding on the kidnapping-murder special-circumstance allegation as we must, we conclude that substantial evidence supports the conclusion that the kidnapping was not merely incidental to the murder.

### c. First degree felony murder based on an arson-murder theory

Defendant challenges the sufficiency of the evidence supporting the first degree murder conviction on a felony murder theory based on arson. We conclude otherwise that substantial evidence supports that basis of first degree murder liability.

"All murder . . . which is committed in the perpetration of, or attempt to perpetrate, arson . . . is murder of the first degree." (§ 189.) As previously discussed, the mental state required for felony murder is "the specific intent to commit the underlying felony" (*People v. Gutierrez, supra,* 28 Cal.4th at p. 1140), and " 'the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death.' " (*People v. Ainsworth, supra,* 45 Cal.3d at p. 1016.) A killing has been "committed in the perpetration of the [underlying felony] if the killing and the felony are parts of one continuous transaction." (*Ibid.*)

Defendant argues that his conviction for first degree felony murder based on arson cannot stand because the arson was merely an afterthought to the killing. Specifically, he asserts that the arson was for the purpose of concealing Kerr's identity and destroying evidence connecting him to her killing. Defendant's argument is premised on his view of the evidence, which is that he believed he had

70

killed Kerr when he strangled her. However, as more fully discussed *ante*, at page 65, there was substantial evidence from which a reasonable jury could conclude that defendant knew Kerr was alive, albeit unconscious, at the time he doused her and the interior of her car with accelerant and set the car on fire. And although defendant may have intended to commit arson for the *additional* purpose of concealing Kerr's identity and his role in her killing, we have observed that concurrent intent to kill and to commit the target felony does not preclude a felony murder theory of first degree murder. (*People v. Gutierrez, supra*, 28 Cal.4th at p. 1141.) A jury reasonably could infer that the killing and the arson were "parts of one continuous transaction." (*People v. Ainsworth, supra,* 45 Cal.3d at p. 1016.)

### d. First degree murder committed by means of torture and torture-murder special-circumstance finding

One of the prosecution's theories of first degree murder was murder committed by means of torture. (§ 189.) To establish this theory of first degree murder, the prosecution must prove "(1) acts causing death that involve a high degree of probability of the victim's death; and (2) a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose." (*People v. Cook* (2006) 39 Cal.4th 566, 602.)

The prosecution also alleged a torture-murder special circumstance under section 190.2, subdivision (a)(18), which the jury found to be true. To prove that special circumstance allegation, the prosecution had to establish that "defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." (*People v. Streeter, supra,* 54 Cal.4th at p. 237.)

For both first degree murder by means of torture and the torture-murder special circumstance, the question of sufficiency is directed at evidence of the

71

defendant's torturous intent. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1187; *People v. Mincey* (1992) 2 Cal.4th 408, 433.) The perpetrator intends to ' "cause pain and suffering in addition to death," ' and ' "in the course, or as a result of inflicting pain and suffering, the victim dies." ' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 716.)

An intent to cause extreme pain or suffering " 'may be inferred from the circumstances of the crime, the nature of the killing, and the condition of the victim's body.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1213-1214.) Considering these factors, we conclude that there was substantial evidence in the record from which a reasonable jury could have inferred that defendant intended to cause Kerr extreme pain and suffering for the purpose of revenge, thus supporting a verdict of murder committed by means of torture and the true finding on the torture-murder special-circumstance allegation.

Defendant's intent to cause extreme pain in order to exact revenge is shown by evidence regarding the circumstances preceding the killing. Several months before Kerr's death, defendant had become increasingly jealous and possessive of Kerr, and he was angry and upset that she wanted to reconcile with her husband. On one or more occasions during this time, defendant indicated to his plumbing assistant that he wanted to get Kerr "off his mind" by blowing up her car or setting it on fire. The evidence also suggested that defendant had come to believe that Kerr was using him for financial support, and he also began to suspect that she was having a sexual relationship with fellow AA member Mark Harvey.

The record further showed that, driven by his suspicions, defendant had planted a listening device in Kerr's apartment and began following her to her work and home. Then, on March 24, 1999, after having become even more obsessed with Kerr, defendant crawled under Harvey's house to listen as Harvey and Kerr talked into the early morning hours. Defendant believed he heard them having

72

sex, and he may have overheard Kerr belittling him by referring to him as "Squirrel Boy." The record indicates that defendant then confronted Kerr, either at her car as she was leaving Harvey's home or after she had returned to her own apartment. Defendant strangled Kerr into unconsciousness, but he was aware that she was not dead, and he placed her on her side on the floorboard between the front and back seats of her own car.

The nature of the killing and the condition of Kerr's body further show a torturous intent. The record indicates that, once having decided Kerr's fate, defendant either drove or pushed the car down the secluded embankment of a freeway off-ramp. He then doused the car's interior and Kerr with a flammable liquid, and ignited a fire by tossing a burning piece of rolled up paper onto the driver's seat. The accelerant-induced fire burned quickly and intensely, obliterating Kerr's hands, the lower portion of her legs, and her feet. As this court has observed, "[f]ire has historically been used as an instrument of torture and is generally known to cause extreme pain." (*People v. Cole, supra*, 33 Cal.4th at p. 1203.)

In sum, a reasonable jury could infer from evidence of defendant's intense possessiveness and all-consuming suspicions that Kerr was using him financially and "cheating" on him with Mark Harvey, coupled with his dousing her and her car with accelerant and lighting them on fire, that defendant intended to inflict severe pain on Kerr for the purpose of revenge.

Defendant argues that he could not have intended to inflict extreme pain on Kerr if he believed she was dead when he set the car on fire. As we have previously explained, however, there is substantial evidence in the record from which to infer that defendant knew Kerr was alive when he set the car on fire. (See *ante*, p. 65.)

73

Referencing the medical examiner's conclusion that Kerr was most likely unconscious when the fire was started, defendant asserts alternatively that, even if he knew Kerr was alive, he would have known that she was unconscious when the fire started, and therefore could not have harbored the intent to cause her to suffer.

As defendant acknowledges, for purposes of murder by means of torture, "there is no requirement that the victim be aware of the pain." (*People v. Cole, supra*, 33 Cal.4th at p. 1207; see *id*. at p. 1228 [awareness of pain is not an element of the torture-murder special circumstance].) As our decisions have explained, the torture-murder theory of first degree murder liability is premised on the defendant's intent to cause pain to the victim, not on whether the victim actually suffered pain. (*People v. Wiley* (1976) 18 Cal.3d 162, 172-173.) From this proposition we have observed that a defendant who, intending to inflict pain and suffering, renders his victim unconscious at the outset of a homicidal attack "may not assert the victim's condition as a fortuitous defense to his own deplorable acts." (*Id*. at p. 173.)

Likewise here, the evidence that defendant had incapacitated Kerr by rendering her unconscious before dousing her body with accelerant and setting her car on fire does not foreclose the inference that defendant intended to cause her extreme pain and suffering. That inference was amply supported by the evidence recounted above.

We conclude that the record contains substantial evidence from which to infer that defendant intended to cause Kerr extreme pain and suffering for the purpose of revenge, thus supporting a verdict of first degree murder based on torture, and the torture-murder special-circumstance finding. We also reject defendant's further assertion that the murder conviction and special circumstance finding must be overturned because the definition of torture is unconstitutionally vague. As defendant recognizes, this court has previously rejected the precise

74

argument he advances here. (See *People v. Chatman* (2006) 38 Cal.4th 344, 394-395.) He provides no persuasive reason for this court to revisit the issue in his case.

### 8. *Claims of instructional error at the guilt phase*

#### a. *Erroneous definition of asportation*

Defendant argues that the trial court's instruction explaining the elements of the special circumstance allegation that defendant murdered the victim while engaged in kidnapping stated an incorrect definition of the asportation requirement. We agree with defendant that the court erred by instructing the jury with a definition of asportation that was not in effect at the time of the crimes in question. We conclude, however, that the error was harmless beyond a reasonable doubt, and therefore does not require that either the kidnapping-murder special-circumstance finding or the death sentence be set aside, as explained below.

In connection with the kidnapping-murder special-circumstance allegation, the jury was instructed under CALJIC No. 8.81.17. (1999 rev.) (6th ed. 1996) that to establish the truth of the allegation, the prosecution must prove, in relevant part, that "[t]he murder was committed while the defendant was engaged in the commission or attempted commission of kidnapping in violation of section 207 of the Penal Code." As noted, section 207, subdivision (a), defines the crime of simple kidnapping and provides, in relevant part, that "[e]very person who forcibly . . . steals or takes, or holds, detains, or arrests any person in this state, and carries the person . . . into another part of the same county is guilty of kidnapping." The statute does not refer to any particular distance the victim must be moved. This court has long recognized, however, that the movement, or asportation, of the victim must be "substantial in character," not slight or trivial

75

(*People v. Stanworth* (1974) 11 Cal.3d 588, 601), and juries were instructed accordingly. (See CALJIC No. 9.50 (6th ed. 1996).)

At the time defendant committed his crimes, in March 1999, the question whether the movement of the victim was "substantial in character" was determined solely by the actual distance that the victim was moved. (*People v. Caudillo* (1978) 21 Cal.3d 562, 572-573.) Decisions applying *Caudillo* established that 90 feet did not satisfy the element of asportation as a matter of law (*People v. Green, supra,* 27 Cal.3d, at pp. 66-67), but that a movement of 200 feet was sufficient (*People v. Stender* (1975) 47 Cal.App.4th 413, 421-423).

In April 1999, this court issued our decision in *People v. Martinez* (1999) 20 Cal.4th 225, 236 (*Martinez*), which abandoned as "ultimately unworkable" *Caudillo*'s exclusive focus on the actual distance the victim was moved to determine whether the movement was "substantial in character." *Martinez* adopted in its place a "totality of the circumstances" standard (*id*. at p. 237) that took into account not simply the actual distance the victim was moved, but "the 'scope and nature' of the movement . . . , and any increased risk of harm" (*id*. at p. 236). The 1999 version of the standard instruction was revised accordingly.

Defendant's trial was held in 2001 and the court instructed defendant's jury with the 1999 revision of CALJIC No. 9.50. Like the former version of CALJIC No. 9.50, the revised version told the jury in relevant part that "[a] movement that is only for a slight or trivial distance is not substantial in character." The jury also was told, however, pursuant to this revision, that "in determining whether a distance that is more than slight or trivial is substantial in character, you should consider the totality of circumstances attending the movement, including, but not limited to, the actual distance moved, or whether the movement increased the risk of harm above that which existed prior to the movement or decreased the likelihood of detection, or increased both the danger inherent in a victim's

76

foreseeable attempt to escape and the attacker's enhanced opportunity to commit additional crimes."  (See CALJIC No. 9.50 (1999 rev.) (6th ed. 1996).)

We agree with defendant, and the People concede, that the court erred by giving the 1999 version of CALJIC No. 9.50.  *Martinez* expressly stated that because its holding enlarged the reach of the kidnapping statute, the totality of the circumstances standard for determining whether the movement of the victim was substantial could not be applied retroactively to a defendant whose offense was committed at the time *Caudillo* was the governing test.  (*Martinez, supra*, 20 Cal.4th at p. 239.)  Here, defendant committed the crimes against Kerr in March 1999, one month before *Martinez* was issued.  The court therefore should have instructed the jurors with the version of the standard instruction on simple kidnapping that preceded the revisions prompted by *Martinez*, which would have focused their attention only on whether Kerr had been moved "a substantial distance . . . [that is] more than slight or trivial."

Although we agree with defendant that the court erred by giving the jury the revised 1999 version of CALJIC No. 9.50, which provided the jury with a more expansive definition of asportation than the one in effect at the time of defendant's crimes, we conclude that the error was harmless beyond a reasonable doubt.

"Misdescription of an element of a charged offense is subject to harmless error analysis and does not require reversal if the misdescription was harmless beyond a reasonable doubt."  (*People v. Hagen* (1998) 19 Cal.4th 652, 670; accord, *People v. Harris* (1994) 9 Cal.4th 407, 424.)  Notwithstanding defendant's arguments to the contrary, we can say beyond a reasonable doubt that the instructional error "did not contribute to the verdict obtained."  (*Chapman v. California, supra,* 386 U.S. at p. 24.)

The court's instruction, although improperly expanding the factual basis on which the jury could decide whether defendant committed simple kidnapping,

77

nonetheless allowed the jury to consider all of the evidence relevant to the issue of the actual distance Kerr was moved. (See *People v. Hagen, supra*, 19 Cal.4th at p. 670.) The revised instruction given to defendant's jurors specifically directed them to consider the "actual distance" the victim was moved. Indeed, our decision in *Martinez* contemplated that a jury instructed in accordance with its holding could decide the asportation element solely on the basis of evidence of the actual distance the victim was moved: "While the jury may consider a victim's increased risk of harm, it may convict of simple kidnapping without finding an increase in harm, or any other contextual factors." (*Martinez, supra*, 20 Cal.4th at p. 237.) The instruction given here thus concerned, not the entirety of the definition of asportation, but rather one of the theories under which the jury was told the element of asportation could be established, a theory that was " 'not itself necessary for the verdict.' " (*People v. Harris, supra*, 9 Cal.4th at p. 430.) Because the court's instruction on the post-*Martinez* theories of asportation included actual distance, we presume, as we must, "that the jury considered all relevant evidence relating to [the actual distance the victim was moved]." (*Harris*, at p. 431.)

This court explained in *People v. Harris, supra*, 9 Cal.4th 407, that in order to conclude that an instructional error " 'did not contribute to the verdict' " within the meaning of *Chapman* (*Harris*, at p. 424) we must " 'find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record' " (*id.,* at p. 430, quoting *Yates v. Evatt* (1991) 500 U.S. 391, italics omitted). Here, there was compelling, uncontroverted evidence showing that the actual distance defendant moved Kerr was sufficient to satisfy the asportation element of simple kidnapping as a matter of law. (See *People v. Caudillo, supra*, 12 Cal.3d at p. 574, citing with approval *People v. Stender, supra,* 47 Cal.App.3d at p. 423 [a movement of 200 feet is sufficient].)

78

Evidence in the record showed two possible locations — either outside Mark Harvey's home or at Kerr's apartment — where defendant rendered Kerr unconscious and moved her into the back of her own car. It is true, as defendant points out, that nothing in the record expressly indicated the precise number of feet between either Harvey's or Kerr's residence and the Hollywood Freeway's Roscoe Boulevard off-ramp where defendant ultimately set Kerr and the car on fire. The police investigator testified, however, that to drive in the early morning hours from those locations to the off-ramp would have taken 15 to 20 minutes, and five to 10 minutes, respectively. The substantial distance between Kerr's apartment and the off-ramp was further shown by People's exhibit No. 12, an enlargement of a street and freeway map on which the prosecutor had labeled both the location of Kerr's residence and the off-ramp where her body was discovered. Also admitted into evidence at trial was a coverage map showing the radio frequency range of individual cellular telephone tower sites located in the San Fernando Valley, along with testimony that different tower sites, rather than the same site, covered calls placed or received from Kerr's apartment, Harvey's home, and the location where Kerr's body was found.

We note, moreover, that both the prosecutor and defense counsel argued to the jury that defendant drove "for hours" with Kerr in the car before arriving at the off-ramp, the prosecutor asserting that defendant choked Kerr, placed her on the floorboard, and drove around to avoid detection, and defense counsel arguing that defendant drove around with Kerr's dead body in the backseat. Indeed, the arguments of counsel suggested that the actual distance defendant moved Kerr was even greater than the distance between the two possible locations where she was incapacitated and the off-ramp where she was killed.

Given the argument of counsel and the undisputed evidence presented to the jury regarding the actual distance Kerr was moved, this jury could not possibly

79

have found defendant guilty of committing arson near the freeway off-ramp where Kerr's car and body were discovered without also finding that the actual distance defendant moved Kerr after incapacitating her was substantial. We are convinced by the record in this case that the instructional error was "unimportant in relation to everything else the jury considered on the [actual distance] issue." (*Yates v. Evatt, supra*, 500 U.S. at p. 403.) We therefore conclude, beyond a reasonable doubt, that the court's error in giving a version of CALJIC No. 9.50 that was not in effect at the time of defendant's crimes did not contribute to the true finding on the kidnapping-murder special-circumstance allegation.

### b. *Failure to instruct on mistake of fact*

Premised on the assertion that he mistakenly believed that Kerr was dead when he placed her on the floorboard of her own car and drove off, defendant argues that the kidnapping-murder special-circumstance finding must be vacated, either because the court prejudicially erred by refusing defense counsel's request to give a mistake of fact instruction for that allegation or because the court had a duty to so instruct on its own motion and failed to do so. We agree with defendant that a court has a sua sponte duty to instruct on a mistake of fact defense to kidnapping when there is substantial evidence that the defendant mistakenly believed the victim was dead at the time of the asportation. As explained below, however, we conclude that there was no substantial evidence supporting instruction on that defense in this case. Accordingly, we reject defendant's argument that the court erred in failing to instruct the jury on mistake of fact.

### 1. *Background*

After the close of evidence, but before the parties' closing arguments, the court met with counsel to discuss jury instructions. The defense asked the court to

instruct pursuant to CALJIC No. 4.35, regarding ignorance or mistake of fact.[9] The court refused the mistake of fact instruction on the ground that the defense might not make such an argument to the jury. However, the court also indicated that its refusal to so instruct was without prejudice, and that defense counsel could renew his request at the conclusion of closing remarks.

After closing arguments, counsel again requested a mistake of fact instruction. The court declined to give the requested instruction, agreeing with the prosecutor that even if defendant mistakenly believed that he had killed Kerr by strangling her, it would not have made any of his conduct after the strangulation lawful. As the court remarked, "The fact of the matter is he's driving around with this body, and . . . he ultimately sets it on fire. There's nothing lawful about that."

### 2. *Discussion*

As a threshold matter, the People argue that because defendant never asked the court to give a mistake of fact instruction in connection with the kidnapping-murder special-circumstance allegation, his claim that the court prejudicially erred in failing to give the instruction with regard to that allegation is not properly before this court. It is true that counsel repeatedly indicated to the court that the requested instruction was directed to one of the prosecutor's theories of first degree murder — that defendant harbored an intent to kill at the time he set the car on fire — and that counsel never mentioned the kidnapping-murder special-circumstance allegation in his request for instruction. The forfeiture rule is

---

[9] The requested instruction would have informed the jury that "[a]n act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime. [¶] Thus a person is not guilty of a crime if he commits an act or omits to act under an honest belief in the existence of certain facts and circumstances which, if true, would make such act or omission lawful." (See CALJIC No. 4.35 (6th ed. 1996).)

81

inapplicable to the claim defendant raises here, however. As we explain below, if there was substantial evidence suggesting defendant believed he had killed Kerr when he strangled her and then placed her on the back floorboard of her car, the court would have been obligated to instruct on that defense to the kidnapping-murder special-circumstance allegation notwithstanding counsel's failure to ask the court to do so.

" 'It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence' " and " 'necessary for the jury's understanding of the case.' " (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189; accord, *People v. Sedeno* (1974) 10 Cal.3d 703, 715.) It is also well settled that this duty to instruct extends to defenses "if it appears . . . the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Sedeno*, at p. 716; accord, *People v. Salas* (2006) 37 Cal.4th 967, 982; *People v. Maury* (2003) 30 Cal.4th 342, 424.)

We conclude that defendant's claim of instructional error comes within the analytical rubric of *People v. Mayberry* (1975) 15 Cal.3d 143, and therefore implicates the rule that the court must instruct on any affirmative defense on which the defendant is relying, or which is supported by substantial evidence and is not inconsistent with the defendant's theory of the case. *Mayberry* involved a prosecution against two brothers, one of whom was charged with kidnapping and rape, among other crimes. At trial, the victim testified that she did not consent to accompany the defendant from a grocery store to his apartment and did not consent to sexual intercourse. She also indicated that she had " 'put on an act' " to try " 'to fool' " the defendant. (*Id*. at p. 148.) The defendant testified that the victim willingly walked to his home from the grocery store and agreed to sexual intercourse. (*Id*. at p. 149.) The trial court refused the defendant's request for a

82

mistake of fact instruction to the effect that the defendant must be acquitted of kidnapping and rape if he reasonably and honestly believed that the victim consented to accompany him to his apartment and engage in sexual intercourse. The defendant was convicted of kidnapping and rape, but this court concluded the court's refusal to give the instruction was prejudicial error and reversed the convictions. (*Id.* at pp. 153-158.)

In assessing the defendant's claim of error, *Mayberry* first looked to Penal Code section 26, which provides that a person committing a charged act or omission under a mistake of fact that disproves any criminal intent is not criminally liable for that offense. (§ 26, par. Three.) As *Mayberry* explained, the word " 'intent' " means " 'wrongful intent,' " and the requirement of a union of act and wrongful intent is a necessary element in nearly every crime, including the crimes of kidnapping and rape. (*Mayberry, supra*, 15 Cal.3d at p. 154; see *id.* at pp. 155-156.) Relying on the requisite union of act and wrongful intent, and decisions finding a mistake of fact defense available for crimes such as unlawful sexual intercourse and bigamy, *Mayberry* held that "if a defendant entertains a reasonable and bona fide belief that [the alleged victim] voluntarily consented to accompany [the defendant] and to engage in sexual intercourse, it is apparent he does not possess the wrongful intent that is a prerequisite [to a conviction of either kidnapping or rape]." (*Id.* at p. 155.) If believed by the fact finder, a defendant's honest and reasonable, albeit mistaken, belief in the victim's consent is a complete defense to a charge of kidnapping or rape. (*Ibid.*; see also *People v. Isitt* (1976) 55 Cal.App.3d 23, 28.)

Defendant's argument on appeal is that his belief he had killed Kerr when he strangled her meant he did not commit a kidnapping for purposes of the special circumstance allegation because a movement of the victim is a required element of kidnapping, and the victim must be alive to be kidnapped. The asserted mistaken

belief here is analogous to that at issue in *Mayberry*: If the victim is dead, she cannot give or withhold her consent to the movement. In *People v. Hillhouse, supra,* 27 Cal.4th at page 499, this court held that, like the crime of rape, kidnapping requires a live victim. For this proposition *Hillhouse* cited *People v. Kelly* (1992) 1 Cal.4th 495, 524, which explained that the crime of rape requires a live victim because rape is an act of intercourse against a person's will and a dead body cannot consent to, or protest against, the intercourse.

Defendant's challenge to the court's failure to instruct on a mistake of fact defense therefore implicates the court's duty to instruct on its own motion either when the defense is relying on that theory at trial, or when there is substantial evidence to support the defense and it is not inconsistent with the defense theory of the case. Nonetheless, for the reasons that follow, we conclude that the court in this case did not have a duty to instruct on its own motion on a mistake-of-fact defense to the kidnapping-murder special-circumstance allegation.

First, defendant was not relying on a mistake-of-fact defense at trial, and such a defense was arguably inconsistent with the defense he did present to the jury. The defense theory was not that Kerr was alive but defendant honestly and reasonably believed that she was dead. Rather, it was that defendant had confronted, strangled, and *actually* killed Kerr "on the spur of the moment" and in the heat of passion, either outside Harvey's home or at Kerr's apartment. Notably, counsel vigorously refuted the medical examiner's opinion that Kerr was alive at the time of the fire, arguing to the jury that it was "just an opinion," and recalling the examiner's testimony during cross-examination that strangulation "may have been a cause of death." (Cf. *People v. Dominguez* (2006) 39 Cal.4th 1141, 1148 [no *Mayberry* instruction was required, in part, because the defendant's defense at trial was that the victim had *consented* to sexual intercourse, not that he reasonably and honestly believed she had consented].)

84

Nor was there substantial evidence that defendant honestly and reasonably believed he had killed Kerr when he strangled her. Substantial evidence supporting sua sponte instruction on a particular defense is evidence that is "sufficient to 'deserve consideration by the jury, i.e., "evidence from which a jury composed of reasonable [persons] could have concluded" ' " that the particular facts underlying the instruction did exist. (*People v. Wickersham* (1982) 32 Cal.3d 307, 325; *People v. Flannel* (1979) 25 Cal.3d 668, 684–685, fn. 12.) Defendant did not testify at trial, so there is no direct evidence that he honestly and reasonably believed he had killed Kerr when he strangled her. And, contrary to defendant's argument, testimony by his Colorado roommate Jayne and his plumbing assistant Heiserman did not suggest any such a belief. Jayne testified that when defendant explained to him that he had "gotten in trouble" in California for strangling his girlfriend, he held his hands in a C-shape and said, "Well, I'm going to go to jail for assault anyway, so I might as well kill her." This testimony indicates only that defendant intended to kill Kerr; it says nothing about the timing of that killing.

Heiserman's testimony likewise does not support a mistake of fact defense instruction. According to that witness, after defendant had been extradited, he told Heiserman that he had "confronted [Kerr] when she got to her car as she was leaving, strangled her, she was out, put her in the back seat." The words "she was out" do not raise the inference that defendant thought he had killed Kerr, only that he had rendered her unconscious.

Defendant maintains that it could be inferred he would not have known Kerr was alive but unconscious while being transported in the back of the car because defendant would not have been able to see her breathing. Such evidence does not trigger the court's duty to instruct on a mistake-of-fact defense, however. The inference it raises, that defendant would not have known Kerr was alive,

provides no basis on which the jury could have concluded that defendant reasonably believed he had killed Kerr at the time he strangled her.

For the reasons stated above, we conclude that the court had no sua sponte duty to instruct on a mistake-of-fact defense in connection with the kidnapping-murder special-circumstance allegation. Because the defense did not request such an instruction for that allegation, the court did not err in failing to give one.

### c. *Failure to cross-reference the definitions of arson and kidnapping*

The jury was instructed that the predicate crimes for the felony-murder theory of first degree murder were arson and kidnapping. Defendant argues that the murder conviction must be reversed because the court failed to instruct that the definitions of arson and kidnapping given in connection with the count charging arson causing great bodily injury and the kidnapping-murder special-circumstance allegation, respectively, also applied to the felony-murder theory of first degree murder. Defendant did not ask the court to clarify for the jury that the definitions of arson and kidnapping in those instructions also applied to the felony-murder instructions. He therefore has forfeited his claim of error. (*People v. Kelly* (2007) 42 Cal.4th 763, 790.) His claim lacks merit in any event.

Defendant argues there was nothing in the wording of the arson instruction or the kidnapping-murder special-circumstance instruction that would have conveyed to the jury that the definitions of arson and kidnapping in those instructions also applied to the felony-murder instruction. We conclude to the contrary that, in light of the instructions as a whole, there is no reasonable likelihood that the jury would have used an erroneous definition of arson or kidnapping when considering the felony-murder theory of first degree murder. The court referred to "arson" and "kidnapping" in both the felony-murder instructions and in the instructions that included the definitions of those crimes. There was no suggestion that those terms

86

meant one thing in connection with the arson charge and the kidnapping-murder special-circumstance allegation and something different, and undefined, with respect to felony murder. Indeed, were the jurors to have believed that different definitions might apply, we would expect them to seek clarification. On similar grounds, this court concluded in *People v. Kelly, supra*, 42 Cal.4th at page 790, that there was no reasonable likelihood the jury in that case would have understood that the definition of "rape" and "robbery" given in the instructions regarding the special circumstance allegations applied only to those allegations, and that some other definition of those crimes applied for purposes of first degree murder based on a felony-murder theory.

Defendant asserts that the jury received "conflicting" instructions regarding the mental state required for arson, a general intent crime, because the felony-murder instruction told the jury that a killing committed during arson is first degree murder "when the perpetrator had the specific intent to commit that crime." His argument is beside the point. The instruction on arson correctly informed the jury that to establish the elements of arson causing great bodily injury in violation of section 451, subdivision (a), the prosecutor must prove (1) that "a person set fire to or burned or caused to be burned property," (2) "the fire was set or burning was done willfully and maliciously," and (3) "the fire caused great bodily injury to another." The definition of arson created no inconsistency with the felony-murder instructions and would not have confused the jury.

### d. *Failure to instruct on assault as a lesser offense of torture murder*

Defendant contends that his conviction for murder perpetrated by torture must be reversed and the torture-murder special-circumstance finding vacated because the court failed to instruct the jury sua sponte on the crime of assault by

87

means of force likely to cause great bodily injury (§ 245, subd. (a)(a)(1)), as a lesser offense of torture.  We reject his claim of error.

Defendant acknowledges that he was not separately charged with the crime of torture.  He also acknowledges that this court has long held that a court's sua sponte duty to instruct on lesser included offenses does not extend to an uncharged offense supporting a special circumstance allegation, or a charge of first degree felony murder.  (See, e.g., *People v. Valdez* (2004) 32 Cal.4th 73, 110-111 [when robbery is not a charged offense but rather forms the basis of a felony-murder charge and a robbery-murder special-circumstance allegation, the court has no sua sponte duty to instruct on theft as a lesser offense to robbery]; accord, *People v. Combs* (2004) 34 Cal.4th 821, 856 [same].)

We express no view regarding whether assault by means of force likely to cause great bodily injury is included within the crime of torture.  (Cf. *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1456 [holding that it is not].)  But even assuming for argument that this form of assault is a lesser included offense of torture, under our precedent, the court had no duty to give an assault instruction here because defendant was not separately charged with the crime of torture. Defendant makes no attempt to explain why the court must instruct on a lesser included offense of torture in connection with a charge of first degree torture murder or a torture-murder special-circumstance allegation, but not on a lesser included offense of the felony on which a charge of felony murder or a felony-murder special-circumstance allegation is predicated.  Nor does he present any grounds for reconsidering our prior pronouncements on the subject.

### e. Refusal to omit portion of CALJIC No. 2.71 directing jurors to "view with caution" defendant's out-of-court admissions

Over defense objection, the court instructed the jury pursuant to CALJIC No. 2.71 that defendant's out-of-court admissions "should be viewed with caution."

88

Defendant claims the court erred by refusing defense counsel's request to omit that portion of the standard instruction. We conclude that even if the court should have granted counsel's request, any error was harmless, as explained below.

During its discussion with the attorneys regarding jury instructions, the court stated its intention to give CALJIC No. 2.71, concerning a defendant's out-of-court admissions. The prosecutor expressed the view that the standard instruction was applicable, but defense counsel objected to the final paragraph, which stated that "[e]vidence of an oral admission of the defendant should be viewed with caution."[10] Counsel explained that evidence of defendant's out-of-court statements to two prosecution witnesses — his plumbing assistant Heiserman and his Colorado roommate Jayne — supported the defense theory that defendant killed Kerr in the heat of passion. Counsel complained that the instruction, if not modified as requested, would permit the prosecutor to urge the jury to view this evidence with caution.

After hearing argument from the prosecutor, and without further explanation, the court ruled it would give CALJIC No. 2.71 in its entirety, impliedly agreeing with the prosecutor that the out-of-court statements could be considered for whatever relevant purpose was being asserted by the parties. The jury was instructed accordingly.

---

**10** At the time of defendant's trial, CALJIC No. 2.71 (6th ed. 1996) provided that "[a]n admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crimes for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part. [¶] [Evidence of an oral admission of [a] [the] defendant not made in court should be viewed with caution.]"

At the time of defendant's trial in 2001, the court had a duty to advise the jury, on its own motion, to view with caution any out-of-court admissions by a defendant. (*People v. Carpenter* (1997) 15 Cal.4th 312, 392-393.) In *People v. Vega* (1990) 220 Cal.App.3d 310, the appellate court rejected the defendant's argument that the trial judge should have modified the cautionary instruction in that case, a prosecution for robbery and vehicle theft. The Court of Appeal observed that the evidence showed defendant admitted to police that he took the vehicle but only temporarily, for an emergency. The appellate court also observed that "it is not uncommon that a single statement may tend to prove guilt or innocence, depending upon the state of the remaining evidence and the issue for which it is being considered." (*Id.* at pp. 317-318.) But the Court of Appeal declined to require modification of the standard instruction in such circumstances, concluding instead that a jury would understand that it must view with caution an "admission," that is, a statement tending to prove guilt, and would not view with caution statements that are exculpatory to the extent they tended to eliminate or reduce the defendant's criminal liability. (*Ibid.*)

The Court of Appeal in *People v. Senior* (1992) 3 Cal.App.4th 765, applied the reasoning of *Vega* to resolve the defendant's claim that the court erred in instructing the jury with CALJIC No. 2.71 to view with caution his extrajudicial statements. The defendant in that case had been charged with numerous counts of molesting his daughter by force or duress. The evidence at trial showed that the defendant had admitted the molestation to several people, including his wife, a member of the clergy, and a police officer, but that he did not admit using force or duress, which was the key issue at trial. (*Senior,* at pp. 769, 771, 773.) Defense counsel highlighted those statements during closing remarks to urge that jurors find the defendant had committed a lesser crime, but the jury found him guilty as charged. In rejecting the defendant's argument that the instruction caused the jury

90

to view with caution the statements on which his defense relied, the appellate court observed that although the defendant's statements tended to prove his guilt of a sex crime, they also tended to prove he did not commit that crime with force or duress, which served to exculpate the defendant. The jury would have understood the instruction to apply only to statements proving guilt, and not to exculpatory statements. (*Id*. at p. 777.)

As summarized above, case law at the time of defendant's trial fully supported the trial court's refusal to modify CALJIC No. 2.71. Recently, however, this court reassessed the propriety of requiring trial courts to give the cautionary instruction in the absence of a defense request. In *People v. Diaz* (2015) 60 Cal.4th 1176 (*Diaz*), we concluded that, in light of several statutory developments occurring after this court first declared a sua sponte duty to direct jurors to view a defendant's out-of-court admissions with caution, the trial court is no longer obligated to give this cautionary instruction unless requested by the defense. (*Id*. at p. 1189.) In reaching that conclusion, we acknowledged the reasoning in *Vega*, that the jury would understand the standard instruction to mean it should view with caution only the statements that incriminate the defendant. (*Diaz*, at p. 1192.) We observed, however, that a defendant "might prefer not to rely on the jury's ability to discriminate between those incriminating admissions it should view with special caution and those exculpatory statements that are not subject to the instruction." (*Id*. at p. 1193.) We observed furthermore that a defendant may "wish to avoid any risk that the jury might apply the cautionary instruction to portions of the statements that he or she wanted the jury to accept." (*Ibid*.) Accordingly, we concluded that the defense should be allowed to make the tactical decision whether to request the instruction. (*Ibid*.) In the present matter, the record plainly shows that defense counsel was concerned that the jury would view with caution the statements supporting the defense theory that defendant

91

killed Kerr in the heat of passion, and would not have requested the court to give CALJIC No. 2.71.

Notably, we did not decide in *Diaz* whether we must retroactively apply the new rule eliminating the trial court's duty to instruct the jury on its own motion to view with caution a defendant's out-of-court admissions, because the court's failure to give the instruction in that case was harmless. (*Diaz, supra*, 60 Cal.4th at p. 1195 [applying the standard for reviewing state law error established in *People v. Watson, supra,* 46 Cal.2d at pp. 835-836].) Likewise here, we need not decide whether *Diaz* governs the court's ruling in the present matter: Even if the court erred in giving the cautionary instruction over defense objection, it is not reasonably probable that the jury would have reached a result more favorable to defendant had it not been instructed to view with caution defendant's out-of-court admissions.

This court has explained that the purpose of the cautionary instruction is to assist the jury in determining whether the defendant actually made the statement attributed to him. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1268; *People v. Beagle* (1972) 6 Cal.3d 441, 456.) We can conclude from the verdict of guilt on the first degree murder charge that the jury believed defendant had made the out-of-court statements attributed to him, including those that supported his heat of passion defense. Indeed, defense counsel strenuously urged the jury to accept the testimony relating defendant's statements to Heiserman and Jayne that he suspected Kerr was cheating on him. He emphasized furthermore defendant's statements to those two witnesses that he followed Kerr to Harvey's house and hid in the crawl space where he overheard Kerr and Harvey having sex and belittling his father, and that he "just couldn't take it."

Counsel did point out one discrepancy between the testimony of Heiserman and Jayne, arguing that Heiserman's testimony relating defendant's statement that

he had confronted and strangled Kerr when she left Harvey's house "makes more sense." Other than questioning Jayne's recollection that defendant said he strangled Kerr at her apartment, however, counsel did not dispute that defendant made any of the statements attributed to him by Heiserman and Jayne. Counsel argued rather that those statements were fully consistent with the defense theory that defendant killed Kerr in the heat of passion. In light of the record in this case, the jurors would not have disbelieved defendant actually made the statements attributed to him. Instead, they apparently disagreed with the defense that this evidence showed he killed Kerr in the heat of passion rather than with premeditation and deliberation, or in the perpetration of kidnapping or arson. We therefore conclude that even had the court modified CALJIC No. 2.71 in accordance with defense counsel's request, there is no reasonable probability that the jury would have returned a verdict more favorable to defendant on the murder count.

### f. Instruction regarding the "acquittal first" rule

With regard to count 1, defendant's jury was instructed on first degree murder and the lesser offenses of second degree murder and voluntary manslaughter based on heat of passion. In connection with those options, and over defense objection, the court instructed with CALJIC No. 8.75, which told the jurors in relevant part that the court could not accept a verdict of guilt of second degree murder unless the jury unanimously found defendant not guilty of murder in the first degree, or a verdict of guilt of voluntary manslaughter unless the jury unanimously found defendant not guilty of first degree and second degree murder.

Defendant argues that the court's instruction regarding the so-called acquittal first rule violated his federal constitutional rights to due process, jury trial, and the prohibition against cruel and unusual punishment, and their California

93

constitutional counterparts, because it coerced a verdict in favor of conviction of first degree murder by precluding the jury from considering his guilt of the lesser offenses.

CALJIC No. 8.75 directs the order in which the jury is permitted to return its verdicts when deciding a defendant's guilt of a charged offense and lesser included offenses, a procedure approved by this court in *Stone v. Superior Court* (1982) 31 Cal.3d 503, 519-520, as defendant acknowledges. The standard instruction also reflects the holding of *People v. Kurtzman* (1988) 46 Cal.3d 322, 329-331, which held that the jury has discretion to *consider* the lesser offenses before reaching unanimous agreement on the greater offense. This court has repeatedly upheld the validity of the acquittal first instruction against challenges similar to those defendant raises here. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 479-480; *People v. Nakahara* (2003) 30 Cal.4th 705, 715; *People v. Fields* (1996) 13 Cal.4th 289, 309-311.)

Defendant asserts nonetheless that the procedure set forth in CALJIC No. 8.75 has been criticized for prejudicing defendants, and he invites this court to abandon our acquittal first rule in favor of the "reasonable efforts" rule adopted by the Arizona Supreme Court in *State v. LeBlanc* (Ariz. 1996) 924 P.2d 441. Arizona's high court concluded in *LeBlanc* that to better serve the interests of justice and the parties, a jury need only use "reasonable efforts" to reach agreement on whether to acquit or convict on the charged offense before beginning to discuss and consider the lesser offense. (*Id.* at p. 442.)

We decline defendant's invitation to replace California's acquittal first rule with the "reasonable efforts" procedure adopted in *LeBlanc.* This court previously has concluded that our acquittal first procedure, which permits the jury to consider the lesser offenses before reaching agreement on the charged offense, protects both "the defendant's interest in not improperly restricting the jury's deliberations

94

and the People's interest in requiring the jury to grapple with the prospect of defendant's guilt of the greatest offense charged." (*People v. Kurtzman, supra*, 46 Cal.3d at p. 334; see *People v. Fields, supra*, 13 Cal.4th at p. 304 [the acquittal first rule represents "an appropriate balancing of interests"].) In reaching that conclusion, this court was well aware of the reasoning in decisions from jurisdictions that had adopted a rule permitting jurors to consider a lesser offense if they were unable to agree on the greater offense. (*Kurtzman,* at pp. 333-334 & fn. 10.) Nothing in *LeBlanc* or the decisions of other jurisdictions that have issued after *Kurtzman* convinces us that the balancing of interests reflected in our acquittal first rule is in need of recalibration.

### g. Absence of instruction requiring the jury to unanimously agree on the theory of first degree murder

Among the theories the prosecutor advanced in support of a verdict of guilt on the count charging first degree murder were premeditated and deliberate murder, and murder during the commission of kidnapping and arson. The jury was instructed accordingly. Defendant claims he was deprived of various constitutional rights by the court's failure to also instruct the jury that it must unanimously agree whether defendant was guilty of murder based on premeditation and deliberation, or on the felony-murder doctrine. As defendant acknowledges, this court has repeatedly rejected the precise arguments he raises here. (*People v. Moore* (2011) 51 Cal.4th 386, 413; *People v. Taylor* (2010) 48 Cal.4th 574, 626; *People v. Morgan* (2007) 42 Cal.4th 593, 616-617.) He presents no persuasive grounds for reconsidering this court's prior pronouncements on the issue.

### 9. Cumulative effect of the asserted errors at the guilt phase

Defendant argues that the judgment must be reversed because the cumulative effect of the trial court's asserted evidentiary and instructional errors at the guilt

phase deprived him of his state and federal constitutional rights to due process and a fair trial. We have rejected all of defendant's claims of evidentiary and instructional error with the exception of five such claims. As to those claims, we found, or assumed, error that did not prejudice defendant. (See *ante*, pp. 37, 44, 53-54, 75-80, 92-93.) Whether considered individually or cumulatively, these errors do not warrant reversal of the judgment.

### B. Penalty Phase Issues

#### 1. *Court's directive to continue deliberations after the jury announced a deadlock*

Defendant asserts that his death sentence must be vacated because the court erred in numerous respects by directing the jury to continue deliberations after having been informed of a deadlock on penalty. For the reasons explained below, we conclude that the court neither erred under state law, nor violated any of defendant's state or federal constitutional rights.

##### a. *Background*

###### 1. *Note regarding possible juror misconduct and oral communication reporting jury deadlock*

The jury began penalty phase deliberations at 3:20 p.m. on June 19, 2001, and recessed for the day at 4:00 p.m. The next day, the jury began deliberating at 9:10 a.m. Before the lunch break, the foreperson gave the bailiff a note for the court in which he complained that two jurors had "lied" about their death penalty views and never intended to vote for death.

Outside the jury's presence, the court shared the note with counsel for both sides, commenting that it raised serious concerns. The court also informed counsel that there had been an additional, unsolicited oral communication by the foreperson. The bailiff reported that the foreperson told him the jury was deadlocked, and provided a numerical division. Both the prosecutor and defense

96

counsel suggested that the court conduct a general inquiry regarding the deadlock, without singling out the two jurors referenced in the foreperson's note.

## 2. *The court's initial inquiry regarding deadlock*

Adopting the parties' suggestion, the court called the jury into the courtroom and began its inquiry with the foreperson. Responding to the court's questions, the foreperson first indicated that he felt the jury was hopelessly deadlocked and that there was nothing the court could do such as providing additional jury instructions or rereading testimony that might assist the jury in reaching a decision. The court also elicited from the foreperson that the jury had taken three votes and that the most recent division was seven to four to one. The court then individually polled the remaining jurors, each of whom indicated that he or she agreed with the foreperson that the jury was deadlocked and that further deliberations would not result in a verdict.

The court held a sidebar conference to discuss the significance of the numerical division in the jury's most recent vote, commenting that any deadlock could not be attributed to the two jurors mentioned in the foreperson's note. The court also indicated its intention to conduct further questioning, including inquiry into the numerical breakdown of the juror's prior ballots, to determine whether the "one" vote meant a juror was sabotaging the deliberation process by abstaining from voting. In the presence of the jury, the court elicited from the foreperson that the juror in question was undecided, not refusing to vote. In response to the court's inquiry, the foreperson also indicated that the numerical breakdown of the second ballot was nine to two to one, and that, in the first ballot, the jury was divided eight to three to one.

Again at a sidebar conference, the court observed that the "trend is moving away from unanimity," but indicated it intended to direct the jury to continue

deliberating. Defense counsel objected, pointing out that all 12 jurors said they were hopelessly deadlocked. Counsel also voiced his concern that the jurors might interpret the court's directive to continue deliberations to mean they should change their votes and reach a verdict. Counsel asked the court to declare a mistrial as to the penalty phase or, alternatively, to expressly instruct the jurors that, in ordering them to continue deliberations, the court was not asking them to reach a verdict. After further discussion about the undecided juror, defense counsel indicated that he had no objection to the prosecutor's suggestion to further question the foreperson, who seemed to have hesitated when responding in the negative to the court's inquiry whether there was anything the court or the parties could do to assist the jury in its deliberations. At the same time, however, defense counsel reiterated his concerns that the jury would misinterpret the court's directive to resume deliberations as a command to reach agreement.

### 3. *The court's further inquiry into deadlock*

The court agreed to conduct further questioning and, at the outset, spoke to the jury as a whole. Likely prompted by defense counsel's concerns, the court told the jurors, "Nothing that I say in asking any questions of you should be interpreted in any way that I am looking for a certain decision from you or favoring a certain decision from you. I am — I think if there's one thing we've learned from the beginning of this trial, that what I've tried to do is be entirely fair to both sides, be entirely neutral, be entirely objective. So nothing that I say now should be viewed as being different from that approach that I have taken throughout. Okay?"

The court then called the foreperson to sidebar and questioned him regarding his complaints that two jurors had misrepresented their views on the death penalty. The foreperson indicated that there was at least one juror who said during

98

deliberations that she would never feel comfortable voting for death, but that even if that juror were excused, the jury would still be at an impasse.

After the foreperson had left sidebar, the parties offered their views on whether the juror in question had committed misconduct. The court then asked the prosecutor, "[I]f the court were to indicate that it's prepared to declare a mistrial, is there an objection from the People?" The prosecutor replied that "based upon what we have on the record, no. It would seem appropriate." However, the prosecutor requested the court ask the jurors if there was "anything we can do." Defense counsel opposed such questioning, pointing out that the same question had already been posed, and repeating his concern that the jury would misinterpret the court's inquiry. But when the court observed that it had questioned only the foreperson on that point, defense counsel asked whether, in that event, the court would begin its inquiry with Juror No. 2, which the court agreed to do.

Proceeding in numerical order beginning with Juror No. 2, the court asked each of the members of the jury a simple yes or no question, whether there was anything that the court could do, either rereading testimony or further instruction on the law, that would assist the jury in reaching a decision. Jurors Nos. 2, 3, 7, and 10 responded, "No." But Jurors Nos. 4, 5, 6, 11, and 12 replied, "Yes," and Jurors Nos. 8 and 9 stated, "Possibly." The court then indicated to the jurors that the court needed to know generally what they would find helpful, although the court also indicated that it had not discussed the matter with the attorneys and had not decided what type of assistance it would permit. The court remarked furthermore that "each and every one of us in this courtroom has a lot invested in the case in terms of our time, our energy, and if we can reach a decision, I'd like to." The court added, however, that "By my saying that, I'm not suggesting that you should reach any decision one way or the other. I'm just generally inquiring."

99

The court excused the jurors for the evening, and directed them to return to court the next day to continue their deliberations and to identify what would assist them, whether it be a rereading of instructions or testimony, or reargument by the parties. After the jury left the courtroom, the court remarked to the attorneys that "there is enough going on with some of these jurors who are saying that, with some help, as yet unidentified, maybe they think it's worthwhile to continue with the discussion, and I'm not willing to simply ignore that for the time being."

4. *The jury's requests for assistance and the court's denial of those requests and defense motions for mistrial*

The next morning, the third day of deliberations, the jury sent the court two "Jury Request" forms. The first form requested "New Argument — different spin on final arguments (15 minutes maximum w/no babbling (no visual aid)." The second form requested "to hear from Donald Brooks." The court conferred with the attorneys regarding the requests. The court first indicated that its tentative decision was to preclude additional argument by the parties. Both the prosecutor and defense counsel agreed. Defense counsel then moved for mistrial based on jury deadlock, asking the court in the alternative to poll the jurors again to inquire whether they were hung and, if so, to declare a mistrial at that time. Pointing to the jury's request to hear from defendant, counsel also moved for mistrial on the ground that the jury was disobeying the court's instruction not to consider defendant's failure to testify.

The court denied the motions for mistrial, but granted defense counsel's further request that the court convey to the jurors its ruling on their request to hear from defendant by simply saying, "Denied," rather than rereading the guilt phase instruction regarding defendant's right not to testify. The court also indicated that it intended to direct the jury to continue deliberating, but that if the jurors

100

indicated sometime later that day that they were still deadlocked, the court would consider declaring a mistrial at that point.

### 5. *The jury's request for further explanation of aggravating and mitigating factors*

When the jurors were called back into the courtroom later in the morning on the third day of deliberations, the court advised them of its rulings denying their requests to hear additional argument by the attorneys and testimony by defendant. The foreperson then indicated that an issue had just come to his attention, and he asked the court to provide a "deeper explanation of A through K." (See § 190.3, factors (a)-(k).) Specifically, the foreperson asked, "If you find one item in mitigation, is that enough for life in prison, if you find just one, or do you need several for each, or is it a scale?" How does that operate?" The court replied that it believed the standard instruction on the aggravating and mitigating factors answered that question, but indicated that it would confer with the attorneys regarding the issue. Confirming with the foreperson that no new votes had been taken that morning, the court then asked the foreperson whether the three deadlocked votes he had reported to the court the previous day reflected the jury's current position. The foreperson responded that there had been a fourth vote that previous day, in which the jury had split three to eight to one.

After directing the jury to return to the deliberations room, the court reviewed CALJIC No. 8.88, and concluded that the instruction directly answered the foreperson's questions. Defense counsel pointed out, however, that a more specific response would be that, under California law, a single factor in mitigation *is* enough to justify a verdict of life without the possibility of parole. Counsel asked the court to respond to the foreperson's question accordingly. Were the court not to give such a response, counsel asserted, the jury might believe a single factor is not sufficient.

101

The prosecutor strenuously opposed the response offered by defense counsel, arguing that it "feeds right into what the [standard] instruction says you can't do, which is a mechanical weighing." Defense counsel countered that his suggested response was not inconsistent with the prosecutor's position, and he urged the court to answer in the affirmative the specific question posed by the foreperson. The court concluded that it would reread the relevant portions of CALJIC No. 8.88 to the jury, but that it would consider additional instruction as requested by the parties.

When the jurors again returned to the courtroom, the court read aloud the reporter's transcript of the foreperson's question, and then reread selected portions of CALJIC No. 8.88. The court then released the jury for a lunch break. A short time later, outside the jury's presence, the court considered defense counsel's written motion asking the court to respond to the foreperson's question by telling the jury that "one mitigating circumstance may be sufficient to support a decision that death is not the appropriate punishment in this case." The court observed that the decisions cited by defense counsel in support of the suggested response addressed a different standard instruction, which was replaced by CALJIC No. 8.88. After hearing additional argument from the parties, the court determined that CALJIC No. 8.88 adequately answered the foreperson's question, and declined to provide any additional response. The court pointed out, for example, that the standard instruction informed the jury that each juror was free to assign whatever moral or sympathetic value he or she deemed appropriate to all of the various factors, and that, to return a verdict of death, each juror must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without the possibility of parole.

The court then denied counsel's motion for mistrial based on the court's decision to provide only the standard instruction in response to the foreperson's question.

### 6. *The jury's continued deliberations and verdict*

After the court's ruling denying defense counsel's request to respond more specifically to the foreperson's question, counsel queried whether the court intended to ask the jurors whether they were hopelessly deadlocked. The court indicated that it had no intention of doing so at that point in time, given the foreperson's report that the jury had not taken a vote since the previous day. Rather, the court stated that it would direct the jury to continue deliberations, and indicated that it had no set deadline for when it would declare a mistrial for jury deadlock.

The jury resumed deliberations after the lunch break. At 3:05 p.m. that same day, the foreperson reported that the jury had reached a penalty verdict. On being polled, each juror indicated that the verdict setting the penalty at death was his or her individual verdict.

### b. *Claims of error*

Defendant presents four interrelated claims of error based on the above described events and rulings. None requires reversal of the death judgment.

### 1. *Coercion of the verdict*

Defendant argues that the court's directive to the jurors to continue deliberations after they had reported a deadlock coerced the jury's verdict in violation of section 1140 and his federal and state constitutional rights to due process, jury trial, and a reliable death verdict. His claim lacks merit on this record.

103

Section 1140 provides in relevant part that a "jury cannot be discharged" without having rendered a verdict unless, "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." "The decision whether to declare a hung jury or to order further deliberations rests in the trial court's sound discretion." (*People v. Debose* (2014) 59 Cal.4th 177, 209; accord, *People v. Breaux* (1991) 1 Cal.4th 281, 319.) However, a court must exercise its power under section 1140 without coercing the jury, and "avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.' " (*People v. Breaux,* at p. 319.) As this court has explained, "[a]ny claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case." (*People v. Pride* (1992) 3 Cal.4th 195, 265; see *Lowenfield v. Phelps* (1988) 484 U.S. 231, 237 [whether the trial court coerced a verdict requires consideration of the court's actions " 'in its context and under all the circumstances' "].)

In arguing that the court erred by not granting defense counsel's first motion for mistrial based on jury deadlock, defendant emphasizes that all 12 jurors had indicated the jury was hopelessly deadlocked, and that there was a fairly close numerical split in the votes and a trend away from unanimity. The record shows that the first three ballots showed the jury was first divided eight to three to one, then nine to two to one, and then seven to four to one. Contrary to defendant's assertion, however, the circumstances of this case show neither an abuse of discretion nor coercion of the penalty verdict. When the jury first informed the court it was deadlocked, which occurred after only a brief period of deliberating, the court elicited from the foreperson that each of the jury's first three ballots reflected a different numerical split. And, after asking only the foreperson whether he believed there was anything the court could do to assist the jury in reaching a decision, the court reasonably conducted further inquiry into the

deadlock by asking the remaining 11 jurors the same question. (See Cal. Rules of Court, rule 2.1036(a) [when a deadlock is reported, the judge should ask jurors whether they have "specific concerns which, if resolved, might assist the jury in reaching a verdict"].) Given that seven jurors indicated that such assistance would, or might, be helpful, the court had an ample basis on which to conclude that there was a "reasonable probability" a verdict could be reached. (§ 1140.)

It is true, as defendant points out, that the court ultimately denied the jury's specific requests for testimony and argument. But we disagree with defendant's contention that because none of the tools for breaking the deadlock that were requested by the jurors were provided to them, the death verdict must be attributable to coercion. Contrary to defendant's reading of the record, the court did assist the jury by rereading selected portions of CALJIC No. 8.88 in response to the foreperson's question whether a single factor in mitigation could support a verdict of life without possibility of parole. Furthermore, the jury's request to hear from defendant was properly denied, at a minimum, because it fell outside the court's offer to *reread* testimony. The court did mention to the jury the possibility of having the attorneys present additional argument. When later denying that request, however, the court explained that allowing further argument by the parties was not a typical option for assisting deadlocked juries and that, on reflection, the court believed the penalty phase of a capital trial was not a time for innovation. That the court did not provide the specific assistance requested by the jury did not render the penalty verdict a product of coercion in this case.

Nor did the court either express or imply to the jurors that they must reach a unanimous verdict, or a particular outcome. (*People v. Sheldon* (1989) 48 Cal.3d 935, 959-960 [a judge's remarks regarding the necessity of reaching a unanimous verdict might produce a coerced verdict].) Defendant argues that coercion is shown by the court's remark that "[e]ach and every one of us in this courtroom has

a lot invested in the case in terms of our time, our energy, and if we can reach a decision, I'd like to."  But the record also shows that, after making that comment, the court immediately clarified that it was "*not suggesting that* [*the jury*] *should reach any decision one way or the other*."  And, the court had expressly conveyed to the jurors earlier that it was not "looking for a certain decision . . . or favoring a certain decision" from them.  Viewing the court's remarks as a whole, and contrary to defendant's assertions, we conclude the jury would not have understood the comments as a warning that failure to reach a verdict would waste both the parties' time and judicial resources.  (See *People v. Butler* (2009) 46 Cal.4th 847, 878, 884 [court's remarks to the deadlocked jury, which referred to two years of " 'sacrifice' " by the attorneys, the parties, and the witnesses in the case, did not suggest to the jury that it should consider the waste and hardship that would result from a mistrial, given that the court made no comments regarding the costs or prospects of retrial, or the desirability of a verdict].)

Defendant argues that the court's inquiry into the numerical split in the jury's votes was coercive because it communicated to the jurors in the minority that the court wanted them to change their minds.  The record does not support defendant's assertion, however.  At no time did the court suggest to the jurors they should reconsider their views in light of the numerical breakdown of the votes.  (*People v. Gainer* (1977) 19 Cal.3d 835, 852 [a trial court is not permitted to give an instruction encouraging jurors to consider the jury's numerical division when reexamining their own views].)  We note, furthermore, that when questioning the foreperson, the court cautioned him to provide only the numerical breakdown of the deadlock, and not to disclose which votes were for death and which were for life without parole.  This directive communicated to the jury that the court was not concerned with the direction of the voting.  (See *People v. Pride, supra*, 3 Cal.4th at pp. 264-265 [court's admonition to the foreperson not to provide details of the

106

jury's vote, and its lack of comment regarding the numerical breakdown, suggested to the jurors that the court found the direction of the vote irrelevant].) Given the fractured state of those votes, the jurors could not reasonably have believed that the court wanted them to reach a verdict of death.

Defendant relies on the Ninth Circuit Court of Appeals' decision in *Jiminez v. Myers* (9th Cir. 1993) 40 F.3d 976 (*Jiminez*) to support his claim that the court coerced the death verdict by inquiring into the numerical split of the jury's deadlock. We are not bound by the decisions of the federal appellate courts, although they may be considered for their persuasive weight. (*People v. Linton* (2013) 56 Cal.4th 1146, 1182, fn. 8.) But we need not decide whether to adopt the Ninth Circuit's reasoning in *Jiminez* because we conclude that the decision does not assist defendant. In *Jiminez*, after the jury reported a deadlock, the superior court judge asked the foreperson for a numerical breakdown of the numerous votes, and elicited from the foreperson that there had been some "movement," to which the court remarked, "[T]hat's what's important to me." (*Jiminez,* at pp. 978-979.) When the jury reported a deadlock after three more hours of deliberations, counsel for both sides indicated that a mistrial was appropriate at that point, but the court decided to bring the jury into the courtroom to determine if there had been " 'any substantial movement.' " (*Id*. at p. 979.) The foreperson informed the court that only a single juror remained in the minority, and he confirmed there had been " 'substantial movement since the last time.' " (*Ibid*.) The court then remarked, " 'Due to the fact we have had that type of movement, I would request, then, to finish the rest of today and see where we are at that point in time.' " (*Ibid*.) Defense counsel objected, asking the court to inquire whether further deliberations would be productive. The court disagreed with counsel's concern that the holdout juror would be subjected to undue pressure, noting that it

107

had asked the jury to deliberate for the " 'rest of today,' " which was only a period of two hours.  (*Ibid.*)

The Ninth Circuit reversed the defendant's conviction, concluding that, under the circumstances of that case, the trial judge had "crossed the line" between permissible inquiry regarding the numerical division of a deadlock and coercive instruction.  (*Jiminez, supra*, 40 F.3d at p. 981.)  As the appellate court explained, by expressing approval of the " 'movement' " toward juror unanimity and directing the jury to continue deliberations, the court in essence instructed the jury to strive to reach a verdict.  (*Id.* at pp. 980-981.)  And when the court learned following the second report of deadlock that only a single juror remained in the minority, and again communicated its approval of the movement toward unanimity, its directive to the jury to deliberate "until the end of the day sent a clear message that the jurors in the majority were to hold their positions and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity."  (*Id.* at p. 981.)

The circumstances in the present matter are distinguishable from those presented in *Jiminez* in a significant respect.  In that case, the court conveyed to the jury its approval of the progression toward unanimity.  No such approval was communicated here and, therefore, it cannot be said that the court impliedly instructed the jury to reach unanimity.  Indeed, the court expressly indicated otherwise, as previously mentioned.

We conclude that, in light of all the circumstances, the court's directive to the jury to continue its deliberations after the report of a deadlock neither violated section 1140 nor coerced a penalty verdict.

## 2. *Inquiry into the numerical division of the jury*

Separate from his arguments regarding jury coercion, defendant claims the trial court erred by even inquiring into the numerical breakdown of the jury's deadlock because such an inquiry is inherently prejudicial.

As a threshold matter, we disagree with the People that defendant has failed to preserve his claim for appeal because counsel did not object below to the court's inquiry into the numerical division of the jury. Instead, we agree with defendant that his claim was preserved for appeal because an objection would have been futile. As this court has explained, "[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence." (*People v. Welch* (1993) 5 Cal.4th 228, 237; cf. *People v. Price* (1991) 1 Cal.4th 324, 386 [counsel did not render ineffective assistance by failing to raise an objection on vicinage grounds, given Court of Appeal precedent to the contrary].) Of relevance here, *People v. Carter* (1968) 68 Cal.2d 810, 815, had long ago approved the practice of conducting an inquiry into the numerical breakdown of a deadlocked jury. The trial court therefore would have been bound to reject any argument that conducting such an inquiry is inherently prejudicial.

Although defendant's claim of error is properly before this court, we decline his invitation to reconsider this court's approval of the practice of inquiring into the numerical division of a deadlocked jury. Defendant argues that *Carter*'s reasoning is flawed because it relied on a series of cases that had assertedly misstated the rule in *Brasfield v. United States* (1926) 272 U.S. 448, which held that inquiry into the numerical division of a deadlocked jury is inherently prejudicial and per se reversible in the federal courts. We have repeatedly rejected the argument that defendant raises here. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1254; *People v. Breaux, supra*, 1 Cal.4th at p. 319; *People v. Rodriguez*

(1986) 42 Cal.3d 730, 776, fn. 14.)  He provides no persuasive reason to reconsider the issue in the present case.

### 3. Request to "hear from" defendant

As previously mentioned, the court learned on the second day of deliberations that the jury was deadlocked.  At a hearing conducted at the end of that court day, seven members of the deadlocked jury indicated they believed there might be something the court or the parties could do to assist them in their stalled deliberations.  The judge asked the jury to resume deliberations the following morning, and to identify what would assist them, such as a rereading of certain testimony, additional argument by the parties on a particular issue, or clarification of any of the court's instructions.

The next day, the jury responded to the court's invitation to identify what would help its deliberations by submitting two Jury Request forms.  One of the forms asked "to hear from Donald Brooks."  Defense counsel moved for mistrial based on that request, arguing that the jury had disobeyed the court's guilt phase instruction not to discuss or consider defendant's failure to testify.  (CALJIC No. 2.60.)[11]  The court denied the mistrial motion, but accepted defense counsel's suggestion to simply indicate to the jury that its request was denied, without further instruction or explanation regarding defendant's right not to testify.

Defendant argues that the jury's request "to hear from" him was serious misconduct, which established that his failure to testify was part of the jury's

---

[11]    The jury was informed at the guilt phase that "[a] defendant in a criminal trial has a constitutional right not to be compelled to testify.  You must not draw any inference from the fact that a defendant does not testify.  Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way."

deliberative process and its decision to return a verdict of death, in violation of his state and federal constitutional rights to silence and a reliable penalty verdict. Defendant's claim does not ultimately succeed, as explained below.

We can infer from the jury's request to hear from defendant that, contrary to the court's directive, the jurors discussed the fact of defendant's failure to testify. This was misconduct, which gives rise to a presumption of prejudice. (*People v. Holloway* (1990) 50 Cal.3d 1098, 1108.) To find the presumption of prejudice has been rebutted, there must be either an affirmative evidentiary showing of no actual bias, or a determination by the reviewing court after considering "[a]ll pertinent portions of the entire record, including the trial record . . ." (*In re Carpenter* (1995) 9 Cal.4th 634), that there is " 'no substantial likelihood' " of actual harm to the defendant from the misconduct. (*Id*. at p. 654; see *id*. at p. 657.)

Here, there is no affirmative evidentiary showing that no juror was actually biased. We can conclude from the trial record, and the record as a whole, however, that the jury drew no adverse inferences from defendant's failure to take the witness stand, and thus there was no substantial likelihood the jury's misconduct in discussing defendant's failure to testify actually harmed defendant. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1425 [purpose of prohibiting jurors from considering a defendant's failure to testify "is to prevent the jury from drawing adverse inferences against the defendant"].)

Indeed, an examination of the record as a whole strongly suggests that the jury's request to hear from defendant was a request for evidence in mitigation that would help the defense case. When the court asked the jurors to indicate what would assist them in their stalled deliberations, their response included a request to hear from defendant. But it cannot be inferred from that request that the jurors had considered defendant's failure to testify as evidence in aggravation or for the purpose of allaying any lingering doubt regarding his guilt. The jurors were

111

already aware of highly damaging evidence against defendant. Their struggle to reach a penalty verdict under these circumstances raises a strong inference that the jury's request to hear from defendant meant it was seeking evidence in mitigation that would help defendant's case. The inference that the jury's request amounted to a plea to hear additional mitigating evidence is even stronger when viewed in light of the jury's question, following the court's denial of the request to hear from defendant, whether a single factor in mitigation could outweigh multiple factors in aggravation to justify a sentence of life without the possibility of parole.

We observe, furthermore, that the defense presented an extensive case in mitigation; five witnesses testified regarding defendant's upbringing in an environment of alcohol-fueled domestic violence, his good character, and his dedication to his children. The case in mitigation therefore did not hinge on defendant's version of events, and it was not undermined by his failure to testify. The jury's penalty determination was a normative decision, not a "he said, she said" choice in which a jury might be likely to construe the defendant's failure to testify as further evidence of his guilt. The jury's request to hear from defendant in this case, was " 'not the same as punishing [defendant] for not testifying.' " (*People v. Leonard, supra*, 40 Cal.4th at p. 1425.)

The record discloses moreover that the jury's request to hear from defendant was made in response to the court's inquiry asking the jurors to identify what the court could do to assist them in their stalled deliberations. Significantly, any improper discussion among the jurors regarding defendant's failure to testify occurred, not during the jury's deliberative process, but rather while the jury was preparing its response to the court's request. The jurors had no reason in that context to draw an adverse inference from the fact defendant had not testified at trial.

112

Finally, the record also shows that the court's request that the jury identify what would assist its deliberations came at the end of the court day, and that the jury responded soon afterward on the following morning. Any discussion of defendant's failure to testify was likely to have been brief and innocuous. (Cf. *People v. Loker* (2008) 44 Cal.4th 691, 749 [jurors' comments on defendant's failure to testify were brief and had no impact on their penalty determination].)

Pointing to what he describes as "substantial factors in mitigation," defendant argues that the jurors' improper consideration of his failure to testify "pushed the jury over the edge" to a death verdict. This argument ignores the prosecution's compelling evidence of defendant's controlling, possessive behavior that induced sustained and palpable fear in the victim in the months leading up to the murder, and the grisly circumstances under which the murder occurred.

Defendant further asserts that because the jury's request to hear from him was refused, the jury likely held defendant's failure to testify against him when deciding penalty. Nothing in the record supports the inference defendant asks us to draw, however, as explained above.

Defendant contends finally that the court's comments during its post-verdict ruling denying the automatic motion for modification of the death sentence support his argument that he was prejudiced by the jury's misconduct in considering his failure to testify. The court observed that when it invited the jurors to indicate what would help them in their stalled deliberations, they said they would like to hear from defendant. What the jury wanted, the court believed, was "to know what was the defendant's motivation when he set that car on fire." In the court's view, "the answer to that question could very clearly have changed the jury's thinking about this case." The court remarked that knowing the answer to that question would have made its ruling on the motion to modify more

113

difficult, but observed that such evidence had not been presented to the jurors for their consideration.

Defendant's argument notwithstanding, the court's comments support the conclusion that the jury's misconduct did not prejudice defendant because it can be inferred that, by requesting to hear from him, the jurors were expressing the view that his testimony "might have assisted [them] in understanding him better." (*People v. Leonard, supra*, 40 Cal.4th at p. 1425.) Fairly read, the court's remarks simply acknowledged that such testimony might have provided the jury with additional mitigating evidence helpful to defendant's case. Those comments do not support defendant's argument that the jury drew adverse inferences from his failure to offer such evidence by taking the witness stand.

Having considered the relevant portions of the record as a whole, we conclude that there was no substantial likelihood defendant suffered actual harm from the jury's request to hear from him during the penalty phase, and that the presumption of prejudice has been rebutted.

### 4. *Single factor in mitigation*

As previously related (*ante*, at pp. 101-102), after the court denied the jury's request to hear from defendant and for additional argument by the attorneys, the foreperson asked for further explanation of the sentencing factors, specifically, whether one item in mitigation was enough for a sentence of life without the possibility of parole. The court declined to give defense counsel's proposed special instruction answering that question in the affirmative, concluding instead that CALJIC No. 8.88 adequately addressed the issue and indicating it would

114

reread to the jury relevant portions of that standard instruction.[12]  Defendant

argues that the court's failure to respond to the jury's question by giving the

proposed special instruction violated his state and federal constitutional rights.

We find no error.

As defendant acknowledges, this court has repeatedly rejected claims of error

based on the trial court's failure to specifically instruct the jury that a single factor

in mitigation could outweigh multiple factors in aggravation to justify a verdict of

life without the possibility of parole, as well as claims that CALJIC No. 8.88 fails

to adequately convey that principle.  (See *People v. Peoples* (2016) 62 Cal.4th

718, 769-770; *People v. Jones* (2012) 54 Cal.4th 1, 79-80; *People v. Kelly, supra,*

42 Cal.4th at p. 799; see also *People v. Salcido* (2008) 44 Cal.4th 93, 163

[observing that such an instruction was misleading in that it would wrongly imply

to the jury that at least one mitigating factor was *required* in order to return a

verdict of life without parole].)

Defendant argues that his case is distinguishable in a significant respect from

this court's prior decisions addressing this issue because here, defense counsel's

proposed special instruction responded to the jury's expression of confusion

---

**12**     In rereading to the jurors selected portions of CALJIC No. 8.88, the court
reminded them that "[t]he weighing of aggravating and mitigating circumstances
does not mean a mere mechanical counting of factors on each side of an imaginary
scale or the arbitrary assignment of weights to any of them.  You are free to assign
whatever moral or sympathetic value you deem appropriate to each and all of the
various factors you are permitted to consider.  [¶]  In weighing the various
circumstances, you determine under the relevant evidence which penalty is
justified and appropriate by considering the totality of the aggravating
circumstances with the totality of the mitigating circumstances.  [¶]  To return a
judgment of death, each of you must be persuaded that the aggravating
circumstances are so substantial in comparison with the mitigating circumstances
that it warrants death instead of life without parole."

115

regarding the concept that a single mitigating factor was sufficient for a verdict of life without parole. This distinction does not compel the conclusion that the court erred in refusing to give the proposed instruction, however. Section 1138 provides that when the jury "desire[s] to be informed on any point of law arising in the case . . . the information required must be given." However, "[w]here the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) In the present case, after a careful review of CALJIC No. 8.88, the court decided to answer the foreperson's question by rereading selected portions of the standard instruction. The court acted well within its discretion in choosing to so instruct because, as this court has concluded, CALJIC No. 8.88 adequately conveys the concept that even a single mitigating circumstance can support a sentence of life without the possibility of parole. (See *People v. Beardslee*, at p. 97 [the court "should decide . . . whether further explanation is desirable, or whether it should merely reiterate the instructions already given"].) We conclude the court did not abuse its discretion in refusing defense counsel's proposed instruction.

### 2. *Juror's exposure to information other than the evidence presented at trial*

Defendant contends the trial court erred in denying defense motions for mistrial based on juror misconduct and the defense request to remove the juror in question. As we explain, even assuming that juror misconduct occurred, the presumption of prejudice arising from such misconduct has been amply rebutted.

### a. *Background*

The evidentiary portion of the penalty phase ended on Friday, June 15, 2001. Later that same day, outside the jury's presence, the prosecutor informed the court that he had observed Juror No. 5 holding what he believed to be a copy of a

nonfiction book on the subject of stalking called The Gift of Fear, in which the prosecutor was referenced and quoted several times. The court indicated it would inquire into the issue the following week. On Monday, June 18, the court informed the parties that it would conduct the inquiry the next day. The court remarked that it needed to find out more about the book, but that "it seem[ed] unusual that [someone] would be reading such a book during such a trial."

The following day, Juror No. 5 was questioned by the court and the parties, outside the presence of the other jurors. She described The Gift of Fear as a book about "protection" and "listening to your intuition," but also indicated that when she realized the book concerned stalking and saw a reference to the prosecutor, she stopped reading it. She also denied having discussed the book with any other juror. Juror No. 5 explained that several weeks earlier she had been given the book by her chiropractor, who was very enthusiastic about the book and said it was a "must-read" for all women. According to the juror, she did not open the book right away. Rather, she started reading it at home one evening the previous week and brought it to court the next day but got only as far as page 17 when she stopped. Responding to the court's questions, Juror No. 5 indicated that nothing she read in the book had caused her to favor one side over the other or had otherwise affected her ability to be fair, impartial and objective. She added that what she actually read were things she already knew.

After Juror No. 5 had stepped outside chambers, defense counsel moved for mistrial of the guilt phase, mistrial of the penalty phase, and, in the event the mistrial motions were denied, removal of the juror. The court declined to declare a mistrial as to either phase of trial or to excuse Juror No. 5, concluding that nothing in the juror's responses warranted such measures. The court found it significant that Juror No. 5 did not seek out the book but was given it by a health professional. As the court pointed out, Juror No. 5 read the book briefly, and

117

stopped once she came to the point at which the prosecutor was mentioned. The court also emphasized the juror's assurances that the book had no effect on her ability to be fair, objective, and impartial.

### b. Discussion

The federal and state Constitutions guarantee a criminal defendant the right to a trial by an impartial and unbiased jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *In re Hitchings* (1993) 6 Cal.4th 97, 110.) A deprivation of that right can occur even if only one juror is biased. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (lead opn. of George, C.J.).)

Juror misconduct, such as the receipt of information other than what is presented at trial, generally raises a rebuttable presumption of juror bias and that the defendant suffered prejudice. (*In re Hamilton* (1999) 20 Cal.4th 273, 295-296; *People v. Nesler, supra,* 16 Cal.4th at p. 578.) This court has recognized that even inadvertent exposure to out-of-court information may constitute misconduct giving rise to the presumption of prejudice. (*People v. Nesler,* at p. 579; *People v. Cummings* (1993) 4 Cal.4th 1233, 1331 [misconduct for juror to inadvertently read newspaper article regarding the trial].)

However, "the presumption of prejudice is rebutted, and the verdict will not be disturbed, if a reviewing court concludes after considering the entire record, including the nature of the misconduct and its surrounding circumstances, that there is no substantial likelihood that the juror in question was actually biased against the defendant. [Citations.] Our inquiry in this regard is a 'mixed question of law and fact' subject to independent appellate review. [Citation.] But ' " [w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 95-96.)

Applying these principles, we conclude that although Juror No. 5's exposure to The Gift of Fear was misconduct, the presumption of prejudice was amply rebutted and the court did not err, either by refusing to declare a mistrial based on juror misconduct, or by denying the defense request to excuse Juror No. 5.

The court initially expressed some concern regarding Juror No. 5's impartiality, finding it "unusual" that a juror would be reading a book on stalking during the trial. After questioning the juror, however, the court concluded that her exposure to The Gift of Fear did not affect her ability to be fair, impartial, and objective. In reaching that conclusion, the court found that Juror No. 5 had been given the book by her chiropractor rather than having sought out the material herself, and that she had read the book only briefly before seeing a reference to the prosecutor and setting it aside. These findings, which are based on the court's assessment of the credibility of Juror No. 5's responses to questions posed by the court and the parties, are supported by substantial evidence.

Accepting the court's credibility determinations and factual findings, and in light of the circumstances surrounding the misconduct and the record as a whole, we conclude there is no substantial likelihood that Juror No. 5 was actually biased against defendant. Juror No. 5's exposure to the out-of-court information occurred because her chiropractor had loaned her The Gift of Fear, a book her chiropractor had enthusiastically touted as something that "all women should read." That Juror No. 5 did not herself seek out information on stalking belies any substantial probability of actual bias. We observe furthermore that Juror No. 5's exposure to the out-of-court information was brief and unremarkable, which further dispels any inference of bias. According to the juror, the 17 pages she read before putting down the book conveyed information that she already knew. Finally, there is nothing in the record suggesting that Juror No. 5 interjected any of the book's contents, or its references to the prosecutor, into her deliberations with follow

119

jurors, which also tends to negate the inference of bias. Notably, Juror No. 5 expressly denied having done so. (See *In re Carpenter, supra,* 9 Cal.4th at p. 657 [that the juror had not revealed the forbidden out-of-court information to any other juror tends to negate the inference that the juror was biased because one would expect a biased juror to tell the other jurors what she had learned].)

Defendant argues that Juror No. 5's actual bias is shown by her failure to notify the court herself when she realized that the book she was reading on the subject of stalking included quotes by the prosecutor. We note, however, that the court was well aware that Juror No. 5 had not come forward but nonetheless accepted her assurances that her exposure to the book did not cause her to favor one of the parties, or that it had otherwise affected her ability to be fair, impartial and objective. As explained above, the court's determination of Juror No. 5's credibility in this regard is supported by substantial evidence.

We observe, moreover, that a juror's failure to disclose his or her receipt of out-of-court information does not necessarily show bias. "Many jurors . . . might, for many reasons unrelated to bias, be reluctant to go forward and actively inject themselves into the proceedings." (*In re Carpenter*, *supra*, 9 Cal.4th at p. 656.)

In sum, although Juror No. 5 committed misconduct when she received and briefly read a book on the subject of stalking that included quotations by the prosecutor, we conclude from our consideration of the entire record that the presumption of prejudice arising from this misconduct has been rebutted because there is no substantial likelihood Juror No. 5 was actually biased against defendant. We therefore reject defendant's assertions that the trial court erred in denying his motions for mistrial based on juror misconduct and refusing to excuse Juror No. 5 for cause.

### 3. *Claims of instructional error at the penalty phase*

#### a. *Absence of instruction defining the elements of the factor (b) crimes*

As part of the prosecution's case in aggravation, the jury heard testimony by defendant's ex-wife, who described a number of violent incidents that occurred during the marriage. In connection with this evidence, which was admitted under section 190.3, factor (b), the court instructed pursuant to CALJIC No. 8.85 that, in determining penalty, the jury should consider "the presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

Defendant contends that the court had a sua sponte duty to further inform the jury what crimes defendant had committed, and to define the elements of those crimes. He acknowledges that this court has long held that a trial court has no duty to give such an instruction absent a request. (*People v. Carter* (2003) 30 Cal.4th 1166, 1227-1228; *People v. Cain* (1995) 10 Cal.4th 1, 72-74; *People v. Hardy* (1992) 2 Cal.4th 86, 205-206.) Our decisions have recognized that the defense may not want such instruction because it "could lead the jury to place undue emphasis on the crimes rather than on the central question of whether he should live or die.' " (*People v. Cain,* at p. 72.)

Defendant nonetheless urges that we reconsider our prior pronouncements because without instruction on the crimes defendant committed, he argues, a jury would not know whether the acts were felonies or misdemeanors and therefore lacked guidance on deciding whether the violent acts weighed in favor of death. Defendant's argument provides no compelling reason to reopen the question. This court observed in *People v. Anderson* (2001) 25 Cal.4th 543 that "[t]he California capital sentencing scheme does require that violent conduct be criminal in fact in

121

order to constitute valid penalty evidence." (*Id*. at p. 588.) "Moreover, 'because evidence that the defendant committed other violent crimes 'is often of "overriding importance . . . to the jury's life-or-death determination," ' " our law requires "that other-crimes evidence offered for this purpose be subject to the reasonable doubt standard of proof. [Citations.] In other words, before a sentencing juror weighs the *culpable nature* of such other violent criminal conduct on the issue of penalty, he or she must be highly certain that the defendant committed it." (*Id*. at p. 589.) However, as this court has further observed, in making what is an "essentially normative determination," the sentencer must decide "simply whether the aggravating circumstances, as defined by California's death penalty law (§ 190.3), so substantially outweigh those in mitigation as to call for the penalty of death, rather than life without parole." (*Ibid*.) To require sua sponte instructions on the elements of offenses that make up the defendant's history of violent conduct " 'would immerse the jurors in lengthy and complicated discussions of matters wholly collateral to the penalty determination.' " (*Ibid*.) A similar concern would arise were we to require instruction regarding the status of those violent crimes as felonies or misdemeanors.

### b. Modification of instructions proposed by the defense

Defendant contends the trial court violated his state and federal constitutional rights to due process and the prohibition against cruel and unusual punishment by the manner in which the court modified four penalty phase instructions requested by the defense. As explained below, the court did not err.

### 1. Victim impact evidence

Defense counsel first requested that the jury be instructed on victim impact evidence as follows: "Evidence has been introduced in this case that may arouse in you a natural sympathy for the victim or the victim's family. [¶] *You must not*

*allow such evidence to divert your attention from your proper role in deciding the appropriate punishment in this case.* You may not impose the penalty of death as a result of an irrational, purely emotional response to this evidence."

The court granted the request to instruct on victim impact evidence but modified the requested instruction by omitting the italicized sentence, agreeing with the prosecutor that the sentence at issue suggested to the jury that it could not consider victim impact testimony when making its penalty determination.

Defendant argues that the language omitted from the instruction was necessary for the jury's understanding that victim impact testimony should not divert its attention from making an individualized sentencing determination based on the circumstances of the crime and defendant's general character. He points out that, as modified, the instruction posed a risk that the emotionally powerful victim impact evidence, and the prosecutor's argument highlighting it, would prevent the jury from properly assessing defendant's culpability and character.

*People v. Edwards* (1991) 54 Cal.3d 787 cautioned trial courts deciding whether and to what extent to allow victim impact evidence and argument at the penalty phase to curtail " 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response.' " (*Id.* at p. 836.) However, this court has repeatedly rejected claims of error based on a trial court's outright refusal to give a victim impact instruction similar to the one requested by defendant here, which tracks the above quoted language from *Edwards*. (See, e.g., *People v. Sattiewhite, supra,* 59 Cal.4th at pp. 483-484; *People v. Montes, supra,* 58 Cal.4th at pp. 884-885; *People v. Zamudio, supra,* 43 Cal.4th at pp. 368-370.) As *Zamudio* explained in relevant part, such an instruction would be misleading because jurors are permitted to " 'exercise sympathy for the defendant's murder victims and . . . their bereaved family members' " when considering the circumstances of the crime. (*Id.* at

123

p. 368, italics omitted; see *People v. Sattiewhite*, at p. 484 [to the extent the proposed instruction would have suggested to jurors that emotion and sympathy played no role in their penalty deliberations, the court was correct to reject it as misleading].)

Here, the court did not altogether refuse to give the victim impact instruction proposed by the defense. Rather, the court modified the instruction to omit any suggestion that the jury was not permitted to consider the victim impact evidence when deciding penalty. The court did not err in doing so.

### 2. Mercy

Defense counsel requested the following special instruction on mercy: "After considering all the aggravating and mitigating factors that are applicable in this case, you may decide to impose the penalty of life in prison without the possibility of parole in exercising mercy on behalf of the defendant. *You may decide not to impose the penalty of death by granting the defendant mercy regardless of whether or not you determine he deserves your sympathy*."

In response to the defense request, the court indicated that it wanted the jurors to understand they could exercise mercy. Agreeing with the prosecutor, however, the court found the italicized portion of the proposed instruction "too dictatorial" and decided to modify the instruction by omitting that second sentence. In addition to giving the modified instruction on mercy, the court gave a modified version of an instruction regarding sympathy that was also proposed by the defense. In relevant part, that instruction stated, "You may consider sympathy or pity for the defendant if you feel it appropriate to do so in determining to impose the penalty of life in prison without the possibility of parole, rather than the penalty of death." The court also instructed with CALJIC No. 8.85, which conveyed to the jury that it could consider "any sympathetic or other aspect of the

124

defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

Defendant complains that the court's deletion of the proposed instruction's second sentence, which would have told the jurors that they could exercise mercy even if they found defendant undeserving of their sympathy, prevented the jury from understanding it had absolute power to return a sentence of life without the possibility of parole, regardless of other factors. We find no error.

The defendant in *People v. Caro* (1988) 46 Cal.3d 1035 raised a similar claim, asserting that the court erred by failing to make clear to the jury that it had " 'the power to exercise mercy.' " (*Id*. at p. 1067.) In that case, the trial court had instructed the jurors that they "could consider sympathy." (*Ibid*.) This court rejected the defendant's argument that additional instruction was necessary because there was "a crucial difference between pity, sympathy, and mercy," concluding instead that the instructions as given could not have created any ambiguity for the jury regarding its power to exercise mercy when making its penalty determination. (*Ibid*.)

Likewise here, the language omitted from the proposed instruction that drew a distinction between sympathy and mercy was not necessary to the jurors' understanding that they were permitted to act with mercy or leniency in arriving at their penalty verdict.

### *3. Lingering doubt*

Defense counsel requested the court give an instruction that would have informed the jury in relevant part that "a juror who voted for conviction at the guilt phase may still have a lingering or residual doubt as to whether the defendant truly did not kill Lisa Kerr in the heat of passion." The court expressed concern with the above quoted portion of the proposed instruction and, after discussing the

125

matter with the parties, decided to modify the proposed instruction by omitting that sentence and two others. The court ultimately instructed the jury that "[i]t is appropriate for you to consider in mitigation any lingering doubt you may have concerning the defendant's guilt. Lingering or residual doubt is defined as that state of mind between beyond a reasonable doubt and beyond all possible doubt."

Defendant argues that the court violated his state and federal constitutional rights to due process, jury trial, and a reliable death verdict by refusing to give the proposed instruction in its entirety. We reject his claim of error.

Defendant is correct that a penalty phase jury may consider lingering doubt as a factor in mitigation. But, as defendant acknowledges, a trial court is under no obligation, constitutional or otherwise, to give a lingering doubt instruction. (*People v. Streeter, supra*, 54 Cal.4th at pp. 265-266; *People v. Brown* (2003) 31 Cal.4th 518, 567.) This court has observed that the standard instruction (CALJIC No. 8.85) describing the factors the jury should consider when making its penalty determination, which include any "circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," together with defense counsel's argument emphasizing the question of lingering doubt, sufficiently covers the concept for the jury. (*People v. Zamudio, supra*, 43 Cal.4th at p. 370; *People v. Sanchez* (1995) 12 Cal.4th 1, 77-78.)

Here, the defense case in mitigation included testimony from Sheila Peet regarding defendant's fragile emotional state during his relationship with Kerr. Moreover, the court instructed the jury with CALJIC No. 8.85 and with portions of the lingering doubt instruction proposed by the defense, which further highlighted the concept. Finally, defense counsel argued lingering doubt as to defendant's state of mind at the time of the crimes. Contrary to defendant's argument here, the trial court's modification of the proposed special instruction did not preclude the

126

jury from giving meaningful consideration to the mitigating evidence tending to show defendant committed manslaughter instead of murder.

Defendant argues, however, that once the court decided to instruct on lingering doubt, it was required to pinpoint for the jury that the defense theory of lingering doubt was based on heat of passion. To support this proposition, defendant cites to *People v. Gay* (2008) 42 Cal.4th 1195, but that decision does not assist him. In that case, the court gave the penalty jury a lingering doubt instruction but prevented defense counsel from presenting a lingering doubt defense and informed the jury that the defendant's responsibility for the murder had been conclusively decided at an earlier trial on guilt. (*Id.* at p. 1225.) This court reversed the penalty judgment, holding that these evidentiary and instructional errors posed "an intolerable risk" that the jury did not consider the defense case in mitigation, which was largely based on lingering doubt. (*Id.* at p. 1226.) *Gay* did not state that instruction on lingering doubt is required, but that, under our death penalty law, the defense is entitled to present evidence and argument in support of a lingering doubt defense. In the present matter, defendant received that to which he was entitled, and more.

### *4. Sympathy or pity*

The court agreed to instruct the jury with one of two paragraphs in a proposed special instruction regarding sympathy. That portion of the proposed instruction informed the jury that "You may consider sympathy or pity for the defendant, if you feel it appropriate to do so, in determining to impose the penalty of life in prison without the possibility of parole rather than the penalty of death," and the jury was so instructed. However, the court refused to give the portion of the proposed instruction that would have told the jury that "[i]f any of the evidence arouses sympathy or compassion in you to such an extent as to persuade you that

127

death is not the appropriate punishment, you may react in response to those feelings of sympathy and compassion and impose life in prison without the possibility of parole."

Defendant complains that the court's refusal to give the remainder of the proposed instruction violated the constitutional prohibition against cruel and unusual punishment because, without the omitted sentence, the jury would not have understood that sympathy or pity *alone* was a sufficient basis on which to return a verdict of life without the possibility of parole, even in the absence of mitigating evidence.

Contrary to defendant's argument, the court did not err by refusing to give the requested instruction in its entirety because other instructions adequately informed the jury regarding the mitigating role of sympathy and pity in its penalty determination. For example, in addition to the portions of the proposed instructions on sympathy and mercy that the court agreed to give (see *ante*, p. 124), the court also read CALJIC No. 8.88, which told the jurors in relevant part that they were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." That instruction informed the jury moreover that "the weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them.

During closing arguments, the parties further emphasized the process of weighing aggravating and mitigating factors. The prosecutor argued, for example, that "when you put to [the aggravating factors] the weight and value that you deem appropriate . . . what will be appropriate in this case is imposition of the death penalty." Defense counsel told the jury that "each one of these factors you

128

attribute weight to, and only one factor — only one factor — that you feel is an important consideration in not fixing the punishment of death is enough."

In *People v. Berryman* (1993) 6 Cal.4th 1048, 1097-1098, this court rejected the defendant's contention that the court erred in refusing, as duplicative, an instruction identical to the instruction proposed in this case. As *Berryman* explained, "[a] reasonable juror would have understood and employed the instructions [that were given] to allow him to consider and give effect to pity, sympathy, and mercy to the extent he deemed appropriate in this case — and indeed to require him to do so." (*Id*. at p. 1098.) The jury in the present matter was instructed with the same instructions given in *Berryman*. We likewise conclude that, on this record, the court's instructions, together with the parties' closing arguments, adequately informed the jury that sympathy for the defendant alone was enough to support a sentence of life without parole. The court did not err in modifying defense counsel's proposed instruction regarding sympathy.

### c. Instruction directing the jury to decide which guilt phase instructions applied at the penalty phase

Defendant claims that the court prejudicially erred by failing to specify which of the guilt phase instructions applied at the penalty phase and instead leaving that issue for the jury to decide for itself. We agree that the court erred by failing to provide the jury with the guilt phase instructions applicable to its penalty determination, but conclude that the instructional error was harmless.

### 1. Background

During discussion between court and counsel regarding the penalty phase instructions to be given at the conclusion of evidence, the court expressed the view that it must reread to the jury the guilt phase instructions that apply at the penalty phase. Defense counsel strenuously objected to the court rereading any of the instructions from the guilt phase, or making the original set of instructions

129

available during deliberations. Counsel's primary concern was that the penalty phase instructions proposed by the defense would "be lost" and "buried in the pile" were the court to reread the guilt phase instructions or simply give them to the jury.

The court briefly consulted with another judge regarding the guilt phase instructions issue. The court then returned to the courtroom and indicated to the attorneys that it intended not to reread aloud the guilt phase instructions. Instead, the court explained, it would send the packet of instructions into the jury room and advise the jurors that they could consider those instructions they deemed appropriate and should not consider those instructions they deemed inapplicable to the penalty phase. The prosecutor agreed with that procedure, but defense counsel again objected to the guilt phase instructions being sent into the jury room. The court overruled the objection and announced it would proceed as planned.

After the presentation of evidence and closing arguments by the attorneys, the court gave the penalty phase instructions, beginning with the following. "Ladies and gentlemen, we've now completed the final arguments of counsel in this, the penalty phase of the trial. It's my duty now to instruct you on the law that will apply to the case. . . . [I]n the early guilt or innocence phase of the trial, I instructed you on the law applicable to that phase of the trial. You should consider those prior instructions on the law to the extent that you view them as properly applying to any of the issues present in the penalty phase of the trial. However, you should not consider any of the prior instructions on the law which you find to be inapplicable to the questions and issues now before you in this penalty phase."

The court then instructed with the standard penalty phase instructions and the instructions requested by the defense, as modified by the court. In relevant part, the jury was instructed that "You will now be instructed as to all of the law that applies to the penalty phase of this trial. . . . You must accept and follow the law

130

that I shall state to you. Disregard all other instructions given to you in other phases of this trial except as instructed by this court." (See CALJIC No. 8.84.1.)

## 2. *Discussion*

Defendant contends that the court erred in directing the jurors to apply the guilt phase instructions they deemed applicable at the penalty phase because it was the *court's* obligation to specify which of those instructions applied. Defendant asserts that the court's instruction deprived the jury of guidance regarding how to evaluate the penalty phase evidence.

As a preliminary matter, we reject the People's argument that defendant invited any error because defense counsel requested that no guilt phase instructions be given to the jury, either orally or in written form. "The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction." (*People v. Lucero* (2000) 23 Cal.4th 692, 723.) Were defendant to claim here that the court should have reread the applicable guilt phase instructions, we would agree with the People that defendant's contention was barred by the invited error doctrine. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1319 [when counsel argued at length against reinstructing with the guilt phase instructions, defendant's claim on appeal that the court erred by not rereading the guilt phase instructions was barred by the invited error doctrine].) But defendant's claim is that the court erred by leaving it to the jury to decide which of the guilt phase instructions to apply at the penalty phase. Counsel did not ask the court to have the jury make that determination. Indeed, he specifically objected to having the original set of guilt phase instructions made available for the jury's review during penalty phase deliberations. The court still had a duty "to instruct the jury on the 'general principles of law that [were] closely and openly

131

connected to the facts and that [were] necessary for the jury's understanding of the case.' " (*People v. Moon* (2005) 37 Cal.4th 1, 37.)

Regarding the merits of defendant's claim, we agree with defendant that the court erred in directing the jury to decide which of the guilt phase instructions applied at the penalty phase. The People do not argue otherwise. As previously mentioned, the court instructed with CALJIC No. 8.84.1, telling the jury that it must "accept and follow the law that I shall state to you" and to "[d]isregard all other instructions given to you in other phases of this trial" except as instructed by the court. We have concluded that "if a trial court so instructs a capital jury, it must later provide it with those instructions applicable to the penalty phase." (*People v. Moon, supra*, 37 Cal.4th at p. 37.)

*People v. Harris, supra*, 43 Cal.4th 1269 is in accord. The trial court in that case did not reinstruct the jury with the guilt phase instructions but, after reading CALJIC No. 8.84.1, gave a special instruction directing the jury in relevant part to " 'be guided by the previous instructions given in the first phase of this case which are applicable and pertinent to the determination of penalty.' " (*Harris,* at p. 1318.) Relying on *Moon*, this court concluded that the court erred, and urged trial courts to "take pains to ensure that penalty phase juries are fully and properly instructed." (*Harris*, at p. 1319.) Similarly here, the court's instruction leaving it to the jury to decide which of the guilt phase instructions to apply to its penalty determination, followed by instruction with CALJIC No. 8.84.1, provided no assurance that the jurors were fully and properly instructed.

Defendant asserts that, absent certain instructions from the guilt phase such as CALJIC Nos. 2.00 through 2.81, the jury had no adequate standards by which to assess the penalty phase evidence. For example, he argues, absent specific instruction with CALJIC No. 2.20, regarding the believability of a witness, the jury had no basis for determining the truthfulness of the defense witnesses.

132

The record does not disclose which guilt phase instructions, if any, the jury decided to apply to its penalty determination. But even were the court's special instruction to have led to the omission of the applicable guilt phase instructions altogether, we conclude that defendant was not prejudiced because the jury was not prevented from considering defendant's evidence in mitigation. (See *People v. Carter, supra*, 30 Cal.4th at p. 1221.) The jury did not need to be instructed on how to consider the defense evidence, such as the testimony of defendant's mother and sister, who described for the jury defendant's difficult background and his generous, loving character, or the testimony of the three other witnesses who testified further regarding defendant's good character and his reputation as an honest and hardworking plumber. None of the witnesses provided lengthy testimony and none was extensively cross-examined by the prosecutor. Notably, there was no testimony by expert witnesses for the jury to assess: Neither side called a mental health or forensic professional, and the defense presented defendant's social history through family members, rather than through an expert. Furthermore, the evidence from both sides was direct, and neither the prosecution nor the defense presented circumstantial evidence or evidence intended for a limited purpose. "In short, the penalty phase evidence was entirely straightforward, and the trial court's failure to reinstruct the jury with any applicable guilt phase instructions was harmless under any standard." (*People v. Moon, supra*, 37 Cal.4th at p. 39.)

### d. CALJIC No. 8.88

The trial court instructed the jury with CALJIC No. 8.88, the standard instruction on how to weigh the aggravating and mitigating evidence. Defendant asserts that the instruction is constitutionally deficient because it failed to convey

133

to the jury the scope of its discretion regarding imposition of the death penalty, in violation of his constitutional rights to due process and a reliable death verdict.

Defendant acknowledges that this court has repeatedly rejected the arguments he raises here — that CALJIC No. 8.88 impermissibly requires the jury to return a death verdict if aggravating factors outweigh mitigating factors, and allows the jury to arbitrarily disregard mitigating factors. (See, e.g., *People v. Brasure, supra,* 42 Cal.4th at pp. 1061-1064; *People v. Duncan* (1991) 53 Cal.3d 955, 977.) He observes, however, that none of the prior decisions considered *People v. Smith* (2005) 35 Cal.4th 334, in which this court concluded that a modified instruction that was based on CALJIC No. 8.88 satisfied the constitutional command to inform the jury of its sentencing discretion. (*Smith,* at p. 371.) The instruction in that case told the jury in relevant part that " '[*y*]*ou may, but are not required to return a judgment of death* if each of you are persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.' " (*Ibid.,* italics added.) As defendant points out, the italicized portion of the instruction in *Smith* was not part of the version of the standard instruction given in the present matter, which told the jury only that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial that it warrants death instead of life without parole." Accordingly, he argues, this court's prior decisions approving CALJIC No. 8.88 do not resolve whether the instruction was constitutionally adequate in his case.

Defendant misreads this court's decision in *Smith*. We did not hold that the instruction given in that case was constitutionally adequate *because* it included the italicized language. Rather, pointing to the decisions holding that CALJIC No. 8.88 satisfied the constitutional command to advise the jury regarding its sentencing discretion, this court rejected the defendant's claim that the trial court erred in

refusing his proposed supplemental instruction, which would have informed the jury that " 'one mitigating factor can sometimes outweigh a number of aggravating factors.' " (*People v. Smith, supra*, 35 Cal.4th at p. 371.)  It is axiomatic that a case is not authority for an issue that was not considered.  (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.)

Although this court has not addressed the specific language in *Smith* that defendant characterizes as "critical" to the jury's understanding of its sentencing discretion, we have rejected claims similar to the one defendant raises here.  For example, in *People v. Butler, supra,* 46 Cal.4th 847, this court found no error in the court's refusal to give a proposed instruction that would have informed the jury in relevant part "that it could, but was not required to, impose the death penalty if aggravating circumstances outweighed mitigating circumstances." (*Id*. at p. 874.)  In rejecting the defendant's claim of error, we reiterated that CALJIC No. 8.88 properly instructs the jury on the weighing of aggravating and mitigating factors.  (*Butler,* at p. 874.)  Likewise in *People v. Burney* (2009) 47 Cal.4th 203, this court rejected the defendant's argument that the trial court erred by refusing defense counsel's request to instruct the jury that " 'you may return a verdict of life imprisonment without possibility of parole even if you find that the factors and circumstances in aggravation outweigh those in mitigation.' " (*Id*. at pp. 263-264, fn. 19.)  The proposed instruction, we concluded, "merely restated the principles that flowed from" CALJIC No. 8.88, which "is adequate and correct."  (*Burney,* at p. 264.)  We decline defendant's invitation to reconsider our prior pronouncements on the adequacy of CALJIC No. 8.88.

### 4. *Cumulative effect of the asserted errors at the penalty phase*

Defendant contends that the judgment of death must be reversed because the cumulative effect of the trial court's asserted errors during the penalty phase

deprived the jury of its ability to fairly and properly find the facts necessary to determine that life without possibility of parole was the appropriate sentence. We have concluded that the jury committed misconduct by discussing the fact of defendant's failure to testify, that Juror No. 5's exposure to a book on the subject of stalking constituted misconduct, and that the trial court erred by having the jury decide for itself which of the guilt phase instructions applied at the penalty phase. We concluded furthermore, however, that defendant was not prejudiced by any of the errors. (See *ante*, at pp. 111-114, 119-120, 132-133.) We reach the same conclusion viewing those errors singly or together.

### C. Denial of Automatic Motion to Modify Death Verdict

At pages 111 through 115, *ante*, we agreed with defendant that the jury's request to "hear from" him was misconduct because it contravened the court's instruction not to discuss defendant's failure to testify. We concluded nonetheless that the presumption of prejudice has been rebutted because no adverse inferences can be drawn from the jury's request for testimony by defendant at the penalty phase. (*Ibid*.) In reaching that conclusion, we disagreed with defendant's argument that certain comments made by the court when it denied the automatic motion for modification of the death verdict supported his argument that he was prejudiced by the jury's misconduct.

Relying on the same comments by the trial court, defendant has reframed his argument as a challenge to the court's denial of the automatic motion to modify his sentence. (§ 190.4, subd. (e).) Specifically, defendant argues that the death judgment must be reversed because the *court* erroneously considered defendant's failure to testify when deciding not to modify the death verdict. For the reasons that follow, we conclude that defendant's claim of error was not preserved for appeal and that, in any event, it lacks merit on this record.

136

*1. Background*

The court conducted a hearing on the automatic motion to modify the death verdict. Before announcing its ruling, the court summarized the nature of its inquiry and heard argument by the parties. Defense counsel reviewed the evidence relating to the various sentencing factors, arguing that the evidence in aggravation was limited and weak. In this regard, counsel expressed the view that the jurors did not follow the court's instruction that each of them must find that "the aggravating circumstances are so substantial in comparison to the mitigating circumstances that it warrants death instead of life without parole." (See CALJIC No. 8.88.) Counsel also repeated his earlier argument that, after reporting a deadlock, the jurors' request to hear from defendant ignored the court's instruction not to consider defendant's failure to testify and was therefore misconduct.

After hearing argument by the prosecutor, the court announced its ruling finding that the aggravating circumstances outweighed the mitigating circumstances, and denying the motion to modify sentence. In explaining the reasons for its ruling, the court described the aggravating and mitigating evidence the court had independently reweighed as it related to each of the 11 sentencing factors provided in section 190.3, including the circumstances of the crime, defendant's prior violent conduct, whether defendant was acting under extreme mental or emotional disturbance, and other circumstances that extenuated the gravity of the crime or aspects of defendant's character on which a sentence less than death could be based. (See § 190.3, factors (a), (b), (d), (k).)

After having discussed the evidence the court had independently considered and reweighed in light of each of the sentencing factors, the court made the following comments, which we set out in some detail. "In response to my inquiry of the jury if there was anything else we could do to assist them when they were reporting being deadlocked in the penalty phase . . . , [¶] [o]ne of the things they

137

said was 'we'd like to hear from the defendant.' [¶] I did not go into any great length to explain to them that the defendant has a right not to testify and he chose to exercise that right . . . . But I can guarantee you that what the jury wanted to know was what was the defendant's motivation when he set that car on fire. Was he finishing the job? Was she in the backseat moaning and groaning even though in a semiconscious state, or did he think she was dead and was just destroying the evidence?"

The court continued, "I think the answer to that question could very clearly have changed the jury's thinking about this case. And indeed, I've thought long and hard about it. I can't make up an answer to that question. I cannot speculate or conjecture. That evidence is not before this court to be reweighed. It was not before the jury to be considered. [¶] What the jury did decide, based upon the evidence, was that she was killed by thermal injury. So I've often thought that if we knew the answer to my question, it might be a very difficult situation with which we are all now confronted, but as I've indicated, I cannot fill in the blanks. I can only reweigh the evidence that was presented, and I have carefully considered and weighed the aggravating and mitigating circumstances, as previously stated."

### 2. Discussion

As a preliminary matter, we agree with the People that defendant has forfeited his challenge to the court's ruling on the automatic motion for modification of the death verdict because counsel did not raise in the trial court the error he asserts here. (*People v. Brady* (2010) 50 Cal.4th 547, 588; *People v. Mungia* (2008) 44 Cal.4th 1101, 1141 [a defendant must bring to the trial court's attention any deficiency in its ruling on the automatic motion to modify so that the court has an opportunity to correct any asserted error].)

138

Defendant argues that defense counsel was excused from objecting because counsel reasonably would have believed that an objection would have been futile, given that the court had already denied the defense motion for mistrial based on the jury's request to hear from defendant. (See *ante*, at p. 111.) What appears more likely, however, is that counsel viewed the court's comments simply as a response to his argument at the hearing that the jury had violated the court's instruction not to consider defendant's failure to testify, and not as an indication that the *court* had considered defendant's failure to testify when ruling on the motion to modify the death verdict, as defendant now argues. In any event, defendant's claim of error is unsupported by the record.

Fairly read, the court's comments demonstrate that the court did not base its denial of the automatic motion to modify the death verdict, even in part, on defendant's failure to testify. Likely in response to defense counsel's argument, the court offered its view as to why the jury wanted to hear from defendant, that is, the jury wanted to know defendant's motivation when he set the car on fire — whether it was to "finish the job" or, in the belief that Kerr was already dead, to destroy evidence of the killing. The court was of the opinion that the answer to that question could have changed the outcome of the case, or have affected the motion to modify. But as shown above, the court emphasized, repeatedly, that it could not speculate as to the answer to that question, and that such evidence was neither presented to the jury for its consideration nor was it before the court for reweighing. Defendant's argument that the court gave impermissible weight to his failure to testify misreads the court's remarks. Contrary to defendant's assertion, nothing in the record suggests the court viewed defendant's failure to testify as having left an evidentiary gap concerning why he set Kerr and the car on fire. Nor does defendant point to anything supporting his argument that the court, like the

139

jury, relied on defendant's failure to testify to assume that he must have known Kerr was alive when he set the fire.

The court concluded its comments at the hearing by reiterating that it had carefully considered and weighed the aggravating and mitigating circumstances. The record bears out the court's observation, and establishes furthermore that the court fully complied with its obligation to (1) independently reweigh the evidence of aggravating and mitigating circumstances, (2) determine whether the weight of the evidence supports the jury's death verdict, and (3) explain on the record the reasons for its ruling. (*People v. Brady, supra*, 50 Cal.4th at p. 588; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1079.) The court's belief that the jury asked to hear from defendant because it wanted to know whether defendant's motivation in setting fire to Kerr's car was to "finish the job" is a questionable assertion, given the jury's earlier verdicts finding true the kidnapping-murder and torture-murder special-circumstance allegations, both of which require a live victim. Nonetheless, the record belies defendant's argument that the court erroneously considered his failure to testify in denying the automatic motion for modification of the death verdict.

### D. Constitutionality of California's death penalty scheme

Defendant presents numerous challenges to the constitutionality of California's death penalty law that, as he acknowledges, are identical to those that this court has previously considered and rejected. We decline his request to reconsider our prior conclusions here. (*People v. Schmeck* (2005) 37 Cal.4th 240, 303.)

The special circumstances listed in section 190.2 that render a murderer eligible for the death penalty, which include felony murder and lying in wait, are not so numerous and broadly interpreted that they fail to narrow the class of death-

eligible first degree murderers as required by the Eighth and Fourteenth Amendments. (*People v. Johnson* (2016) 62 Cal.4th 600, 654-655; *People v. Myles* (2012) 53 Cal.4th 1181, 1224-1225.)

Section 190.3, factor (a), which requires the jury to consider as evidence in aggravation the circumstances of the capital crime, is not so broad as to allow the arbitrary and capricious use of contradictory circumstances to support a death verdict, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. (*People v. Merriman, supra*, 60 Cal.4th at pp. 105-106; *People v. Brown* (2004) 33 Cal.4th 382, 401.)

The jury's reliance on unadjudicated criminal activity as a factor in aggravation under section 190.3, factor (b), without any requirement that the jury unanimously find that the activity was proved beyond a reasonable doubt, does not deprive a defendant of any federal constitutional rights, including the Sixth Amendment right to trial by jury and the Fourteenth Amendment right to due process. (*People v. Clark, supra,* 52 Cal.4th at p. 1007; *People v. Balderas* (1985) 41 Cal.3d 144, 204-205.)

Nor does section 190.3's use of adjectives such as "extreme" and "substantial" in factors (d) and (g), respectively, act as a barrier to the jury's consideration of mitigating evidence, in violation of constitutional commands. (*People v. Johnson, supra*, 62 Cal.4th at p. 656; *People v. Adcox* (1988) 47 Cal.3d 207, 270.)

Regarding defendant's various challenges to the penalty phase procedures, this court has repeatedly rejected arguments that the federal Constitution requires the penalty phase jury to make unanimous written findings beyond a reasonable doubt that the aggravating factors exist, that they outweigh the factors in mitigation, and that death is the appropriate penalty. (*People v. Johnson, supra*, 62 Cal.4th at p. 655; *People v. Linton, supra*, 56 Cal.4th at p. 1215.) This court

141

has also concluded that "neither the federal Constitution nor section 520 of the Evidence Code requires that the jury be instructed that the prosecution has the burden of proof with regard to the truth of aggravating circumstances or the appropriateness of the death penalty, and the trial court is not required to explicitly tell the jury that neither party bears the burden of proof." (*People v. Leonard, supra*, 40 Cal.4th at p. 1429.)

There is no Eighth Amendment requirement that our death penalty procedures provide for intercase proportionality review. (*People v. Johnson, supra*, 62 Cal.4th at p. 656; *People v. Lang* (1989) 49 Cal.3d 991, 1043.)

The failure to afford capital defendants at the penalty phase the same procedural safeguards afforded to noncapital defendants does not offend equal protection principles, because the two groups are not similarly situated. (*People v. Whalen* (2013) 56 Cal.4th 1, 91.)

California does not regularly use the death penalty as a form of punishment, and "its imposition does not violate international norms of decency or the Eighth Amendment's prohibition against cruel and unusual punishment." (*People v. Clark, supra*, 52 Cal.4th at p. 1008.)

### III. CONCLUSION

The judgment is affirmed in its entirety.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

I join today's opinion except its holding that the evidence here was sufficient to support the jury's finding of the kidnapping-murder special circumstance. (Pen. Code, § 190.2, subd. (a)(17)(B).)

In addressing a sufficiency challenge, we review the record " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the [special circumstance allegation true] beyond a reasonable doubt.' " (*People v. Boyce* (2014) 59 Cal.4th 672, 691.) The standard is deferential, but the evidence in support of the judgment must be *reasonable, credible, and of solid value*; "a mere possibility" or "[s]peculation is not substantial evidence" (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851). Moreover, we must examine whether the evidence is such that a reasonable jury could find the special circumstance true *beyond a reasonable doubt*.

The court makes two arguments in support of its conclusion that a jury "could reasonably infer" beyond a reasonable doubt "that defendant had not yet decided Kerr's fate after incapacitating her and moving her into the back of her own car" (maj. opn., *ante*, at p. 68) and therefore had "an independent felonious purpose to commit" kidnapping (*People v. Brents* (2012) 53 Cal.4th 599, 608–609 (*Brents*)).

First, the court notes there was a three-hour gap between the time Kerr left Harvey's home and the firefighters' discovery of the burning car containing Kerr's body, and it relies on a statement by Heiserman that Brooks said he (Brooks)

1

strangled Kerr immediately after she left Harvey's home.  (Maj. opn., *ante*, at pp. 66, 68.)  But this is not sufficient evidence from which a reasonable jury could find beyond a reasonable doubt that Brooks had an independent felonious purpose to kidnap Kerr.  Indeed, the prosecution understood the entirety of the evidence to support the theory that Brooks strangled Kerr after she returned to her apartment.  On appeal, the Attorney General's briefing does not deviate from this theory and does not even mention Heiserman's statement in connection with the kidnapping special circumstance, let alone rely on it as a basis for affirming the jury's true finding.  When pressed at oral argument on the timing of events, the Attorney General did not point to Heiserman's statement or any other evidence suggesting when the strangling took place.  Moreover, the record contains no evidence indicating how long Brooks drove around before setting the car on fire.  The evidence is not sufficient for a reasonable jury to infer the timing of the events beyond a reasonable doubt.

Second, the court points to Brooks's "complicated relationship with Kerr" and "fragile mental and emotional state."  (Maj. opn., *ante*, at p. 69.)  This evidence, the court contends, "raised a reasonable inference that defendant was conflicted, confused, and possibly in a state of panic after rendering Kerr unconscious, and that he decided her fate only after having placed her on the floorboard of her car and driven off."  (*Ibid.*)  But this inference is highly speculative and inconsistent with the prosecution's theory of the crime throughout the trial, which was that Brooks had planned to kill Kerr weeks before the crime, specifically by burning her in her car.  In closing arguments, the prosecutor repeatedly stressed "[t]he evidence in this case shows time after time this man is thinking about homicide . . . well beforehand, weeks beforehand."  Not once did the prosecutor suggest that Brooks was in a "state of panic" or unsure about Kerr's

2

fate when he drove away, or that he had some additional motive in transporting her unconscious body.

This is not the first time we have struggled to find sufficient evidence to support a true finding on the kidnapping-murder special circumstance. In *Brents*, *supra*, 53 Cal.4th 599, the defendant and several accomplices beat up Kelly Gordon after an argument over proceeds from a drug sale. The defendant choked Gordon, forced her into the trunk of his car, and told his accomplices, " '[w]e got to take her out . . . because she w[ill] tell.' " (*Id.* at p. 604.) He then drove her 16 miles away, where he doused the car in gasoline and burned Gordon alive. (*Id.* at pp. 604, 609–610.) We rejected the defendant's argument that there was "no evidence of an independent purpose to kidnap Gordon," reasoning that he could have killed Gordon when he initially assaulted her. (*Id.* at p. 609.) The fact that he instead drove her almost half an hour away — and that he "had not mentioned to anyone an intent to burn Gordon alive" — suggested that the defendant "was not sure what he wanted to do with Gordon when he drove away with her in the trunk." (*Id.* at p. 610.) We also noted that the "defendant must have known that by driving [Gordon] such a long distance, he was increasing her terror." (*Ibid.*) If the defendant "took some satisfaction in the terror [Gordon] was experiencing during the drive," we held, then he had an "independent concurrent purpose for the crime of kidnapping." (*Ibid.*)

In reaching this holding, we acknowledged that "the evidence here of an independent purpose to kidnap was weak" and "far from overwhelming." (*Brents*, *supra*, 53 Cal.4th at pp. 614, 611; see *id.* at pp. 619–620 (conc. opn. of Liu, J.).) The evidence in this case is even weaker. Here, unlike in *Brents*, the prosecutor's consistent theory was that the defendant had long before planned to kill the victim, specifically by means of burning her car, and that the defendant had revealed his intent to kill the victim to others weeks before the incident. Nor is there any

3

suggestion, as there was in *Brents*, that the defendant drove the victim to terrorize her, since the parties agree she was unconscious. Finally, whereas the evidence was clear in *Brents* that the defendant drove the victim, while conscious, for at least 30 minutes, the record here contains no evidence regarding the length of time Brooks drove with Kerr's unconscious body.

Further, the jury here was never instructed that in order to find the special circumstance to be true, it must first determine that Brooks had an independent felonious purpose to commit the kidnapping. Brooks did not raise this instructional issue on appeal, and his sufficiency claim requires us to consider only whether a reasonable jury could find the special circumstance true beyond a reasonable doubt. Nevertheless, in this case we cannot even say *this* jury found that Brooks had an independent felonious purpose for the kidnapping, depriving us of the positive inference that is usually implicit when considering a sufficiency challenge to a jury verdict.

The sufficiency standard is deferential but not toothless. Based on the evidence here, I do not see how a reasonable jury could find beyond a reasonable doubt that Brooks had an independent felonious purpose for the kidnapping. Today's opinion reaches a contrary conclusion by relying on characterizations of the evidence not urged by either the prosecution at trial or the Attorney General on appeal. I therefore respectfully dissent from the court's decision to uphold the kidnapping-murder special circumstance finding. In all other respects, I join the court's opinion.

LIU, J.

4

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Brooks

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S099274
**Date Filed:** March 20, 2017

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Warren G. Greene

_____

**Counsel:**

John L. Staley, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Acting Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John L. Staley
11770 Bernardo Plaza Court, Suite 305
San Diego, CA  92128
(858) 613-1047

Allison H. Chung
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2058